## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

John Doe; The Door; Make the Road New
York; New York Immigration Coalition;
Sanctuary for Families; Urban Justice Center,

        Plaintiffs,

v.

U.S. Immigration and Customs Enforcement;
U.S. Department of Homeland Security;
Donald J. Trump, in his official capacity as
President of the United States; Kevin
McAleenan, in his official capacity as Acting
Secretary of Homeland Security; Matthew T.
Albence, in his official capacity as U.S.
Immigration and Customs Enforcement
Deputy Director and Senior Official
Performing the Duties of the Director; Susan
Quintana, in her official capacity as U.S.
Immigration and Customs Enforcement New
York Field Office Director,

        Defendants.

# 19CV8892

Civil Action No. 19-_____

## JUDGE NATHAN

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

        Plaintiffs, who need unfettered access to the courts of New York State to obtain

relief critical to the safety, economic security and liberty of themselves and their clients, by and

through their undersigned counsel, bring this action against Defendants, upon knowledge with

respect to themselves and their own acts and upon information and belief with respect to all other

matters, and allege as follows:

## NATURE OF THE ACTION

    1.     This action challenges, under statutory, constitutional and New York common

law, the legality of U.S. Immigration and Customs Enforcement's ("ICE") policy of carrying out

federal immigration arrests of noncitizens in and around New York state courthouses without judicial warrants. Instead of abiding by the long-standing history of respecting the sanctity of courthouses as a place where victims of crime, criminal defendants, witnesses and participants in civil court proceedings alike can safely seek justice, Defendants exploit the open access and safety provided in New York State courts for their enforcement activities.

2.      ICE abuses the safety and security afforded by state courts for federal immigration enforcement purposes. Despite calls to end this practice from state and local judges, attorneys general and district attorneys, bar associations, legal services providers, public defenders, civil rights groups, anti-violence advocates and legislators, ICE defends this policy, indicating that courthouses are an ideal venue for efficiently and safely arresting noncitizens. ICE has also expressed a retaliatory motive for conducting courthouse arrests in jurisdictions that decline to cooperate with ICE detainer requests.

3.      In January 2017, agents of ICE, a sub-agency of the U.S. Department of Homeland Security ("DHS"), began dramatically increasing arrests and surveillance of noncitizens appearing in state courts, departing from a long tradition of recognizing the sanctity of courthouses. In early 2018, ICE issued Directive No. 11072.1, Civil Immigration Enforcement Actions Inside Courthouses (ICE 2007) (the "Courthouse Arrests Directive"), memorializing its courthouse arrest policy and expressly rejecting limitations on its enforcement powers in courthouses. As has been the expected and intended result of this directive, ICE's courthouse arrests have continued. Indeed, the Immigrant Defense Project has documented an increase of 1736% in ICE courthouse enforcement in and around courts in New York from late

2

2016 to April 10, 2019.[1]  Arrests have even continued despite New York State Office of Court

Administration's ("OCA") April 18, 2019 issuance of a rule prohibiting ICE courthouse arrests

without a judicial warrant in New York State courts.

4.     Known victims of ICE's courthouse arrests have included: criminal defendants;

parents appearing in child support matters; parents appearing in delinquency matters; survivors

of gender-based violence, sexual assault, human trafficking and other crimes.  Groups of plain-

clothes ICE agents use state courts to surveil, identify and even stalk people inside New York

State courthouses and their immediate vicinity, and, once apprehended, place them in civil

immigration detention and removal proceedings.  Since April 2019, for example, ICE officers

have made arrests in the immediate vicinity of the criminal courts in Richmond, Queens and

New York Counties.  Other times, ICE officers have arrested people waiting to appear before a

judge, or, after identifying specific immigrants inside the courthouse, have followed them and

immediately arrested them outside of the courthouse.  In none of these cases was a judicial

warrant tendered.[2]  Other immigrants have been forcibly removed from the state court process

while in court.  At times, removals by plain-clothes ICE agents are so aggressive that bystanders

believe they have witnessed a kidnapping.[3]

5.     Forcibly prevented from continuing to participate in the court process and denied

access to their lawyers, arrested individuals are unable to return to New York state and other

courts, which is highly prejudicial to their ability to participate in court proceedings to vindicate

their legal rights.

---

[1] Immigrant Defense Project, *Safeguarding the Integrity of Our Courts: The Impact of Ice Courthouse Operations in New York State 46-47 (Apr. 10, 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf.*
[2] *Id.* at 46-47.
[3] *Id.* at 46.

6.      In addition to individuals forcibly taken from court, others never make it to court. ICE's courthouse arrests have been widely publicized and are well-known across New York State, including within immigrant communities, creating an atmosphere of fear that has had the effect of keeping countless noncitizens from accessing New York State courts both affirmatively and defensively.  Some decline to continue to participate in an ongoing case, and others are afraid to seek relief altogether.  For example, in many cases, the only way for a noncitizen to obtain lawful status or for a victim of abuse to obtain protection is through participation in state court proceedings.  ICE's courthouse arrest policy dissuades individuals, including the individual plaintiff in this action, from doing just that.

7.      Access to justice has a central importance in our legal system, as reflected in the protections guaranteed under the First, Fifth, and Sixth Amendments of the U.S. Constitution. New York courts have designated courthouses as protective spaces through the application of the common law privilege from civil arrest, and New York court officials expend resources to ensure that all of its residents—including noncitizens—are safe coming to court.  Access to courts is not only an important legal value but also a practical right, as our criminal and civil legal systems are structured around the assumption that individuals will be able to access the courts without fear.  These systems include our immigration system: the Immigration and Nationality Act ("INA") sets forth immigration benefits and grounds for deportation that depend on access to state criminal and civil courts to function effectively.  And historically, immigration authorities recognized that courts are sensitive places for purposes of conducting immigration enforcement; until the last two years, DHS's predecessor agency the Immigration and Naturalization Service ("INS"), later followed by ICE, generally stayed out of courts and issued policies specifically recognizing their special function in American life.

4

8.      In the Courthouse Arrests Directive, ICE claims that its policy to engage in enforcement actions in and around state courts is a response to the decision of states like New York not to honor ICE detainer requests, a "rationale" belied by the fact that ICE arrests noncitizens from courthouses in counties that do honor ICE detainers.  This is not a well-reasoned rationale for adopting this policy, and there is no evidence that Defendants gave any meaningful thought to the impact that courthouse arrests have on the ability of litigants—citizen and noncitizen—to exercise their Constitutional and statutory rights in New York State courts. In particular, Defendants ignore how ICE courthouse arrests undermine Congress's clear intent to afford non-citizens the ability to appear in state courts, unfettered by fear of arrest, to pursue forms of immigration relief that require participation in state court proceedings.  Such forms of relief include, but are not limited to, U and T nonimmigrant visas, relief under the Violence Against Women Act ("VAWA"), and Special Immigration Juvenile Status ("SIJS").  Defendants also did not consider how ICE courthouse arrests delay immigration court proceedings for noncitizens facing criminal charges who need access to state courts to defend themselves and resolve outstanding matters.

9.      ICE's conduct—including its adoption of a policy that deliberately makes civil immigration arrests of state court participants – violates the many constitutional protections that relate to access to courts and justice, as well as the New York common law immunity for civil arrest afforded to court participants.  Furthermore, by disregarding these legal protections, and by ignoring the ways in which obstructing court access undermines other important policy objectives, ICE is acting contrary to the INA and in a manner that is arbitrary and capricious.

10.      As a result of Defendants' policy of arresting noncitizens in and around New York State courts, Defendants have violated and continue to violate Plaintiffs' federal statutory

5

and constitutional, and New York common law, rights.   Plaintiffs seek injunctive and declaratory relief against ICE's unlawful and unconstitutional policy of surveilling and arresting noncitizens while they are coming to, attending and returning from court.   The policy should also be set aside under the Administrative Procedure Act because it is arbitrary and capricious and violates federal law.

11.    In addition, Plaintiffs seek an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the Plaintiffs' claims under the U.S. Constitution and federal law, and has supplemental jurisdiction over claims arising under New York state law.  The United States has waived sovereign immunity for purposes of this case pursuant to 5 U.S.C. § 702.

13.    The declaratory and injunctive relief that Plaintiffs seek is authorized under 28 U.S.C. §§ 2201 and 2202.

14.    Venue is proper in the district under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because Defendants are officers or employees of the United States acting in their official capacities and agencies of the United States, a substantial part of the acts or omissions giving rise to this Complaint arose from events occurring within this judicial district, and Plaintiffs Make the Road New York, Urban Justice Center, Sanctuary for Families, The Door and New York Immigration Coalition have their principal places of business in this district.

15.    The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201 and 2202, and its inherent equitable powers.

## PARTIES

### *Individual Plaintiff*

16.     Plaintiff John Doe is a citizen of both Venezuela and Spain.  Mr. Doe came to the United States approximately four years ago and has resided in New York City ever since.  He does not currently have lawful immigration status in the United States.  Although he is in need of an order of protection against his abusive former partner, he has not commenced an action in New York State family court for an ex parte order of protection because he fears being arrested by ICE when appearing in court.

### *Organizational Plaintiffs*

17.     Plaintiff Make the Road New York ("MRNY") is an association of approximately 23,000 immigrant members residing in New York City, Long Island and Westchester County and is dedicated to building the power of immigrant, Latinx and working-class communities in New York to achieve dignity and justice.  MRNY has offices in Brooklyn, Queens, Staten Island, Suffolk County and Westchester County.  MRNY brings this action on behalf of itself, a nonprofit, membership-based § 501(c)(3) organization.

18.     MRNY's staff includes lawyers, community organizers, health advocates and adult literacy professionals, among others.  MRNY integrates adult and youth education, legal and survival services and community and civic engagement in order to support low-income New Yorkers in improving their own lives and neighborhoods.

19.     MRNY has a legal department staffed by approximately twenty-eight attorneys and nineteen advocates and paralegals who provide a broad range of civil legal services to immigrant New Yorkers.  MRNY's immigration legal team represents immigrants facing deportation as well as immigrants filing affirmative applications for immigration benefits, such as T and U Visas, Violence Against Women Act ("VAWA") self-petitions, asylum, Deferred

7

Action for Childhood Arrivals ("DACA") renewals, hardship waivers, adjustment of status, SIJS applications and naturalization. MRNY's organizers counsel and advocate for families affected by ICE enforcement activities including enforcement activities in and in close proximity to courthouses.

20.     Plaintiff Urban Justice Center ("UJC") is a social justice advocacy organization that represents clients in family, civil and immigration proceedings in New York State and before the federal agencies and courts. Its principal place of business is in Manhattan, but it also provides on-site services to victims of family-based violence and trafficking in the City-run Family Justice Center in Queens, which is located a block from the Queens county criminal court. UJC brings this action on behalf of itself, a nonprofit, § 501(c)(3) organization, and on behalf of its clients.

21.     UJC also engages in systematic advocacy, community education and political organizing. Approximately 35-40% of UJC's clients are noncitizens.

22.     UJC is composed of thirteen distinct Projects, which support clients in the areas of tenants' rights and housing justice, immigrants' rights and workers' rights, among others. UJC also provides extensive civil legal representation and clinical services to victims of domestic violence and human trafficking. UJC's staff includes attorneys, community organizers, social workers, researchers and policy analysts.

23.     Plaintiff Sanctuary for Families ("SFF") is New York's largest dedicated service provider and advocate for adult and child survivors of domestic violence, sex trafficking and related forms of gender violence. Its principal place of business is in Manhattan. SFF brings this action on behalf of itself, a nonprofit, § 501(c)(3) organization, and on behalf of its clients.

24.     Seventy-five percent of SFF clients are immigrants, and of those, many are either undocumented or partially documented.  SFF staff communicate with clients in over thirty languages in eleven locations throughout New York City, including New York City-run Family Justice Centers located in proximity to various state courts.

25.     Each year, SFF provides legal, clinical, shelter and economic empowerment services to approximately 15,000 survivors and their children.  SFF employs 50 attorneys and an additional 30 staff members who work exclusively with survivors of domestic violence, sex trafficking and other forms of gender violence.  SFF provides direct representation to survivors in connection with a number of legal needs, including immigration, family court and housing court matters.

26.     SFF provides training and engages in outreach and advocacy on issues related to domestic violence and sex trafficking to community advocates, pro bono attorneys, law students, service providers and the judiciary.  SFF also advocates for policies and legislation around issues affecting survivors of domestic violence and sex trafficking.

27.     Plaintiff The Door is an organization that provides comprehensive youth development services in the New York City area.  Among other services, including family law, public benefits and landlord-tenant law, The Door represents young people in immigration matters, including direct representation of clients applying for special immigrant juvenile status ("SIJS"), asylum, U and T visas and other forms of humanitarian relief, and one of its core missions is to obtain lawful immigration status and a pathway to permanent residency and citizenship for young immigrants in New York City and the surrounding areas. Its principal place of business is in Manhattan.  The Door brings this action on behalf of itself, a nonprofit, § 501(c)(3) organization, and on behalf of its clients.

28.    The Door's Legal Services Center provided services for 1,173 clients in 2017, 915 of whom were immigrants.  In 2018, 793 of Legal Services Center's 1,067 clients were immigrants.  Most of the Door's clients are low-income and do not speak English, making it extremely difficult for them to sue on their own behalf.  The Door has represented children in SIJS applications for more than 20 years.

29.    Plaintiff New York Immigration Coalition ("NYIC") is an umbrella policy and advocacy organization that represents more than 200 immigrant and refugee rights groups in New York State.  NYIC's mission is to unite immigrants, members and allies so all New Yorkers can thrive.  NYIC's principal place of business is 131 West 33rd St., New York, NY 10001.

30.    NYIC serves as an advocate for laws, policies and programs that support all immigrant groups and give them access to justice and opportunity.  NYIC consists of more than 200 dues-paying 501(c)(3) nonprofit organizations committed to immigrants' rights work.  NYIC's members are located both in and out of New York State.  The organizations include grassroots community groups, social services providers, large-scale labor and academic institutions and organizations working toward economic, social and racial justice.  Many NYIC member organizations receive funding from the local, state and federal government in order to provide social service, health and education programs.

31.    Organizational Plaintiffs MRNY, UJC, SFF, The Door and NYIC have each expended significant resources to mitigate the institutional and individual harms caused by ICE's courthouse arrests.  As set forth below, they have spent considerable time and resources training and preparing their staff to advise clients and members about, and how to manage, the consequences of ICE's courthouse arrests.  Organizational Plaintiffs have also been involved in developing and providing community trainings for vulnerable noncitizen groups that fear and/or

10

are at risk of arrest by ICE. ICE's courthouse arrest policy has also rendered Organizational

Plaintiffs' direct representation of their clients much more difficult by requiring them to spend

time advising and counseling about the risks of courthouse apprehensions, time that would

otherwise be spent on addressing substantive legal issues; making it difficult to meet with clients

due to their fear of appearing at or near courthouses; and limiting the options of clients for

certain types of judicial and immigration relief that require appearances in court. This policy

thus harms the missions and operations of Organizational Plaintiffs in myriad ways, as well as

the interests of their clients and members.

***Defendants***

32.     Defendant Donald J. Trump is the President of the United States. He is sued in

his official capacity.

33.     Defendant Kevin McAleenan is the Acting Secretary of Homeland Security. He

is sued in his official capacity.

34.     Matthew T. Albence is the Acting Director of U.S. Immigration and Customs

Enforcement. He is sued in his official capacity.

35.     Susan Quintana is the New York Field Office Director of U.S. Immigration and

Customs Enforcement. She is sued in her official capacity.

36.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet

department of the United States federal government. Its mandate includes the administration of

the interior enforcement provisions of the Nation's immigration laws. DHS developed the

Administration's policy on courthouse arrests and publicly released a memorandum describing

the policy. Agents of DHS execute courthouse arrests in the courts of New York.

37.     Defendant U.S. Immigration and Customs Enforcement is a sub-agency of DHS.

Its mandate is the administration of the interior enforcement provisions of the Nation's

immigration laws.  Agents of ICE execute courthouse arrests in New York courts and in close

proximity thereto.

## LEGAL FRAMEWORK

### I.     Fundamental Constitutional and Common Law Rights to Access State Courts.

38.     Numerous provisions of the U.S. Constitution safeguard access to the courts for

U.S. citizens and non-citizens alike:

- a.     The Due Process Clause of the Fifth Amendment of the U.S. Constitution forbids the federal government from depriving an individual of life, liberty or property without due process of law.  Due process includes the right to access state courts and to participate in state court proceedings as a witness, party or complainant;

- b.     The Petition Clause of the First Amendment to the U.S. Constitution guarantees the right of petition, which includes the right to petition the Government for a redress of grievances.  This right to petition includes right to access state courts and to participate in state court proceedings as a witness, party or complainant;

- c.     The Sixth Amendment to the U.S. Constitution guarantees defendants in criminal prosecutions the right to a speedy and public trial, compulsory process, assistance of counsel and to be confronted with witnesses against them.

39.     Aside from these constitutional protections, New York courts have recognized a

common law privilege of immunity from civil arrest in and around courthouses for over 100

years as an essential element of access to justice.  *See, e.g.*, *Parker v. Marco*, 136 N.Y. 585, 589

(1893) (the common law immunity is not "simply a personal privilege, but it is also a privilege of

the court, and is deemed necessary for the maintenance of its authority and dignity and in order

to promote the due and efficient administration of justice."); *Person v. Grier*, 66 N.Y. 124, 125

(N.Y. 1876) ("It is the policy of the law to protect suitors and witnesses from arrests upon civil

process while coming to and attending the court and while returning home.").  *See also Stewart*

*v. Ramsay*, 242 U.S. 128, 130 (1916) ("Courts of justice ought everywhere to be open,

accessible, free from interruption, and to cast a perfect protection around every man who

necessarily approaches them") (internal citation and quotations omitted).

12

II.     **Authority for Federal Immigration Enforcement.**

40.     The Immigration and Naturalization Act, 8 U.S.C. §§ 1101 *et seq.*, as amended

("INA") authorizes civil immigration arrests and governs removal proceedings.  Pursuant to 8

U.S.C. § 1357(a)(2), ICE may detain an alien without a warrant if ICE has "reason to believe that

the alien . . . is in the United States in violation of any [immigration] law or regulation and is

likely to escape before a warrant can be obtained for his arrest."  DHS has promulgated

regulations that govern its enforcement activities. *See, e.g.*, 8 C.F.R. §§ 287.1-12.

41.     The statute thus gives the government the same type of civil-arrest authority that

had historically been used to institute civil proceedings. *See INS v. Lopez-Mendoza*, 468 U.S.

1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to

remain in this country").  The statute today, as in 1952, when it was enacted, gives no indication

that the authority Congress granted differs in any way from the civil-arrest authority that existed

at common law—including the limitation privileging those attending court on official business

from civil courthouse arrest.

42.     Soon after his inauguration as President, Donald Trump issued Executive Order

13,768, entitled "Enhancing Public Safety in the Interior of the United States" ("EO 13,768").

EO 13,768 abandoned deportation prioritization programs employed by both the George W.

Bush and Obama administrations, and called instead for the deportation of any and all deportable

people from the United States (over12 million human beings), and a near-tripling of ICE's

deportation force.  EO 13,768 encouraged ICE and U.S. Customs and Border Protection ("CBP")

agents to engage in immigration enforcement against noncitizens who "[in] the judgment of an

immigration officer, otherwise pose a risk to public safety or national security."  EO 13,768 is

silent as to process, supervisor review or judicial review for these enforcement decisions.  EO

13,768 was implemented on February 20, 2017 in a DHS memorandum.

III.   **Congressional Limits on Federal Immigration Enforcement Activities.**

43.   In the INA, Congress grants authority to Defendants to pursue immigration enforcement.  But equally important, the INA's statutory scheme limits Defendants' enforcement authority.  The immigration system established under the INA – both the affirmative benefits available to obtain lawful status and the removal process – depends in large part on unfettered noncitizen access to state courts.

44.   Congress has designated state courts to play a critical role in establishing eligibility for various affirmative immigration benefits through several provisions of the INA added by both VAWA and the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA").

45.   VAWA was originally enacted in 1994 to address congressional concerns about violent crime, and violence against women in particular.  VAWA affords benefits to abused foreign nationals and allow them to obtain lawful status independently of the U.S. citizen or legal permanent resident ("LPR") relatives who originally sponsored them.  In enacting VAWA, Congress recognized that cooperation between noncitizen survivors of violence and law enforcement is critical in prosecuting violent crime.  *See, e.g.*, *Violence Against Women: Fighting the Fear Before the Comm. on the Judiciary*, 103rd Cong. 4 (1993) (statement of Sen. William S. Cohen) ("The Violence Against Women Act, is designed to both increase public awareness of the magnitude of the problem and also to enhance law enforcement and prevention efforts").

46.   8 U.S.C. § 1101(a)(51) affords victims and survivors of intimate partner violence committed by a U.S. citizen or LPR spouse or parent the ability to petition for their own immigration status relief under VAWA (known as a "VAWA self-petition").  8 U.S.C. § 1186a(c) enables noncitizens with conditional LPR status to apply to remove the conditions on

their immigration status without the assistance of their spouse through a battered spouse waiver, evidence in support of which may include court documents demonstrating battery or extreme cruelty by an applicant's spouse. However, this form of relief relies upon safe passage through the state courts: obtaining a family court or criminal court order of protection against an abuser is often a prerequisite to making a VAWA self-petition. Now, due to fears of an immigration arrest in state court, survivors eligible for relief under 8 U.S.C. § 1101(a)(51) or 8 U.S.C. § 1186a(c) cannot safely separate from their abusive partners and seek family law and immigration legal assistance.

47.    ICE's actions are directly at odds with VAWA, created to enable survivors to pursue legal remedies outside of an abusive relationship without fear of jeopardizing their legal status. Congress passed VAWA, in part, to "increase the availability of legal assistance necessary to provide effective aid to victims of domestic violence, stalking or sexual assault who are seeking relief in legal matters arising as a consequence of that abuse or violence, at minimal or no cost to the victims." H.R. Conf. Rep. 106-939. Legal assistance includes assistance in immigration matters, protection or stay away order proceedings and other similar matters. H.R. Conf. Rep. 106-939. By arresting survivors at courthouses, ICE violates the basic purpose of VAWA, both by scaring immigrants away from courthouses and by inhibiting the delivery of legal assistance to survivors.

48.    Moreover, pursuant to 8 U.S.C. § 1186a(c), noncitizens with conditional LPR status who are victims of gender-based violence perpetrated by a U.S. citizen or LPR spouse can apply to remove the conditions on their immigration status without the assistance of their spouse through a battered spouse waiver, evidence in support of which may include court documents demonstrating battery or extreme cruelty by an applicant's spouse.

15

49.     ICE's courthouse arrest policy also conflicts with the implementation, and undermines the effectiveness, of other provisions of VAWA. The Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), attached as an amendment to VAWA in 2013, created distinct paths to lawful immigration status for victims of crime and human trafficking who assist law enforcement.

50.     In particular, 8 U.S.C. § 1101(a)(15) (U) establishes U Visas as a category of immigration benefit for victims of crime who cooperate with law enforcement. Cooperating with law enforcement typically requires appearances in state criminal or family court. In passing this provision, Congress intended to incentivize immigrants to participate in criminal investigations and prosecutions. Without unfettered access to state courts, many U visa applicants cannot establish their eligibility for statutory relief.

51.     In addition, 8 U.S.C. § 1101(a)(15)(T) establishes T Visa status for victims of human trafficking. Victims of trafficking are often arrested and face criminal charges for activities they are forced to do by their traffickers. In those cases, arrest represents the beginning of a path to escape from traffickers and connection with social and legal services, including immigration counsel. If people eligible for T Visas are unable to appear in criminal court, they will struggle to obtain T Visas and the criminal operations of traffickers cannot be exposed.

52.     8 U.S.C. § 1101(a)(27)(J), added through the TVPRA of 2008 and amended in 2013, establishes SIJS, a form of humanitarian immigration relief for which certain vulnerable young people are eligible. Obtaining SIJS is conditioned upon having a state family court order that makes certain findings about a juvenile's family and custodial situation and his or her inability to return to his or her country of origin. Young people unable to appear in state court cannot obtain SIJS. 8 U.S.C. § 1101(a)(27)(J)(i)-(ii).

53.     ICE has directly acknowledged the limitations proscribed by Congress on its

removal authority.  ICE Directive No. 10036.1, issued on January 22, 2007, describes the

background of VAWA and status and recognizes courthouses as "sensitive locations" similar to

domestic violence shelters, rape crisis centers and other similar settings, and requires

"certificates of compliance" with certain procedures from ICE officers who seek to conduct

enforcement activities in such locations.  Specifically, the directive states:

> The certificate of compliance requirements reflects **congressional intent** that ICE
> proceed cautiously when making an arrest or otherwise physically encountering
> an alien at one of the sensitive locations without objective evidence that the alien
> is in the United States in violation of the immigration laws and that victims of
> battery, abuse, trafficking, and extreme cruelty be protected.

(emphasis added).[4]

54.     Before the Trump Administration took office in January 2017, Congressional

protections of victims and survivors limited ICE enforcement against them.  Since January 2017,

as set forth in this Complaint, ICE enforcement has taken place in family courts, human

trafficking courts and criminal courts.

## IV.     New York State and Local Laws Protect Noncitizens' Access to Public Services and Limit Federal Immigration Enforcement Activities.

55.     Immigrants have long been an essential part of the social fabric of New York

State.  As of 2014, New York State was home to nearly 4.4 million immigrants, composing

---

[4]     *See also* Memorandum from John Morton to Field Office Directors et al. (Oct. 24, 2011) (on file with ICE), http://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf (directing ICE to continue to preserve potential VAWA applicants' access to the courts specifically and defining "sensitive locations" using a non-exhaustive list that should be read to encompass state courts and notes specifically that "particular care should be exercised with any organization assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities."); Memorandum from David Aguilar to Assistance Commissioner, Office of Air and Marine et al. (Jan. 18, 2013) (on file with FOIA Library), https://foiarr.cbp.gov/streamingWord.asp?i=1251 (describing and providing a non-exhaustive list of certain "community locations" as locations where ICE supervisors should "consider alternative measures that could achieve the enforcement objective without causing significant disruption to the normal activities or operations at the identified location" and instructing ICE agents to seek guidance if an enforcement action is planned near a location "not specifically listed above but that may be similar in nature, description, or function" to those locations listed therein).

approximately 22% of the State's total population, second only to California. In New York City alone, over 35% of the population consisted of immigrants in 2014 and almost a third of American-born children have at least one parent who is foreign-born.

56.    New York has long recognized that, given the size and economic contribution of the noncitizen population, including undocumented immigrants, noncitizens must be able to safely report crimes and rely on law enforcement. In New York City, the last five mayoral administrations have implemented and/or upheld policies that limit civil immigration enforcement in connection with municipal functions and services, and in particular public safety functions and services. These policies were adopted in recognition of the fact that such policies preserve the health, education and safety of all New Yorkers. For instance, Executive Orders 34 and 41, adopted in 2003 and still in effect today, promote access to City services for all immigrants, including undocumented immigrants, by requiring City employees to protect the confidentiality of a person's immigration status and other kinds of personal information. There are also several City policies and laws that require City agencies providing direct public services to provide meaningful translation services and language access to accommodate immigrant populations.

57.    New York State has likewise adopted policies designed to protect the ability of all immigrants to participate in public life, including participation in state courts. In April 2018, Governor Andrew Cuomo expanded Executive Order No. 170 through Executive Order 170.1 to increase protections against civil immigration arrests in state facilities and to prohibit state agencies from inquiring about individuals' immigration status. In taking this action, Governor

Cuomo stated, "The reckless and unconstitutional practices ICE is deploying in our communities violate everything we believe in New York and are an assault on our democracy."[5]

58.      On April 17, 2019, the OCA promulgated Directive No. 1-2019, which requires ICE agents to provide federally issued warrants or judicial orders in order to execute arrests inside New York State courthouses.  Despite affirmative actions taken by New York State to protect unfettered access to its courts, ICE agents have arrested noncitizen litigants in the immediate vicinity of New York State courthouses without judicial warrants since the OCA Directive was issued.

## SUBSTANTIVE ALLEGATIONS

### I.      ICE's Courthouse Arrests Are Blunt, Dangerous and Illegal Tools in its Unbridled Immigration Enforcement Efforts.

59.      President Trump has publicly and frequently spoken about his administration's goal of conducting mass deportations of immigrants who are removable from the United States, including through an expansion of ICE and CBP, the agencies primarily responsible for immigration enforcement and deportation.  EO 13,768 and the February 20, 2017 DHS memorandum implemented this goal by simply prioritizing the removal of any and all noncitizens who may be removable for any reason.  At the time EO 13,768 was issued, the federal government recognized that in order to carry out this substantial increase in immigration enforcement activities, it would be required to also increase federal resources devoted to immigration enforcement, including a near-tripling of ICE's capacity.

60.      In early 2017, as part of its efforts to execute the Trump administration's broad deportation agenda, ICE greatly expanded its surveillance and arrests of noncitizens in and

---

[5]      Governor's Press Office, "Governor Cuomo Issues Cease and Desist Letter to ICE" (Apr. 25, 2018), https://www.governor.ny.gov/news/governor-cuomo-issues-cease-and-desist-letter-ice.

around state courthouses through a civil arrest process largely devoid of judicial warrants, officers who identify themselves, and other law enforcement norms. The frequency of these arrests has escalated since President Trump's inauguration and has now become a regular occurrence in New York State, creating widespread fear among noncitizens in New York and beyond. This federal policy abuses state courts and commandeers state court resources to carry out federal immigration enforcement activities.

61.     After legal practitioners, judges and communities around the country began speaking out against the increase in ICE's courthouse arrests, the Trump Administration made several public statements in defense of ICE's surveillance and arrest of immigrants in and around state courthouses. For instance, on March 29, 2017, then Homeland Security Secretary John Kelly and Attorney General Jefferson Sessions sent an open to letter to Hon. Tani G. Cantil-Sakauye, Chief Judge of the California Supreme Court, defending ICE's policy of conducting courthouse arrests and stating adamantly that ICE would continue these operations. In this letter, they admitted that conducting immigration enforcement activities in state courthouses used the state's resources for the benefit of the federal government and was therefore an efficient and effective way to make civil immigration arrests: "[b]ecause courthouse visitors are typically screened upon entry to search for weapons and other contraband, the safety risks for the arresting [ICE] officers and persons being arrested are substantially decreased."[6]

62.     On April 4, 2017, a DHS spokesperson announced publicly that ICE agents would continue to arrest individuals attending court, including witnesses and victims: "Just because they're a victim in a certain case does not mean there's not something in their background that

---

[6] Letter from John Kelly, Homeland Security Secretary, and Jefferson Sessions, Att'y Gen., to Hon. Tani G. Cantil-Sakauye, Chief Judge, Cal. Supreme Court (March 29, 2017), https://www.politico.com/f/?id=0000015b-23c8-d874-addf-33e83a8c0001.

could cause them to be a removable alien[.] Just because they're a witness doesn't mean they might not pose a security threat for other reasons."[7]  Notably, this statement was made after a survivor of gender-based violence in Texas, who had just received an order of protection from the court, was arrested by ICE in a state courthouse.  DHS and other Trump Administration officials have continued to make similar public remarks, culminating in the release of the written memorialization of their policy on courthouse raids on January 10, 2018.

## II.    ICE Memorialized its Illegal Courthouse Arrest Policy in the January 10, 2018 Directive.

63.     On January 10, 2018, DHS released the Courthouse Arrests Directive, an internal operating memorandum issued to its agents regarding its policy on courthouse arrests and raids.  The Courthouse Arrests Directive instructs ICE agents to continue to conduct surveillance and arrest operations against those coming to, attending, and leaving state courts.

64.     While this Directive ostensibly sets parameters for ICE's courthouse arrests, it merely cross-references back to the wide-ranging, undefined and unsupervised discretion set forth in EO 13,768 and other immigration-related Executive Orders issued by the Trump Administration.  The Directive ultimately places no restrictions on the courts ICE agents may enter or the types of court proceedings the agents may disrupt for purposes of making civil immigration arrests.

65.     In particular, the Directive states that ICE civil immigration enforcement actions "inside courthouses include actions against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, [etc.] when ICE officers or agents have

_____

[7] Devlin Barrett, *DHS: Immigration Agents may Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post (April 4, 2017), https://www.washingtonpost.com/world/national-security/dhsimmigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-98871a5314b56a08_story.html?utm_term=.d3cbacf93414.

information that leads them to believe the targeted aliens are present at that specific location."[8] However, it is not limited to those categories of person. The Directive further provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "target alien[s]…will not be subject to … enforcement action, *absent special circumstances*," (emphasis added), but does not define or give any parameters whatsoever to what constitute "special circumstances."[9]

66.    The Directive further states that "ICE officers and agents should generally avoid enforcement actions in courthouses, or areas within courthouses that are dedicated to non-criminal (e.g., family court, small claims court) proceedings" and that "[w]hen practicable" ICE agents will seek to "minimize their impact on court proceedings," but contains no specific procedures or guidance for doing so.[10] Indeed, in ICE's Frequently Asked Questions on courthouse arrests—which is structured as questions followed by ICE's responses—one of the eight questions asked is: "Is there any place in a courthouse where enforcement will not occur?" ICE replies neither "yes" nor "no."[11] Instead, the memorandum specifically instructs agents to use "the court building's non-public entrances and exits[,]" and to work in "collaboration with [State] court security staff."[12]

67.    The Courthouse Arrests Directive formalizes the Trump Administration's policy that ICE use state courthouses to arrest anyone suspected of a civil immigration violation—including criminal defendants, victims, witnesses and parties to civil proceedings. However, because Congress never abrogated the longstanding and well-settled common-law privilege

---

[8] Directive No. 11072.1, Civil Immigration Enforcement Actions Inside Courthouses at 1 (ICE 2007), https://www.ice.gov/sites/default/files/documents/Document/2018/ciEnforcementActionsCourthouses.pdf
[9] *Id.* at 1.
[10] *Id.* at 1-2
[11] U.S. Immigration and Customs Enf't, *FAQ on Sensitive Locations and Courthouse Arrests*, https://www.ice.gov/ero/enforcement/sensitive-loc (last updated Sept. 25, 2018).
[12] *Id.*

against such arrests. Congress never authorized ICE to conduct civil courthouse arrests. The INA does not grant the federal government the authority to conduct civil courthouse arrests in violation of the common-law privilege, and so ICE's policy of conducting such arrests exceeds ICE's statutory authority.

68.     Moreover, ICE's policy is fundamentally inconsistent with the statutory scheme for ICE's enforcement activities and ICE's own prior policies, which intended that ICE exercise caution when carrying out enforcement activities at sensitive locations and that ICE be constrained in carrying out enforcement activities of vulnerable persons, including victims and survivors of abuse and trafficking. These policy objectives are not reflected or adhered to in the text of the Courthouse Arrests Directive or the manner in which ICE has carried out courthouse arrests since the beginning of 2017. Instead, victims of abuse and trafficking, including Mr. Doe and clients and members of Organizational Plaintiffs, are effectively kept out of New York state courts and chilled from seeking protections as a result of ICE's courthouse arrest policy and its failure to abide by the clear congressional mandate.

## III.     State and Federal Legal and Law Enforcement Officers Publicly Criticize ICE's Courthouse Arrest Policy

69.     On December 12, 2018, a group of 68 former state and federal judges from 23 states issued a letter to ICE's acting director, urging ICE to explicitly add courthouses to its list of "sensitive locations" where immigration enforcement efforts by the agency are generally barred. This letter cited myriad ways in which ICE's courthouse arrests impede the effective administration of justice and make noncitizens fearful of appearing in court, thereby rendering them vulnerable to exploitation and making communities less safe overall.[13]  The letter stated

---

[13] Letter from Wallace B. Jefferson, Chief Justice of the Supreme Court of Texas, et al., to Ronald D. Vitiello, Acting Director of U.S. Immigration and Customs Enforcement (Dec. 12, 2018), https://www.scribd.com/document/395488473/Letter-From-Former-Judges-Courthouse-Immigration-Arrests.

"[j]udges simply cannot do their jobs—and our justice system cannot function effectively—if victims, defendants, witnesses, and family members do not feel secure in accessing the courthouse…ICE's reliance on immigration arrests in courthouses instills fear in clients and deters them from seeking justice in a court building."[14]

70.     Two members of this group—Judge Jonathan Lippman, former Chief Judge of the New York Court of Appeals, and Wallace B. Jefferson, former Chief Justice of the Supreme Court of Texas—reiterated their objections to ICE's courthouse arrest practices in a December 19, 2018 article in *The Hill* newspaper, stating:

> When fear limits access to courts, public safety is imperiled. Our legal system must guarantee that people seeking or aiding justice will not be discouraged from petitioning the courts.  Courthouse arrests also make justice more difficult to administer. . . Safe admittance to courthouse[s] preserves justice. As chief judges for our states, we worked hard to achieve that goal. For many, access to our justice system is now in doubt because of ICE's courthouse arrests. Without a shared understanding that everyone may access courts without fear, public safety is compromised, and our democracy's guarantees are unfulfilled.[15]

71.     State district attorneys and attorneys general have likewise publicly rebuked ICE for preying on immigrants in and around state courts, and have pointed to the threat to the administration of justice and to public safety, and the broad disruption to the functioning of the courts.  In February 2018, the Manhattan, Brooklyn and Bronx District Attorneys jointly appeared at a press conference to implore ICE to stop arresting noncitizens in New York State courthouses.  Brooklyn District Attorney Eric Gonzalez said that ICE courthouse arrests do "not keep us safe."[16]  They "jeopardize[] public safety."[17]  This group also cited the chilling effect of

---

[14] *Id.*

[15] Jonathan Lippman & Wallace B. Jefferson, ICE Director Should Make Courthouses Safe for All, The Hill (Dec. 19, 2018), https://thehill.com/opinion/immigration/421899-ice-director-should-make-courthouses-safe-for-all.

[16] Erin Durkin, *City DAs Plead with ICE to Stop Arresting Immigrants at NYC Courthouses: 'It Jeopardizes Public Safety'*, New York Daily News (Feb. 14, 2018), http://www.nydailynews.com/new-york/city-das-press-ice-stop-arresting-immigrants-courthouses-article-1.3820798.

[17] *Id.*

ICE courthouse arrests on witnesses' willingness to come forward, with Manhattan District Attorney Cy Vance explaining that because noncitizens cannot appear in New York state courts "without fear of getting arrested… critical witnesses and victims in cases don't proceed with important prosecutions, and New Yorkers are less safe because of it."  In April 2019, the District Attorneys of Middlesex and Suffolk Counties in Massachusetts, Marian Ryan and Rachael Rollins, respectively, among other plaintiffs, recognized that "entire communities now view the Massachusetts courts as places where they cannot go, for any reason," which has "greatly imped[ed] access to justice and undermin[es] the administration of justice in these communities."[18]  District Attorneys Ryan and Rollins commenced proceedings in federal court for injunctive relief barring ICE from making civil arrests in and around courthouses, which the Massachusetts district court granted on June 2019.[19]

72.     ICE's courthouse arrest policy and practice undermines the stated policies of New York State, New York City and localities throughout the State to ensure noncitizen residents have safe and complete access to the justice system, including state courthouses themselves. Indeed, by ICE's own admission, this policy is a reaction to and reprisal for policies protective of immigrant communities like those that have long been in place in New York.  ICE's "Frequently Asked Questions" on Sensitive Locations and Courthouse Arrests states that its systematic use of courthouse arrests, and the formalization of that policy in the Courthouse Arrests Directive, are necessary due to "the increasing unwillingness of some jurisdictions to cooperate with ICE in the safe and orderly transfer of targeted aliens inside their prisons and jails."[20]

---

[18] Complaint, Ryan v. U.S. Immigration & Customs Enf't, No. 19-11003-IT (D. Mass. Apr. 29, 2019), ECF No. 1.
[19] *Ryan v. U.S. Immigration & Customs Enf't*, __ F. Supp. 3d __, No. 19-11003-IT, 2019 WL 2553664 (D. Mass. June 20, 2019).
[20] U.S. Immigration and Customs Enf't, *FAQ on Sensitive Locations and Courthouse Arrests*, https://www.ice.gov/ero/enforcement/sensitive-loc (last updated Sept. 25, 2018).

IV. **ICE's Courthouse Arrest Policy Disrupts the Functioning of New York's Courts and Imperils Public Safety.**

73.     ICE does not disclose the frequency of, or details concerning, its civil courthouse arrests in New York. Nevertheless, Plaintiffs have attempted, through their own and others' observations of ICE in New York courts, to understand the extent and nature of ICE's presence in New York courts. ICE officers are regularly present in New York State courts such that appearing in a New York State court requires exposing oneself to the possibility of civil ICE arrest.

74.     On information and belief, on the day of a courthouse raid, squads of anywhere from two to twelve ICE agents wearing plain clothes and displaying no law enforcement identification approach a courthouse. Some of them stay outside, some of them enter. They typically have some information about the person they intend to arrest, though there have been reports of collateral arrests. Agents arrive with the name of their intended arrestee, which they use to check court date and courtroom information. They will wait in or around that courtroom and listen for the name to be called. By watching an individual appear before the court, ICE agents are able to identify their arrest target. Once identified, agents arrest the individual either in the courthouse or as he or she is leaving the building. Some people are arrested on their way *into* court. ICE has information about these individuals in advance, including their home addresses, vehicle numbers and photographs.

75.     ICE agents almost never have a judicial warrant or court order when making a civil immigration arrest in or around a courthouse. They sometimes possess an administrative warrant, though rarely show the warrant unless asked, or refuse to show the administrative warrant, even to those they arrest or their counsel. At the time of an arrest, plain clothes agents often do not identify themselves until well after they have made a seizure, and even after they

26

have taken the person into custody, handcuffed them and placed them inside an ICE vehicle, which is often unmarked.  It is common for ICE personnel to identify themselves as federal immigration agents for the first time only at this point in the arrest process.

76.     ICE agents use force and excessive force during courthouse raids.  For example, in an incident outside of the courthouse complex near Borough Hall in Brooklyn, New York, plain-clothes ICE agents shouted after a young man leaving the criminal court.  When the young man ran, ICE agents tackled him to the ground.  Up to this point, they had never identified themselves as law enforcement officers or as ICE agents.  The young man's pregnant companion resisted the agents. They threw her to the ground and put him into a car.  Only at this point did they notify the young man that they were ICE agents.

77.     ICE agents regularly arrest vulnerable groups in and around courthouses.  Agents arrest survivors of violence and sexual violence, young people, trafficking victims and even pregnant women.  The arrests take place in criminal, family and civil courts.  They take place inside courtrooms, in vestibules, in hallways, in private areas, in elevators, in entranceways and on sidewalks.  They take place by agents stopping people's cars when they are on their way to or from court.

78.     ICE carries out courthouse arrests at all stages of legal proceedings—at arraignments and other initial appearances, as well as at subsequent appearances.  They take place often outside the presence of counsel.  In many cases, individuals were arrested as they were on their way to meetings with their lawyers.  In almost every case, ICE does not notify counsel that their clients are going to be arrested.  Even where counsel asks to speak with their clients, ICE often refuses to grant them access.

79.     In response to the severe disruption caused by ICE's courthouse arrest policy in

New York State courts, thoroughly documented by the statements and experiences a range of

stakeholders set forth in the April 10, 2019 *Safeguarding the Integrity of Our Courts: The Impact

of Ice Courthouse Operations in New York State* report, the New York OCA issued Directive No.

1-2019 on April 17, 2019, requiring ICE agents to provide a federally issued warrant or judicial

order in order to execute arrests inside a New York State courthouse.[21] Yet notwithstanding that

directive, ICE continues to arrest noncitizens coming to or leaving the courthouse.

### A.     ICE's Courthouse Arrests Impede Individuals' Access to Justice.

80.     Individuals affected by ICE's courthouse arrests come from a variety of

backgrounds, both in terms of their immigration statuses and the business that brings them before

the courts of New York State.

81.     *Criminal Defendants*.  Many noncitizens affected by ICE for courthouse arrests,

including clients and members of Organizational Plaintiffs, are criminal defendants, who like all

such defendants enjoy the presumption of innocence and the right to participate with their

counsel in their defense.

82.     The outcomes of removal proceedings for those who face criminal charges are

dependent on court access.  By arresting noncitizen criminal defendants, DHS causes criminal

charges to remain unresolved, which can lead to arrest warrants for failure to appear in criminal

court (for example, if they are in ICE detention).  An open and unresolved criminal matter will

be a strong adverse factor in an immigration bond redetermination hearing and when seeking a

discretionary form of relief in removal proceedings, making it harder for noncitizens to obtain

---

[21] Immigrant Def. Project, *Safeguarding the Integrity of Our Courts : The Impact of ICE Courthouse Operations in New York State* (Apr. 10, 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf.

release, return to their homes and families and resolve the pending criminal case. In determining whether to release individuals from immigration custody or grant relief from removal, immigration judges consider pending criminal charges as significant adverse factors. Additionally, when determining whether to strip a permanent resident of his or her lawful status based on past criminal conduct, immigration courts rely upon convictions found by criminal courts.

83.     ICE's presence in New York's courts has created a chilling effect on the willingness of these individuals to attend their own court appearances and pursue robust defenses of their cases, contrary to their own legal interests and the efficiency interests of the courts. Many noncitizen defendants are so fearful of risking potential exposure to ICE when appearing in court that they prioritize their own liberty over pursuing a vigorous defense of their criminal charges. As a result, and even after being advised of the potential immigration consequences, many noncitizen defendants choose to take a plea at arraignments or agree to pleas on less favorable terms, rather than negotiating a better plea, carrying out a full investigation of their case or taking their case to trial. Others forego participating in criminal proceedings altogether, which can be particularly harmful for nonimmigrants with minor criminal issues that could otherwise be easily resolved with a court appearance and that, as a result, escalate into open arrest warrants that can have much more detrimental effects, including on immigration status.

84.     ICE's courthouse arrests also greatly impede the ability of criminal defendants to participate in problem-solving courts, such as the Queens Human Trafficking Intervention Court ("HTIC"), where Plaintiff SFF represents survivors of sex trafficking. Defendants are less willing to enter such programs in the first place because they typically require additional court appearances, which create more opportunities for these individuals to be arrested by ICE. These

are not hypothetical fears – ICE has conducted enforcement operations against those having their cases adjudicated before the HTIC. Plaintiff SFF has observed a significant chilling effect among its noncitizen clients who have appearances in HTIC, which often results in the clients refusing to appear in court and subsequently not being connected the services and programs the HTIC offers.

85.     *Crime Victims and Witnesses*. Noncitizen victims and witnesses of crimes are also targets of ICE's courthouse arrests and, as a result, are fearful of coming forward to report criminal activity or to continue with existing cases. For example, Plaintiff SFF represents a minor client who was raped and wanted to cooperate with law enforcement to testify against her rapist in court. The client, whose mother is undocumented, knew her mother would accompany her to court. The client refused to testify because she feared her mother would be arrested by ICE.

86.     The district attorneys of the Bronx, Manhattan and Brooklyn have all publicly spoken out about the chilling effect of ICE's courthouse arrests on the willingness of victims and witnesses to come forward and participate in criminal cases. Brooklyn District Attorney Eric Gonzalez has identified several cases his office could not prosecute due to the unwillingness of witnesses or victims to appear in court out of a fear of being arrested by ICE. In one example, District Attorney Gonzalez surmised that ICE's courthouse arrests have chilled the ability and willingness of undocumented workers to come forward with evidence and participate in his office's current large-scale investigation of construction violations in New York City, thereby hindering the overall investigation and prosecution of this case.

87.     Data collected by prosecutors' offices and defender organizations lay bare the reality of the chilling effect of ICE's conduct in New York's courts. The Immigration Units of

the Kings County and Nassau County District Attorney's Offices have experienced precipitous declines in caller volumes to their immigration hotlines since ICE intensified its courthouse arrest efforts in 2017. Calls to the Kings County Immigration Affairs Unit ("IAU") hotline declined from 431 calls in 2016 to only 132 calls in 2017 and 142 calls in 2018. In Nassau County, calls to the IAU hotline decreased 96% in 2017. In 2018, calls to the Nassau IAU hotline were only 16% of pre-2017 levels. In Queens County, IAU calls declined from 358 calls in 2017 to 277 calls in 2018. Moreover, the Mayor's Office to Combat Domestic Violence, now known as the Mayor's Office to End Domestic and Gender-Based Violence ("ENDGBV") reported a 10% decline between 2016 and 2017 in the number of new foreign-born clients visiting New York City's Family Justice Centers.

88.    *Participants in Civil Court Proceedings*.  ICE's courthouse arrests are not limited to New York's criminal courts.  ICE has also targeted individuals appearing in family court, including: victims of gender-based violence seeking orders of protection; parents trying to secure child support payments, custody, visitation and guardianship rights; Persons in Need of Supervision findings, or abuse or neglect findings; and young people applying for SIJS, seeking findings of abuse or neglect against their parents or with appearances in juvenile delinquency proceedings.

89.    Plaintiff John Doe is one such individual who has been effectively kept out of family court and unable to pursue robust protection from his abuser due to his fear of ICE's courthouse arrests.

90.    Mr. Doe was in a relationship with his former partner, a legal permanent resident of the United States, for approximately three years.  Mr. Doe's ex-partner was physically and verbally abusive, which led Mr. Doe to end the relationship in or around August 2018.  Prior to

leaving his former partner, Mr. Doe and his partner had been living together.  After a particularly

aggressive outburst by his former partner, Mr. Doe fled their shared home, leaving behind many

of his belongings, including his passports, which had expired.

91.     After Mr. Doe fled, his former partner harassed him through email, text message

and voicemail for several months, and threatened to report to ICE that Mr. Doe was

undocumented, claiming that he had a direct connection through a family member who worked

for ICE.  These threats became so severe and traumatizing that Mr. Doe quit his job and moved

apartments to avoid being located by his former partner.

92.     In approximately September 2018, Mr. Doe's former partner sued Mr. Doe in

small claims court for alleged expenses incurred during the course of their relationship.  In

addition to the harassing and threatening messages he had been sending Mr. Doe for many

months, Mr. Doe's former partner also began sending intimate photos of Mr. Doe to his sister in

Venezuela and threatened to distribute the photos more broadly if Mr. Doe did not pay him the

amount claimed in the small claims court action.

93.     Terrified of appearing in court and being arrested by ICE, Mr. Doe sought counsel

from the New York City Anti-Violence Project ("NYCAVP").  Mr. Doe and his lawyer at

NYCAVP considered seeking an *ex parte* order of protection against Mr. Doe's former partner,

which is the typical course of action to protect a victim of domestic violence against an abuser.

However, such an order requires the petitioner to appear in family court.  Mr. Doe was so afraid

of being arrested by ICE when appearing in court that he decided against seeking an order of

protection.

94.     In approximately December 2018, Mr. Doe's attorney from NYCAVP appeared

in small claims court on Mr. Doe's behalf, as Mr. Doe was too afraid of being arrested by ICE to

32

appear himself. At this court appearance, opposing counsel presented photocopies of Mr. Doe's expired passports and announced that ICE officers were present in the courtroom and "ready to go." The small claims action against Mr. Doe was dismissed with prejudice that day.

95.     Though the threats and harassment against Mr. Doe by his former partner have subsided, he still does not feel safe and cannot be sure whether his former partner will try to find, harass, threaten and/or abuse him again. Were it not for his fear of being arrested by ICE when appearing in court, Mr. Doe would seek an order of protection in family court against his former partner, which he cannot obtain without appearing in court.

96.     The specter of ICE's presence in New York's courts also extends to housing courts. To avoid having to appear in court and risk being apprehended and arrested by ICE, many noncitizen tenants, including clients and members of Organizational Plaintiffs, decline to sue their landlords for repairs and instead continue to live in deplorable and unsafe conditions. Similar to the pressures faced by noncitizen criminal defendants, in an effort to avoid ICE in housing court during a court appearance, noncitizen tenants feel pressured to resolve housing court cases as quickly as possible and not ask for a new court date to seek advice of counsel. This, in turn, often results in tenants unknowingly waiving defenses and counterclaims, signing judgment agreements with unjust terms (*e.g.*, inaccurate amounts of rent arrears, overly harsh probationary periods, unnecessary move-out agreements from rent-stabilized or rent-controlled apartments) or being unnecessarily evicted from their homes, among other adverse consequences.

97.     Ultimately, as a result of the widespread fear of ICE's courthouse arrests, a broad range of noncitizen residents of New York, including clients of Organizational Plaintiffs, have been much more reluctant to pursue relief for which they are eligible, seek protection against

their abusers, continue cooperating with law enforcement in the prosecution of their abusers and/or vindicate their rights before the court. This fear often takes a severe emotional and psychological toll on these individuals, many of whom, believing they may be deported if they seek relief in the courts, decide to remain in abusive relationships and are subjected to continued psychological and physical violence. This dynamic, in turn, can lead to individuals needing to seek medical treatment and/or take time off work, which takes an economic toll on these individuals and their children.

98.     Because of the fear of having their immigration status used against them if they seek recourse from their abusers through the legal system, these individuals, many of whom have often already suffered personal crises and trauma, are put in the untenable position of choosing between staying in an abusive relationship or dangerous living situation or appearing in court, which they fear may lead to being arrested by ICE, deported and/or losing custody of their children. Others who are no longer in abusive relationships often still suffer economically as they are too afraid to appear in court to seek child support, spousal support and equitable distribution in a divorce. Still others are unable to see their children because of fear of seeking visitation, custody or guardianship. ICE's courthouse arrest policy deprives noncitizen residents of New York of a safe judicial forum in which to assert their rights, often thereby forcing them to endure abuse that violates New York law.

**B.     ICE's Courthouse Arrests Harm Organizational Plaintiffs and Interfere with Organizational Plaintiffs' Representation of their Clients and Counseling of their Members.**

99.     As a result of ICE's courthouse arrests, Organizational Plaintiffs MRNY, SFF, UJC, The Door and NYIC have been harmed in myriad, concrete ways and have had to divert time and resources from other core organizational activities to a range of activities that they would not otherwise undertake, including: counseling clients and members regarding their fears

34

of ICE courthouse arrests and those who have been personally affected by courthouse arrests; advising clients and members regarding alternative forms of relief that do not require participation in court processes; and developing internal and external trainings and protocols to manage risks around ICE's courthouse arrest policy.

100.   *Additional Time Spent Advising and Counseling Clients, Members and Community Members*.  Organizational Plaintiffs' direct assistance to and legal representation of their clients, members and community members has been severely impacted by ICE's courthouse arrests.  Organizational Plaintiffs are now required to spend time dealing directly with the aftermath of courthouse arrests in the communities they serve, as well as counseling clients about their fears of ICE's courthouse arrests, which time would otherwise be spent addressing substantive legal issues for their clients.  Moreover, in the current environment where ICE's courthouse enforcement tactics are widespread and carried out without warning, Organizational Plaintiffs encounter challenges in building strong cases due to the unwillingness of noncitizen witnesses and their clients' family members to appear in court out of fear of being arrested by ICE.  Additionally, the ability of Organizational Plaintiffs to pursue zealous claims and defenses on behalf of their clients is severely impaired in the current environment, as Organizational Plaintiffs must weigh the benefits of court appearances with the serious risk of arrest by ICE in or around courthouses.

101.   Plaintiff MRNY staff have observed the widespread fear ICE's courthouse arrest policy creates among its clients, members and the broader communities that MRNY serves.  MRNY has tallied and provided support in over 25 instances of courthouse arrests over the past two years.

102.    This fear requires MRNY to expend additional time and resources counseling clients, members and the community on ICE's courthouse arrests.  MRNY organizers spend considerable time counseling families who have had members violently apprehended from outside state courthouses by ICE.  In addition, when MRNY attorneys and advocates advise or answer questions from clients and members subject to removal about their legal options in a range of contexts, the risk of ICE enforcement enters the calculus of which options to pursue. The complicated nature of these consultations and the high stakes involved pose considerable challenges for MRNY, especially when a given client or member is required to appear in court (for example in response to a criminal court summons) but doing so could put her at risk of being arrested by ICE.

103.    On the organizing and community response side, to coordinate and manage its response to enforcement actions impacting clients and members, a significant proportion of which are ICE courthouse arrests, MRNY has dedicated the resources of several attorneys; community organizers, including one organizer dedicated full-time to raids response work since 2017, and several paralegals and immigration "navigators" who would otherwise devote this time and resources to other projects related to MRNY's core mission.  From approximately the fall of 2017 to the fall of 2018, MRNY employed a rotating assignment system for members of its legal team to act as "on call" immigration experts, on top of their normal workloads, to help address questions and concerns related to ICE courthouse arrests and other enforcement actions impacting clients and members.  In the fall of 2018, MRNY replaced this system with a legal fellow dedicated to providing raids response support and, a year later, hired a full-time raids response attorney.

104.    Attorneys at Plaintiff SFF who represent clients in family court, housing court, HITC, the Supreme Court of New York and New York State criminal court must now spend considerable additional time advising their noncitizen clients of the risks of attending court proceedings given the possibility of being arrested by ICE.  This has created an atmosphere of heightened anxiety and lowered morale for SFF staff and its clients alike and has significantly increased the workload of SFF attorneys in connection with these cases.  For example, SFF represented a noncitizen client from China whose son was taken back to China by her abusive husband who refused to return the child.  After several years of separation, in 2018 the client learned that her son was back in the United States.  Her counsel at SFF advised her of potential legal remedies, including seeking custody of her son through a petition in family court and filing for relief through a writ of habeas corpus.  However, the client was extremely fearful of being apprehended by ICE when appearing in court and she was initially reluctant to pursue these remedies for many months.  Only after SFF expended additional resources counseling the client and engaging in safety planning to prepare for the possibility of the client being arrested by ICE did the client ultimately seek, and was awarded, temporary custody of her son after nearly 4 years of separation.  This fear of being arrested by ICE when appearing in court intensified and compounded the severe trauma this client had already suffered.

105.    SFF advises clients who are the victims of violence in numerous locations around New York City, including in the City-run Family Justice Centers, and has had to spend time and resources counseling and even accompanying clients to court, including in matters where clients appear *pro se*.  Simply getting clients to leave the Family Justice Center to walk a block or two to the courthouse nearby can be a terrifying experience for a client fearing ICE enforcement.  Often the client asks the SFF advocate to accompany them to court for fear of arrest.  ICE's policy of

37

arresting non-citizens in and around courthouses has therefore impeded SFF's clients' willingness to appear before a judge and has required SFF to provide additional support to their clients so they can vindicate their rights in court.

106.     Because of the heightened fear and suspicion created by ICE's courthouse arrests, attorneys at Plaintiff UJC have been required to become involved in a much wider range of cases, diverting time and resources away from their core mandates.  UJC's immigration attorneys are now frequently brought in to consult with UJC clients involved in family court and housing court matters regarding the potential immigration consequences of being arrested when appearing in court.  In addition, since early 2017, UJC's family law attorneys have regularly conducted family preparedness workshops and consultations for clients represented by UJC attorneys in other practice areas, as these clients are afraid of being arrested by ICE when appearing in court.  In response to ICE's courthouse arrests and the widespread fear it has generated among UJC's noncitizen clients, UJC attorneys have prepared advocacy letters for clients, attended court proceedings with clients and spent significant additional time advising clients and their family members about the risks of appearing in New York State courts, all of which they would not have done absent the risks posed by ICE's courthouse arrests.

107.     ICE's courthouse arrests have required Plaintiff The Door to devote more resources on matters involving clients in family court than previously was necessary.  In SIJS guardianship cases, for example, The Door's attorneys now spend time counseling potential guardians about the risk presented by ICE's courthouse arrest policy, and in some instances have even been required to change their case strategy, necessitating more attorney resources.  For example, in an effort to spare prospective guardians who are fearful of ICE's courthouse arrest

policy from the need to go to court for fingerprinting, as often required in a SIJS application, The Door now routinely writes lengthy motions to waive the New York state requirement.

108.    In addition, obvious candidates for guardianship of The Door's clients, such as the clients' parents, are so afraid of the risk of deportation posed by ICE's courthouse arrests that they have refused to act as guardians, which is not only highly disruptive to families but also requires The Door to spend significant amounts of time finding new guardians.  For example, The Door represented two children seeking SIJS status whose mother refused to act as a guardian, requiring the children to move twice before a suitable guardian could be found.  Addressing these issues can substantially prolong the time it takes to resolve a case and therefore slows the entire guardianship process.  Because The Door receives its funding in part based on how many cases the organization resolves in a given year, these time delays threaten The Door's funding.

109.    Plaintiff NYIC rely on NYIC to provide advocacy for their communities and needs, which has been made more difficult by ICE's courthouse arrest policy.  NYIC's mission is to bolster immigrant community members' capacity to deal with a wide range of issues that arise for immigrants in everyday life.  However, NYIC has had to increasingly direct its time and resources towards addressing the frequent crises that arise as a result of ICE's presence in and around New York state courthouses.  Time that could be spent providing counseling and advocacy for other issues must instead be spent fighting against ICE's courthouse arrest policy, including organizing rallies, discussion forums, bar association events and other methods to raise awareness.  ICE courthouse arrests thus limit NYIC's ability to provide legal services in other areas.  Instead of being able to move its agenda forward, NYIC is forced to act on the defensive, straining its resources and causing additional burdens on its staff.

110.    NYIC has also devoted dozens of hours to pass legislation that would prevent ICE from making arrests in courthouses.  In addition, when a particularly aggressive ICE arrest or incident has occurred, NYIC has had to spend considerable resources participating in press conferences, fielding press calls and reaching out to elected officials in order to publicize the event and raise awareness of the effect of ICE's courthouse arrest policy.  NYIC has diverted resources away from its other work as a service coordinator in order to rapidly respond to these issues.

111.    Organizational Plaintiffs have also suffered consequences as a result of ICE's courthouse arrests when representing noncitizen clients in connection with other civil matters. Housing lawyers at Organizational Plaintiffs have been required to spend additional time counseling endangered tenants who are considering initiating cases or responding to cases brought against them by landlords.  Organizational Plaintiff UJC, for example, has begun attending tenant association meetings around New York City to address concerns among noncitizens about ICE's courthouse arrests, which is not something it did prior to the onset of ICE's courthouse arrest policy in 2017.

112.    *Limits on and Impediments to Certain Types of Relief*.  The work of Organizational Plaintiffs in representing survivors of domestic violence and human trafficking has been severely impacted and impaired by ICE's courthouse arrest policy.  In the current climate, advocates are unable to assure clients that they can safely seek protection from the courts without risking arrest by ICE, exacerbating their clients' trauma and anxiety.  Some Organizational Plaintiffs have observed that due to the presence of ICE in New York State courthouses, their clients have less trust in New York's courts and law enforcement institutions,

40

a trend that undermines hard-won advances for the rights of victims and survivors over the last several years, which Organizational Plaintiffs have been instrumental in achieving.

113.    Moreover, abusers are increasingly emboldened to threaten their victims and survivors with arrest by ICE if they appear in court, and, whereas Organizational Plaintiffs used to be able to dismiss these threats as highly unlikely to result in ICE arrest, they can no longer do so. The obstacles that Organizational Plaintiffs now face in being unable to reassure their clients that they should be safe from ICE if they seek protection from New York State courts undermine their core missions of ensuring that their vulnerable clients can safely seek access to justice. These clients, in turn, often suffer from heightened physical, emotional and financial abuse, as they believe their abuser's threats are legitimized and that they will be deported if they seek protection through the legal system.

114.    As a result of ICE courthouse arrests, SFF attorneys have had to balance their clients' often urgent needs for legal protection from abuse against the risk of ICE arrest that may befall them when pursuing those remedies. SFF has observed a noticeable chilling effect on the willingness of noncitizen survivors to access the New York State justice system as a result of ICE's courthouse arrests. Since early 2017, SFF clients have been significantly more reluctant to take any course of action that would require participating in court proceedings.

115.    For example, many of Plaintiff SFF's clients who are survivors of domestic violence are potential witnesses in criminal cases against their abusers. But since early 2017, SFF has observed that these clients have increasingly refused to appear in court and make police reports due to ICE's courthouse arrests. These clients are also fearful of meeting with state prosecutors in New York City because their offices are close to courthouses, where they fear ICE is lurking. SFF attorneys are frequently asked by clients to accompany them to court

41

appearances and meetings with law enforcement, which SFF attorneys cannot always do given the many competing strains on their time and resources.

116.    Many of UJC's noncitizen clients are eligible for forms of immigration and humanitarian relief, including VAWA self-petitions, U visas, T visas and asylum.  However, this relief hinges upon the client's participation in court processes, which may be stymied by a client's fear of an ICE courthouse arrest.  One UJC client eligible for VAWA relief decided not to seek help due to her fears of encountering ICE.  She became so overwhelmed by her fears of sudden deportation that she fled New York without contacting UJC.  When an ICE officer, who had been sitting in the back of the courtroom, followed and arrested another UJC client outside the courthouse it sent a wave of panic through the court and the community.  Such episodes confirm the worst fears and paranoias of UJC clients and those clients' communities, making it more difficult for UJC to provide its clients with the services they need to obtain relief through the justice system.  UJC clients need assistance with civil legal matters, such as filing for custody of children, obtaining orders of protection or filing for divorce, but now they are much more reluctant to pursue relief that requires appearances in New York State courts.  They are much less willing to act as complaining witnesses in ongoing criminal cases against their abusers.  ICE courthouse arrests scare UJC clients and their family members out of filing for guardianship proceedings,  which destabilizes families and forestalls viable immigration remedies.

117.    UJC's representation of clients who are survivors of human trafficking has been harmed and complicated in a number of ways by ICE's courthouse arrests.  UJC frequently represents such clients in seeking vacatur of prostitution-related convictions under New York law, a critical step for these individuals to rebuild their lives.  However, as a result of the widespread fear of ICE's courthouse arrests, UJC has observed that its clients are generally much

less willing to seek this relief, which requires appearing in criminal court. UJC must expend additional resources in order to address clients' fears of encountering ICE for those eligible for vacatur relief. For example, UJC attorneys must now frequently accompany clients to District Attorney meetings that do not require the presence of an attorney. Survivors eligible for T visas, many of whom have open warrants and criminal cases stemming from their trafficking, are often too fearful of returning to court to resolve those matters because of the prospect of ICE being at the courthouse. This creates a barrier to relief as USCIS will not adjudicate immigration applications without a final disposition of these criminal matters. The profound fear of ICE in the courts often continues even after clients are granted T visas. For example, UJC recently expended substantial additional time and resources counseling two different clients with T visas regarding their receipt of juror subpoenas, which required an appearance in New York County criminal court, of which these clients were terrified.

118.    ICE's courthouse arrest policy has also interfered with the ability of The Door to pursue family court proceedings providing for the placement of vulnerable children with trusted guardians. ICE's courthouse arrest policy has deterred trusted, capable and otherwise willing adults to serve as guardians for The Door's clients, out of fears of ICE arrest while appearing in family court to complete the guardianship application process. ICE's courthouse arrest policy has had real and severe impacts on the well-being of The Door's clients and has also had ripple effects for their clients' immigration status. Without guardians, The Door cannot assist its clients to pursue citizenship through SIJS. When delays identifying a guardian put clients at risk of aging out of SIJS (which is available until the age of 21), The Door has been forced to initiate applications for other forms of relief, such as asylum, which require additional resources, compound delays and expose The Door's clients to additional risks and hardship.

119.    Attorneys at each of Organizational Plaintiffs have faced and continue to face difficulties where clients arrested by ICE have open family court cases.  Organizational Plaintiffs are unable to offer their clients or witnesses on behalf of their clients in family court proceedings, jeopardizing their chances of success in family court.

120.    In addition, Organizational Plaintiffs face obstacles in zealously pursuing affirmative family court cases because they cannot assure clients that they can safely participate in these proceedings without being at risk of arrest by ICE.  Attorneys at each of the Organizational Plaintiffs represent clients in family court in connection with SIJS proceedings. These cases require all members of the SIJS applicant's household to be fingerprinted and for the applicant's proposed guardian to appear in family court.  Organizational Plaintiffs now face obstacles in meeting these requirements where their SIJS clients' household members and proposed guardians are noncitizens and afraid of ICE's presence in courthouses.  Organizational Plaintiffs' SIJS-eligible clients themselves are also less willing to file for SIJS out of fear that they or their loved ones will be arrested by ICE when appearing in family court.

121.    Before initiating SIJS cases, Organizational Plaintiffs must now allocate more attorney time and resources to assessing its clients' household members who may be at higher risk for removal.  Where household members are at risk, attorneys from the Organizational Plaintiffs must work with other attorneys and organizations to secure independent counsel for these individuals.  Before ICE's courthouse arrest policy was instituted, household members generally would appear *pro se*; many are now too fearful to appear in court without an attorney. Because the participation of these individuals is necessary for their clients to obtain SIJS, the fear of ICE's courthouse arrests among their clients and families has often resulted in considerable case delays, taxing the time and resources of their attorneys.

122.    Ultimately, the crippling fear of ICE courthouse arrests among noncitizens residents of New York has required Organizational Plaintiffs to consider and pursue alternative forms of relief and remedies for their clients outside of court processes, which often results in clients foregoing the most robust protections and relief for which they would be eligible.

123.    *Additional Resources Spent on Developing New Trainings and Protocols.*  Due to widespread fear and concern among their clients and members about ICE's presence and enforcement actions in New York State courts, Organizational Plaintiffs have expended significant resources on developing new internal and external practices and materials regarding preparation for and responses to ICE's courthouse arrests.

124.    In 2017, in response to ICE's increasingly aggressive enforcement tactics in courthouses and elsewhere, Plaintiff MRNY began to create a set of rapid response resources and protocols to work with and support its clients and members impacted by ICE arrests.  Through these initiatives, when a MRNY community member impacted by an ICE courthouse arrest contacts MRNY, MRNY works with impacted family members to provide orientation and information about detention and deportation proceedings.  MRNY also advises families about potential eligibility for assigned counsel programs and/or assists in making legal referrals to alternative counsel.  Often MRNY provides additional emergency legal support.  Since late 2017, MRNY has provided this type of assistance in dozens of cases involving courthouse arrests.

125.    In connection with these initiatives, MRNY has also dedicated additional resources to creating new trainings and guidance to educate and prepare its staff to manage the consequences of ICE arrests, including courthouse arrests.  Because of widespread fear of courthouse arrests, MRNY organizers and attorneys also devote time to counseling impacted community members and their families who fear detention should they attend court and

educating MRNY clients and members and other members of the public about ICE arrests and

detentions in Know Your Rights presentations.  MRNY has also dedicated resources to

broader-based advocacy against courthouse arrests, including participating in coalitions,

speaking at press conferences and preparing and working with impacted members of the public

to testify about their fears and experiences.  The resources MRNY has devoted to these

initiatives are diverted from its other organizational activities.

126.    Plaintiff SFF has likewise diverted and continues to divert valuable resources

from its normal-course activities to dedicate additional time to discussing with its attorneys the

challenges caused by ICE courthouse arrests, specifically how to advise SFF's clients about their

rights and remedies now that ICE is routinely present in and around New York State courts.  SFF

staff have also been involved in conducting external trainings for *pro bono* counsel and

community groups regarding ICE's courthouse arrest policy.

127.    Plaintiff UJC has likewise dedicated and continues to dedicate considerable

attorney time to providing "Know Your Rights" trainings to community groups and individual

counseling regarding the risks of ICE's courthouse arrests.  Given the diverse profiles and needs

of UJC's clients, and the fact that UJC clients are often involved in multiple legal proceedings at

the same time, the impact of ICE's courthouse arrests has been felt across all of UJC's 13

projects.  As a practical matter, ICE policies hampered UJC's ability to provide its services at its

own offices, some of which are located in Family Justice Centers and in the same buildings as

District Attorneys' offices, and have required UJC to relocate its trainings and consultations.

Furthermore, the legal teams in each of UJC's projects have been required to coordinate and

consult with one another in other ways that were previously unnecessary, since ICE's courthouse

arrests threaten clients' ability to safely participate in all manner of New York State court legal proceedings.

128.    Plaintiff The Door has had to develop new internal trainings that show its attorneys how to counsel guardians about the new risks that ICE's arrest policy creates.  These trainings focus on the guardians' immigration status and were generally unnecessary prior to ICE's policy of conducting arrests in and around courthouses.

129.    NYIC conducts a 40-hour training program in order to help members become accredited members of the Board of Immigration Appeals.  NYIC has now had to divert two to three hours of this training on ICE courthouse arrests, specifically how to counsel clients who are afraid of ICE arrest in and around courthouses and what steps to take if service providers encounter ICE while in or around a courthouse.

130.    In addition to these challenges and the institutional diversion of resources caused by ICE's courthouse arrests, one of Organizational Plaintiffs' core missions – to provide zealous legal representation to their clients, regardless of their immigration status – is fundamentally frustrated by this policy.  ICE courthouse arrests have led to a breakdown in communication and trust between attorneys and court staff, including judges.  This communication breakdown has severely interfered with clients' representation and exercise of rights and hampered Organizational Plaintiffs' operations and their ability to help ensure their vulnerable and marginalized clients can safely seek access to justice.

C.    **ICE Commandeers State Resources to Carry Out Courthouse Arrests.**

131.    ICE relies on and coopts the resources of New York State by using state court facilities as a locus of its federal immigration enforcement and arrest operations.  New York expends resources to create a courtroom environment that adjudicates important rights in a safe

and secure setting.  ICE then exploits the vulnerability of individuals in this environment.  ICE

explicitly notes on its website that it conducts enforcement efforts inside state courthouses in

order to take advantage of the safety measures undertaken by state law enforcement officers:

"Individuals entering courthouses are typically screened by law enforcement personnel to search

for weapons and other contraband."[22]  New York State is providing security personnel at

courthouses to ensure that employees and visitors to the courts feel safe.  ICE improperly

leverages these security services to more easily effectuate arrests, without regard to how their

actions undermine broader public safety goals.  Moreover, ICE agents exploit the vulnerability of

individuals in state courthouses by using non-public areas of New York courthouses to make

arrests, as has been documented in Unusual Occurrence Reports prepared by Office of Court

Administration personnel[23] and witnessed by defendants and bystanders.  Indeed, the Courthouse

Arrests Directive specifically directs ICE agents to make arrests in non-public areas of

courthouses and to use other non-public facilities of the courts, such as private elevators.

132.    In addition to their use of the physical facilities of state courthouses, ICE

commandeers New York court officers to facilitate their enforcement activities.  ICE's

courthouse arrests have required New York courts to implement protocols and train staff to

accommodate and address this practice.  Moreover, because courthouse arrests are frequently

carried out in a disruptive manner in which ICE agents exert physical force, court staff are

required to monitor the disruption, cordon off space and restrain bystanders, ICE's arrest targets,

and attorneys.  ICE also routinely asks court officers and clerks for information about arrest

---

[22] U.S. Immigration and Customs Enf't, *FAQ on Sensitive Locations and Courthouse Arrests*,
https://www.ice.gov/ero/enforcement/sensitive-loc (last updated Sept. 25, 2018).
[23] Pursuant to the April 2019 OCA directive, "UCS court security personnel shall file an Unusual Occurrence Report
for each law enforcement action taken in a New York State courthouse by a law enforcement agency covered by this
protocol. For purposes of this protocol, 'law enforcement action' shall include observation of court proceedings by
law enforcement agents acting in their official capacity."  New York OCA, Directive No. 1-2019, para. 2, April 17,
2019.

targets from state court files. There have been reported instances of ICE asking New York court officers to change the timing of an arrest target's court appearance in order to facilitate an arrest. ICE has also relied on the time and resources of court interpreters to assist its agents in communicating with its arrest targets and other individuals whom ICE arrests collaterally.

133.    ICE's courthouse arrests also tax the resources of New York's state court judges who are required to manage the consequences of courthouse arrests as part of their adjudications of cases involving arrested noncitizens. This includes making decisions about whether to notify defense attorneys if their clients have been or will be arrested, dealing with the impact of noncitizen defendants being arrested by ICE on speedy trial time, adjudicating petitions for writs of production once an individual has been arrested mid-case and entertaining unconventional bail applications.

## V.    ICE's Courthouse Arrests Erode Trust In New York's Judiciary and Among Stakeholders.

134.    The impact of ICE's courthouse arrests on the aforementioned stakeholders has led to a fundamental breakdown of trust in New York's courts, which were heretofore recognized as places where people could safely seek justice. Trust has eroded between the community and the justice system as a whole, as well as between court staff, judges and the defense bar. ICE's practice of running roughshod over New York's courts interferes with the mission of these institutions and the daily functions of court-appointed counsel, who are integral to that mission and a significant fixture in the court system. It has also precipitated a loss of faith in and legitimacy of the courts of New York in the eyes of the public at large.

135.    The administration of justice in New York's courts is impeded in myriad ways as a result of ICE's courthouse arrests, including waste of finite court resources, as well as the resources of district attorneys' offices and the defense bar.

136.    The functioning of the court system is also hampered by the reluctance of noncitizen victims of crime and other forms of violence and exploitation to participate in the justice system due to their fear of being arrested by ICE if they come forward and appear in court.  In addition, ICE's courthouse arrests have necessitated a significant expenditure of resources by the nonprofit advocacy community, including advisory councils and other bodies that are convened to support the functioning of state courts.

## CAUSES OF ACTION

### Count One
### Violation of the Fifth Amendment to the U.S. Constitution – Due Process

137.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138.    U.S. citizens and noncitizens are guaranteed the right to due process under the Fifth Amendment to the U.S. Constitution, which includes the rights to access state courts and to participate in state court proceedings as a witness, party or complainant.

139.    Defendants' unlawful surveillance and arrests of noncitizens in and around New York state courts violate the constitutionally-protected liberty interests of Plaintiff Doe and the clients and members of Organizational Plaintiffs to adequately, effectively, and meaningfully access the courts of the state of New York.

140.    As a proximate result of Defendants' conduct, Plaintiff Doe and the clients and members of Organizational Plaintiffs have suffered prejudice, actual and substantial hardship and irreparable injury.

141.    Plaintiffs have no adequate remedy at law.

**Count Two**
**Violation of the First Amendment to the U.S. Constitution**

142.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

143.    U.S. citizens and noncitizens are guaranteed the right of petition under the First Amendment to the U.S. Constitution, which includes the right to petition the Government for a redress of grievances.  This right to petition includes right to access state courts and to participate in state court proceedings as a witness, party or complainant.

144.    Defendants' unlawful surveillance and arrests of noncitizens in and around New York state courts violate the rights of Plaintiff Doe and the clients and members of Organizational Plaintiffs to engage in constitutionally-protected conduct under the First Amendment, including accessing the courts of the state of New York and petitioning such courts for redress of their grievances.

145.    Defendants' conduct also unlawfully interferes with the constitutional rights of Organizational Plaintiffs to effectively and fully carry out their duties as officers of the court, by impeding the ability of Organizational Plaintiffs to provide legal services to and representation of their clients before the courts of New York to the fullest extent of their organizational missions, and professional and ethical obligations, in violation of the First Amendment.

146.    As a proximate result of Defendants' conduct, all Plaintiffs and the clients and members of Organizational Plaintiffs have suffered prejudice, actual and substantial hardship and irreparable injury.

147.    Plaintiffs have no adequate remedy at law.

**Count Three**
**Violation of the Sixth Amendment to the U.S. Constitution**

148.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.    Under the Sixth Amendment to the U.S. Constitution, U.S. citizen and noncitizen defendants in criminal prosecutions are guaranteed the right to a speedy and public trial, compulsory process, assistance of counsel and to be confronted with witnesses against them.

150.    Defendants' unlawful surveillance and arrests of noncitizens in and around New York state courts prevent criminal defendant clients and members of Organizational Plaintiffs from fully and freely participating in state court proceedings in which they are defendants in violation of their rights under the Sixth Amendment.

151.    As a proximate result of Defendants' conduct, Organizational Plaintiffs have suffered prejudice, actual and substantial hardship and irreparable injury.

152.    Plaintiffs have no adequate remedy at law.

**Count Four**
**Violation of the Common Law Immunity Against Civil Arrest While**
**Coming to, Attending, and Returning from Court**

153.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

154.    New York law recognizes a longstanding common-law privilege from civil arrest for witnesses, parties and other individuals attending courts.  This privilege is also recognized by federal courts, including the Supreme Court, and federal and state courts enforce the privilege on behalf of each other.

155.    Defendants' unlawful surveillance and arrests of noncitizens in and around New York state courts violate the New York common law privilege that protects witnesses and parties

from civil arrest while they are voluntarily attending unrelated court proceedings and when traveling to and from those proceedings.

156.    As a proximate result of Defendants' conduct, Plaintiff Doe and the clients and members of Organizational Plaintiffs have suffered prejudice, actual and substantial hardship and irreparable injury.

157.    Plaintiffs have no adequate remedy at law.

## Count Five
## Violation of the Administrative Procedure Act

158.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159.    The Administrative Procedure Act ("APA") prohibits federal action that is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," *id.* § 706(2)(A), and that is taken "without observance of procedure required by law," *id.* § 706(2)(D).

160.    Defendants' policy of surveilling and arresting noncitizens in and around New York State courthouses is a final agency action subject to review under the APA.  This policy violates the longstanding common law privilege against civil arrest in and around courthouses without a judicial warrant and is therefore "not in accordance with law."  It also misinterprets and/or violates the First, Fifth and Sixth Amendments, and therefore violates the APA as an unconstitutional agency action.

161.    Moreover, this policy is inconsistent with the federal statutory scheme as set forth in 8 U.S.C. §§ 1101(a), 1182(a)(2), 1186a(c) and 1227(a)(2), and with the implementation of the benefits and protections conferred by these provisions.  These provisions necessarily limit ICE's

53

enforcement activities in state courts, in particular making clear that such activities generally should not occur at sensitive locations and should not interfere with the rights of vulnerable individuals to seek relief from the courts.

162. ICE's courthouse arrest policy is arbitrary and capricious for multiple additional reasons, including that:

- Defendants have not provided adequate reasoning and legal support for this shift in policy;

- Defendants' stated purpose for this policy is to retaliate against jurisdictions that are unwilling to cooperate with ICE's requests to detain noncitizens and transfer them to ICE custody and to take advantage of security systems put in place by state courts; and

- Defendants failed to adequately consider the impact and consequences of this policy on the ability of noncitizens and their family members to safely access state courts, in contravention of Defendants' policies, historical practices and legal obligations.

163. As a proximate result of Defendants' conduct, Plaintiff Doe and the noncitizen clients and members of Organizational Plaintiffs have suffered prejudice, actual and substantial hardship and irreparable injury.

164. Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs pray that this Court grant the following relief:

(1) Declare that Defendants' policy and practice of surveilling and making civil immigration arrests of people without a judicial warrant while coming to, attending or returning from court is illegal and unconstitutional;

(2) Issue a permanent injunction ordering Defendants not to make a civil immigration arrest without a judicial warrant or surveil any individual coming to, attending or returning from court;

(3)     Set aside ICE's unlawful policy of surveilling and making civil immigration arrests of

individuals without a judicial warrant at courthouses;

(4)     Award Plaintiffs' reasonable costs and attorney's fees; and

(5)     Grant any other and further relief that this Court may deem fit and proper.

Dated: September 25, 2019
        New York, New York

Respectfully submitted,

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

By: _____

Jonathan I. Blackman
*jblackman@cgsh.com*
Jessica Thompson
*jethompson@cgsh.com*
Rikki S. Stern
*rstern@cgsh.com*
Lee Hill
*leehill@cgsh.com*
Vishakha S. Joshi
*vjoshi@cgsh.com*

One Liberty Plaza
New York, NY 10006
Tel: (212) 225 2000
Fax: (212) 225 3999

*Attorneys for Plaintiffs*

**THE LEGAL AID SOCIETY**

Hasan Shafiqullah
*hhshafiqullah@legal-aid.org*
Janet Sabel
*jsabel@legal-aid.org*
Adriene Holder
*aholder@legal-aid.org*
Judith Goldiner
*jgoldiner@legal aid.org*
Susan Cameron
*scameron@legal-aid.org*
Susan E. Welber
*sewelber@legal-aid.org*

199 Water Street, 3rd Fl.
New York, NY 10038
Tel: (212) 577 3300