UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

John Doe; The Door; Make the Road New York; New York
Immigration Coalition; Sanctuary for Families; Urban
Justice Center,

Plaintiffs,

v.

19 Civ. 8892 (AJN)

U.S. Immigration and Customs Enforcement; U.S.
Department of Homeland Security; Donald J. Trump, in his
official capacity as President of the United States; Chad
Wolf, in his official capacity as Acting Secretary of
Homeland Security; Matthew T. Albence, in his official
capacity as U.S. Immigration and Customs Enforcement
Acting Director; Thomas Decker, in his official capacity as
U.S. Immigration and Customs Enforcement New York
Field Office Director, [1]

Defendants.

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2614/2721
Fax: (212) 637-2686
Email: rebecca.friedman@usdoj.gov
            tomoko.onozawa@usdoj.gov

REBECCA R. FRIEDMAN
TOMOKO ONOZAWA
Assistant United States Attorneys, *Of Counsel*

---

[1] Acting Secretary of Homeland Security Wolf is automatically substituted for Kevin McAleenan
as the Defendant in this action by operation of Fed. R. Civ. P. 25(d).  Thomas Decker is
automatically substituted for Susan Quintana as the Field Office Director for U.S. Immigration
and Customs Enforcement New York Field Office.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................................................1

BACKGROUND ...............................................................................................................2

    A.    Federal Statutory Removal and Arrest Authority .................................................2

    B.    Courthouse Arrests.............................................................................................3

ARGUMENT ...................................................................................................................6

    A.    Standard of Review.............................................................................................6

    B.    Plaintiffs Lack Article III Standing.......................................................................7

        1.    Plaintiff John Doe Lacks Article III Standing ............................................8

        2.    The Organizational Plaintiffs Lack Standing................................................9

            (a)    All of the Organizational Plaintiffs Lack Associational
                 Standing ....................................................................................10

            (b)    Plaintiff NYIC Lacks Standing to Sue in Its Own Right..............12

    C.    Plaintiffs' APA Claims Should Be Dismissed.......................................................13

        1.    Plaintiffs Are Not Within the Zone of Interests of Sections 1226 or
            1357......................................................................................................13

        2.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA
            Claims Because the Location of Enforcement Actions Is
            Committed to Agency Discretion by Law ...................................................15

        3.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA
            Claims Because the Directive Is Not a Final Agency Action....................17

    D.    Plaintiffs' Constitutional Claims Fail as a Matter of Law .....................................19

        1.    Plaintiffs' Fifth Amendment Claim Fails as a Matter of Law .................19

        2.    Plaintiffs' First Amendment Claims Fail as a Matter of Law...................20

        3.    Plaintiffs' Sixth Amendment Claim Fails as a Matter of Law..................21

    E.    Plaintiffs' Common Law Immunity Claim and APA Claim Fail As a
        Matter of Law .....................................................................................................23

1.      There Is No Common Law Privilege Against Federal Immigration
        Enforcement in Courthouses..................................................................24

2.      Congress Established a Comprehensive Immigration Detention
        Scheme That Displaced any Prior Common Law on Civil
        Immigration Enforcement Arrests ..........................................................27

CONCLUSION.....................................................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Adam v. Barr*,
  18 Civ. 2106 (AJN), 2019 WL 1426991 (S.D.N.Y. Mar. 29, 2019) ......................................... 9

*Am. Elec. Power Co. Inc. v. Connecticut*,
  564 U.S. 410 (2011).................................................................................................... 28, 29

*Arizona v. United States*,
  567 U.S. 387 (2012)................................................................................................... *passim*

*Art and Antique Dealers Legaue of America, Inc. v. Seggos*,
  18 Civ. 2504, 2019 WL 416330 (S.D.N.Y. Feb. 1, 2019) ...................................................... 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................................ 6, 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................................ 6, 7

*Borough of Duryea, Pa. v. Guarnieri*,
  564 U.S. 379 (2011)............................................................................................................... 21

*Bours v. Tuckerman*,
  7 Johns. 538 (N.Y. Sup. Ct. 1811)......................................................................................... 25

*Bowen v. Mich. Acad. of Family Physicians*,
  476 U.S. 667 (1986).............................................................................................................. 15

*Brass v. Am. Film Techs., Inc.*,
  987 F.2d 142 (2d Cir. 1993)..................................................................................................... 7

*Brause 59 Co. v. Bridgemarket Assocs.*,
  216 A.D.2d 200 (N.Y. 1st Dep't 1995).................................................................................... 26

*Broadgate Inc. v. U.S. Citizenship & Imm. Servs.*,
  730 F. Supp. 2d 240 (D.D.C. 2010) .................................................................................. 18, 19

*Bronsztejn v. INS*,
  526 F.2d 1290 (2d Cir. 1975)................................................................................................... 1

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001).............................................................................................................. 30

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017)..................................................................................... 12

*City of Milwaukee v. Illinois & Michigan*,
    451 U.S. 304 (1981).................................................................................... 27, 28

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987)........................................................................................... 13

*Conn v. Gabbert*,
    526 U.S. 286 (1999)........................................................................................... 11

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
    633 F. App'x 61 (2d Cir. 2016) ......................................................................... 26

*Ctr. for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005)................................................................... 12, 13

*Cunningham v. Neagle*,
    135 U.S. 1 (1890)....................................................................................... 28, 29

*De Dandrade v. U.S. Dep't of Homeland Security*,
    367 F. Supp. 3d 174 (S.D.N.Y. 2019)............................................................... 15

*Doe v. Vill. of Mamaroneck*,
    462 F. Supp. 2d 520 (S.D.N.Y. 2006)............................................................... 13

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ............................................................................ 21

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
    48 F. Supp. 3d 1 (D.D.C. 2014)................................................................... 13, 18

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938)........................................................................................... 27

*FDIC v. Meyer*,
    510 U.S. 471 (1994)............................................................................................ 6

*Grossi v. City of New York*,
    No. 08 Civ. 1083 (RRM) (ALC), 2009 WL 4456307 (E.D.N.Y. Nov. 30, 2009)................... 20

*Heckler v. Chaney*,
    470 U.S. 821 (1985)............................................................................. 15, 16, 17

*Herrera-Inirio v. INS.*,
   208 F.3d 299 (1st Cir. 2000) .................................................................. 30

*Hoffman v. Bailey*,
   996 F. Supp. 2d 477 (E.D. La. 2014) ..................................................... 20

*Hunt v. Washington State Apple Adver. Comm'n*,
   432 U.S. 333 (1977) ............................................................................... 10

*In re Kimball*,
   14 F. Cas. 474 (S.D.N.Y. 1867) ............................................................ 25

*In re Tarble*,
   80 U.S. 397 (1871) ................................................................................. 28

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
   326 U.S. 310 (1945) ............................................................................... 27

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ........................................................................ 14, 29

*Kappa Printing Group, LLC v. Archie Comic Publ'ns, Inc.*,
   No. 17 Civ. 7511 (VB), 2018 WL 2561032 (S.D.N.Y. June 4, 2018) ...................... 6

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ......................................................................... 11, 12

*Lamb v. Schmitt*,
   285 U.S. 222 (1932) ............................................................................... 26

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
   104 F.3d 1349 (D.C. Cir. 1997) ............................................................. 16

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................................... 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................................... 13

*Light Tech., Inc. v. N. Lights Club*,
   236 F.3d 57 (1st Cir. 2001) .................................................................... 25

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) .......................................................................... 15, 18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................... 7, 8, 12

*Lunney v. United States*,
    319 F.3d 550 (2d Cir. 2003) ...................................................................... 15

*Match-E-Be-Nash v. Patchak*,
    567 U.S. 209 (2012) .................................................................................. 14

*Milardo v. Kerilikowske*,
    No. CV316MC00099 (VLB), 2016 WL 1305120 (D. Conn. Apr. 1, 2016) ............ 30

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012) ........................................................................ 9

*Nachwalter v. Christie*,
    805 F.2d 956 (11th Cir. 1986) .................................................................... 28

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .................................................................... 18

*Netograph Mfg. Co. v. Scrugham*,
    197 N.Y. 377 (1910) ................................................................................. 25

*New England Industries v. Margiotti*,
    270 A.D. 488 (N.Y. 1st Dep't 1946) ........................................................... 24

*New York v. United States Department of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y.  2019) ........................................................ 10

*Noel v. Chapman*,
    508 F.2d 1023 (2d Cir. 1975) ..................................................................... 18

*Norton v. S. Utah Wilderness*,
    *All.*, 542 U.S. 55 (2004) ........................................................................... 19

*Parker v. Marco*,
    136 N.Y. 585 (1893) ................................................................................. 24

*Pearl River Union Free Sch. Dist. v. King*,
    214 F. Supp. 3d 241 (S.D.N.Y. 2016) ......................................................... 19

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015) .............................................................................. 18

*Person v. Grier*,
   66 N.Y. 124 (1876) .......................................................................................... 24, 25

*Phifer v. City of New York*,
   289 F.3d 49 (2d Cir. 2002) ...................................................................................... 6

*Port Washington Teachers' Ass'n v. Bd. of Educ.*,
   478 F.3d 494 (2d Cir. 2007) .................................................................................... 7

*Rajah v. Mukasey*,
   544 F.3d 427 (2d Cir. 2008) .................................................................................. 12

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) .............................................................................................. 21

*Ryan v. U.S. Immigration & Customs Enf't*,
   382 F. Supp. 3d 142 (D. Mass. 2019) .................................................................. 26

*Sanford v. Chase*,
   3 Cow. 381 (N.Y. 1824) ....................................................................................... 25

*Shakhnes v. Berlin*,
   689 F.3d 244 (2d Cir. 2012) .................................................................................. 17

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
   528 F.3d 310 (4th Cir. 2008) ................................................................................ 17

*Stewart v. Ramsay*,
   242 U.S. 128 (1916) .............................................................................................. 24

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................................................ 8

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
   752 F.3d 239 (2d Cir. 2014) .................................................................................... 6

*Taylor v. Bernanke*,
   No. 13-CV-1013, 2013 WL 4811222 (E.D.N.Y. Sept. 9, 2013) ............................ 13

*United States ex rel. Turner v. Williams*,
   194 U.S. 279 (1904) .............................................................................................. 21

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ............................................................................ 30

*United States v. Carpio-Leon*,
   701 F.3d 974 (4th Cir. 2012) ................................................................. 21

*United States v. Green*,
   305 F. Supp. 125 (S.D.N.Y. 1969)................................................... 25, 26

*United States v. Knotts*,
   460 U.S. 276 (1983)............................................................................. 20

*United States v. Portillo-Munoz*,
   643 F.3d 437 (5th Cir. 2011) ............................................................... 21

*United States v. Valenzuela-Bernal*,
   458 U.S. 858 (1982)............................................................................. 23

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990)........................................................................ 20-21

*Warth v. Seldin*,
   422 U.S. 490 (1975)............................................................................. 11

*Wayte v. United States*,
   470 U.S. 598 (1985)............................................................................. 17

*Younger v. Harris*,
   401 U.S. 37 (1971)................................................................................ 8

**Statutes & Regulations**

5 U.S.C. § 551(13) ................................................................................. 19

5 U.S.C. § 704 ...................................................................................... 17

8 U.S.C. § 1182 ...................................................................................... 1

8 U.S.C. § 1225 ...................................................................................... 1

8 U.S.C. § 1226 .............................................................................. *passim*

8 U.S.C. § 1229(e) .......................................................................... *passim*

8 U.S.C. § 1231 ................................................................. 1, 22, 27, 29

8 U.S.C. § 1252 ............................................................................. 12, 14

8 U.S.C. § 1326 ...................................................................................... 5

8 U.S.C. § 1357 ................................................................................................................ *passim*

8 U.S.C. § 1367 ................................................................................................................ *passim*

8 C.F.R. § 212.5(b) ..................................................................................................................... 22

N.Y. Crim. Proc. § 30.30 ........................................................................................................... 22

N.Y. Crim. Proc. §170.30(1)(e) ................................................................................................. 22

N.Y. Crim. Proc. §210.20(1)(g) ................................................................................................. 22

N.Y. Crim. Proc. § 580.30 ......................................................................................................... 22

Defendants respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' complaint ("Compl.") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Pursuant to Congress's "plenary power over the admission of aliens and their right to remain in the United States," *Bronsztejn v. INS*, 526 F.2d 1290, 1291 (2d Cir. 1975), Congress has codified the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States.  *See* 8 U.S.C. §§ 1182, 1225, 1226, 1229, 1231, 1357.  The Executive Branch may, among other things, arrest aliens with or without a warrant pending a decision on whether they are to be removed from the United States.  *Id.* §§ 1226(a), 1357(a)(2).

Here, individual plaintiff John Doe ("Doe"), and organizational plaintiffs The Door, Make the Road New York ("MRNY"), New York Immigration Coalition ("NYIC"), Sanctuary for Families ("SFF"), and Urban Justice Center ("UJC") (collectively, the "Organizational Plaintiffs"), seek to enjoin "Defendants' policy and practice of surveilling and making civil immigration arrests of people without a judicial warrant while coming to, attending, or returning from court."  Compl. at 54.  Plaintiffs contend that Defendants have violated the First, Fifth and Sixth Amendments, a so-called "common law privilege against civil arrest in and around courthouses," Compl. ¶ 160, and the Administrative Procedure Act ("APA") in carrying out their civil immigration enforcement functions under the INA, 8 U.S.C. §§ 1226 and 1357.

Plaintiffs' complaint should be dismissed in its entirety.  ***First***, all of the Plaintiffs lack standing to sue under Article III because they have not alleged a viable "injury in fact."  ***Second***, Plaintiffs' claims regarding Defendants' civil arrest and surveillance practices are unreviewable under the APA because: (1) the Organizational Plaintiffs lack a cognizable cause of action under

zone-of-interests principles; (2) the public location where ICE chooses to conduct a civil enforcement activity is a matter fully committed to agency discretion by law; and (3) Plaintiffs have not identified a discrete final agency decision within the meaning of the APA which governs ICE's decision to conduct civil enforcement activities in or around courthouses, and the Directive about which Plaintiffs complain—Directive No. 11072.1:  Civil Immigration Enforcement Actions Inside Courthouses—is itself only a general statement of policy, not a final agency decision.  This Court should also dismiss Plaintiffs' complaint as a matter of law because they have not pleaded viable Fifth, First, and Sixth Amendment claims against Defendants.

*Finally*, Plaintiffs' reliance on a common law privilege, both as a standalone claim and as part of their APA claim, fails for two reasons: (1) there is no state or federal common law immunity from immigration enforcement for those who are subject to ICE arrest; and (2) even if there were such an expansive common law privilege, Congress established a comprehensive system of immigration laws which dictates when and where immigration arrests are lawful, including at courthouses, thereby displacing any purported common-law privilege.

## BACKGROUND

### A.    Federal Statutory Removal and Arrest Authority

The federal government has "broad, undoubted power over the subject of immigration and the status of aliens," and Congress has "specified which aliens may be removed from the United States and the procedures for doing so."  *Arizona v. United States*, 567 U.S. 387, 394, 396 (2012); *see* U.S. Const. art. I § 8, cl. 4.  Pursuant to that authority, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  Congress has also provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in

violation of any [] law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2).

## B.    Courthouse Arrests

ICE has long conducted surveillance and exercised its civil arrest authority at and around courthouses, given that Congress gave ICE officers the authority "to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).  In 2006, Congress acknowledged ICE's civil enforcement activities at or around courthouses with the passage of the Violence Against Women and Department of Justice Reauthorization Act of 2005 ("VAWA 2005"), Pub. L. No. 109–162, 119 Stat. 2960 (enacted Jan. 5, 2006).  VAWA 2005 added a new provision to the INA which provides that: "[i]n cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specific in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 1367 of this title have been complied with." 8 U.S.C. § 1229(e)(1).  One of the specified "locations" is "a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 1101(a)(15) of this title." *Id.* § 1229(e)(2)(B).[2]

---

[2] 8 U.S.C. § 1367, in turn, provides that the federal government cannot make an "adverse determination of admissibility or deportability of an alien . . . using information furnished solely by . . . a spouse or parent who has battered the alien or subjected the alien to extreme cruelty." 8 U.S.C. § 1367(a)(1).  This section also prevents the Attorney General from permitting "use by or

Since 2014, ICE has issued guidance documents to assist ICE officers in making the discretionary determination whether a civil enforcement action against a specific, targeted alien at or outside a courthouse is operationally necessary and appropriate, and, if so, how to properly carry out such enforcement action.  In a March 19, 2014 memorandum (the "2014 Policy"), ICE advised its personnel that "[e]nforcement actions at or near courthouses will only be undertaken against" aliens convicted of crimes, who were gang members aged 16 years or older, and/or were considered national security or public safety risks.  *See* Mem. from Philip T. Miller, Assistant Director for Field Operations, to Field Office Directors & Deputy Field Office Directors, *Enforcement Actions at or Near Courthouses* (Mar. 19, 2014), annexed as Ex. A to the Declaration of Tomoko Onozawa, dated December 4, 2019 ("Onozawa Decl.").  The 2014 Policy restricted enforcement actions against "collaterally" present aliens, "such as family members and friends" of the "target alien," and directed that enforcement actions should, "whenever practicable," "take place outside public areas of the courthouse," "be conducted in collaboration with court security and staff," and "utilize the court building's non-public entrances and exits."  *Id.*

In January 2018, ICE promulgated Directive 11072.1 (the "Directive"), *see* Onozawa Decl. Ex. B, which revised ICE's policy "regarding civil immigration enforcement actions inside federal, state, and local courthouses."  *Id.* at 1.  The Directive indicates that "civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband."  *Id.*  The Directive differs from the 2014 Policy in three main respects: (1) it focuses solely on civil

---

disclosure to anyone . . . of any information which relates to an alien who is the beneficiary" of a VAWA petition, or a T or U visa petition.  *Id.* § 1367(a)(2).

immigration enforcement actions "inside" courthouses; (2) it adds two categories of targeted

aliens: "aliens who have re-entered the country illegally after being removed" (a federal felony

under 8 U.S.C. § 1326) and "aliens who have been ordered removed from the United States but

have failed to depart"; and (3) it articulates "special circumstances" in which ICE may arrest

non-target aliens, such as "when the individual poses a threat to public safety or interferes with

ICE's enforcement actions." *Id.* As to witnesses and victims of crimes, including domestic

violence, ICE policy and 8 U.S.C. § 1367 set additional limitations on ICE's civil enforcement

actions against aliens who are victims of or witnesses to a crime, or victims of abuse.[3]

The Directive instructs ICE officers "generally [to] avoid enforcement actions in

courthouses, or areas within courthouses that are dedicated to non-criminal (*e.g.,* family court,

small claims court) proceedings." Directive at 2. Under the Directive, when an ICE officer

determines that an enforcement action inside a courthouse is "operationally necessary," the

arresting officer must first obtain the approval of a higher-level officer to proceed. *Id.*[4] The

Directive advises that, "when practicable," ICE officers should "conduct enforcement actions

discreetly to minimize their impact on court proceedings." *Id.* at 1. It further states that

enforcement actions inside courthouses "should, to the extent practicable, continue to take place

in non-public areas of the courthouse, be conducted in collaboration with court security staff, and

utilize the court building's non-public entrances and exits." *Id.* at 2. ICE officers and agents are

---

[3] *See* Mem. from John Morton, Director of U.S. Immigration and Customs Enforcement, to All Field Office Directors, All Special Agents in Charge and All Chief Counsel, *Prosecutorial Discretion: Certain Victims, Witnesses and Plaintiffs* (June 17, 2011), Onozawa Decl. Ex. C. This memorandum provides that "[a]bsent special circumstances or aggravating factors, it is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime," or "to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties." *Id.* at 1–2.

[4] The Directive emphasizes that "ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with [DHS] policy." *Id.* at 1 n.1.

also advised to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public," and are required to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions." *Id.* Finally, the Directive addresses only "civil immigration enforcement actions inside courthouses," *id.* at 2, and, contrary to Plaintiffs' assertions, does not address, in any way, enforcement actions around or outside courthouses. *See, e.g.,* Compl. ¶¶ 1, 3, 8.

## ARGUMENT

### A.   Standard of Review

On a Rule 12(b)(1) motion to dismiss, the party asserting subject matter jurisdiction bears "the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). In considering challenges to subject matter jurisdiction under Rule 12(b)(1) at the pleading stage, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Id.* The Court may also consider evidence extrinsic to the pleadings. *See Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002). "'However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn.'" *Kappa Printing Group, LLC v. Archie Comic Publ'ns, Inc.*, No. 17 Civ. 7511 (VB), 2018 WL 2561032, at *2 (S.D.N.Y. June 4, 2018) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit," and "[s]overeign immunity is jurisdictional in nature." *FDIC. v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).   The court should begin by "identifying pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  If well-pleaded factual

allegations exist, the court must then determine whether "they plausibly give rise to an

entitlement to relief."  *Id.*  In considering a Rule 12(b)(6) motion, courts consider the "factual

allegations in [plaintiff's] . . . complaint . . . , documents attached to the complaint as an exhibit

or incorporated in it by reference, [and] matters of which judicial notice may be taken."  *Brass v.*

*Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

**B.      Plaintiffs Lack Article III Standing**

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the

Court's jurisdiction.  Plaintiffs must allege facts that establish the three elements that constitute

the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560 (1992), namely, that: (1) there is an "'injury in fact,'—an invasion of a legally protected

interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical"; (2) there is "a causal connection between the injury and the conduct complained

of"; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be

redressed by a favorable decision."  *Id*.  "Every plaintiff seeking to establish standing must prove

these three elements, even where . . .  he or she asserts 'third-party standing'—that is, he or she is

attempting to resolve the rights of third parties who are not parties to the litigation but whose

rights are likely to be 'diluted or adversely affected.'"  *Port Washington Teachers' Ass'n v. Bd.*

*of Educ.*, 478 F.3d 494, 498 (2d Cir. 2007) (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)).

As set forth below, none of the Plaintiffs have established Article III standing to assert their

claims.

### 1.    Plaintiff John Doe Lacks Article III Standing

Plaintiff Doe alleges that he lacks lawful immigration status in the United States, Compl. ¶ 16, and that he has declined to go to Family Court to obtain an *ex parte* order of protection against his former partner because he fears being arrested by ICE. *Id.* ¶¶ 93, 95. These allegations are insufficient to support Doe's standing to bring suit as the injuries alleged are conjectural and hypothetical, not "actual and imminent." *Lujan*, 504 U.S. at 560.

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citations omitted). Although the Supreme Court has acknowledged that "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law," *id.*, or in this case, Defendants' practice of conducting civil enforcement actions inside and outside courthouses, a plaintiff subject to "the threatened enforcement of a law" must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists *a credible threat* of prosecution thereunder." *Id.* (emphasis added) (citations omitted). *See also Younger v. Harris*, 401 U.S. 37, 42 (1971) (plaintiffs who failed to "claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," but merely alleged that they "feel inhibited" in engaging in constitutionally-protected activity did not establish standing).

Here, Doe has not pleaded facts suggesting that ICE has threatened him with removal or arrest, and he admitted in a sworn affidavit that he is "not currently in deportation proceedings." *See* Aff. in Support of Motion to File Under Pseudonym, dated July 18, 2019 [Dkt. No. 33], ¶ 11. Doe has also not alleged *any* of the personal factors specified in the Directive that would render him the potential subject of a civil immigration enforcement action inside a courthouse—*e.g.*, a

criminal conviction, gang membership, posing a national security or public safety threat, a final

order of removal, or a history of re-entering the country illegally after being ordered removed.

Directive at 1.  Contrary to Doe's contention, a domestic violence victim is not in danger of

being arrested by ICE in court based solely on derogatory information provided by the abuser.

*See* 8 U.S.C. § 1367; 8 U.S.C. § 1229(e); *see also* Prosecutorial Discretion: Certain Victims,

Witnesses, and Plaintiffs (June 17, 2011) (attached as Onozawa Decl. Ex. C).  Moreover, the

Directive specifically provides that "ICE officers and agents should generally avoid enforcement

actions in courthouses, or areas within courthouses that are dedicated to non-criminal (e.g.,

family court, small claims court) proceedings."  Directive at 2.  Accordingly, Doe lacks standing

to bring suit, because he has not pleaded facts plausibly suggesting that the threat of ICE arrest is

credible as is required to show an imminent injury.  *See Adam v. Barr*, 18 Civ. 2106 (AJN), 2019

WL 1426991, at *4 (S.D.N.Y. Mar. 29, 2019) (plaintiff lacked Article III standing to challenge

Controlled Substances Act, where he "failed to allege *any* facts from which a credible threat of

prosecution by the Defendants for religious use of marijuana could reasonably be inferred")

(emphasis in original), *aff'd*,  2019 WL 6004632 (2d Cir. Nov. 14, 2019).

### 2.    The Organizational Plaintiffs Lack Standing

The Organizational Plaintiffs can establish standing in one of two ways.  They can sue on

behalf of their members (known as "associational standing") or they can "have standing in [their]

own right" (known as "organizational standing").  *N.Y. Civil Liberties Union v. N.Y. City Transit

Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).  Because all of the Organizational Plaintiffs have failed

to plead facts that satisfy Article III on the first theory—associational standing—their claims

under the First, Fifth and Sixth Amendments, the purported common-law privilege against civil

arrest for individuals attending courts, and the APA must be dismissed for lack of subject matter

jurisdiction.  *See* Compl, ¶¶ 139, 145, 150, 156, 163.  With respect to the Organizational

Plaintiffs' First Amendment claim, which is the only claim for which they assert organizational standing to sue in their own right,  Compl. ¶ 145, plaintiff NYIC has failed to plead facts that satisfy Article III, and thus its claim should be dismissed for lack of standing.[5]

### (a)    All of the Organizational Plaintiffs Lack Associational Standing

All of the Organizational Plaintiffs' claims should be dismissed because they lack associational standing.  A plaintiff asserting associational standing must show that:

> (a) [I]ts members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977).  Here, the Organizational Plaintiffs lack associational standing because they have failed to allege that a specific member or members would otherwise have standing to sue in their own right.

As a general matter, each Organizational Plaintiff has asserted claims on behalf of a broad group of unidentified, anonymous "clients and members" who are allegedly "chilled" from attending court appearances because they are "fearful of risking potential exposure to ICE."  *See, e.g.,* Compl. ¶¶ 81, 83–84, 96–97, 105–06, 114–16.  "Although proof of a mere 'statistical probability that some of [an organization's] members are threatened with concrete injury' is not enough to satisfy the first prong of associational standing, an organization can meet the first prong by offering 'specific allegations' . . .  'establishing that at least one identified member had suffered or would suffer harm.'"  *New York v. United States Department of Commerce*, 351 F. Supp. 3d 502, 605 (S.D.N.Y.  2019) (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 497–98 (2009)), *aff'd in part and rev'd in part on other grounds*, 139 S. Ct. 2551 (2019).  *See*

---

[5] Defendants do not challenge the standing of Organizational Plaintiffs MRNY, The Door, SFF, and UJC to assert a First Amendment claim in their own right.

*also Art and Antique Dealers Legaue of America, Inc. v. Seggos*, 18 Civ. 2504, 2019 WL 416330, at *2 (S.D.N.Y. Feb. 1, 2019) ("An organizational plaintiff's 'self-description of the activities of its members' and its assertion that there is a 'probability that some of those members are threatened with concrete injury' will not suffice").  Here, the Complaint does not plausibly allege that the anonymous "clients and members" of the Organizational Plaintiffs, like plaintiff Doe, are subject to a "credible threat of prosecution" by Defendants that would confer individual standing and, in turn, confer associational standing on Plaintiffs.  *See supra*, B1.[6]

The Organizational Plaintiffs also lack standing to assert the constitutional rights of their clients.  "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  A party seeking third-party standing "to assert the rights of another" must show two things: (1) that "the party asserting the right has a 'close' relationship with the person who possesses the right"; and (2) that "there is a 'hindrance' to the possessor's ability to protect his own interests."  *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citations omitted).  The Supreme Court has also "allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights."  *Id.* (citations omitted); *see Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (attorney lacked standing to litigate alleged violation of client's constitutional rights).  Here, the

---

[6] UJC and SFF have alleged that three individual, unnamed clients have suffered harm.  *See* Compl. ¶ 85 (minor client of SFF fearful of testifying in court because of fear that her mother would be arrested by ICE); ¶ 104 (Chinese client of SFF fearful of obtaining custody of her son because of concern that she would be apprehended by ICE; client eventually went to court and obtained custody); ¶ 116 (UJC client eligible for VAWA relief "decided not to seek help due to her fears of encountering ICE").  However, like Doe, there are no facts from which a credible threat of arrest by the Defendants can reasonably be inferred; indeed, one client went to court without being arrested, and the other two clients possess none of the factors that would make them subject to civil enforcement actions under the Directive.  Directive at 1.

Organizational Plaintiffs have not demonstrated a "hindrance" to their clients' advancing their own constitutional rights, insofar as the INA provides a process for individual aliens to challenge their arrest and detention in immigration court, *see* 8 U.S.C. § 1252;  *see, e.g., Rajah v. Mukasey*, 544 F.3d 427, 441 (2d Cir. 2008) (recognizing that aliens may challenge the initiation of removal proceedings based on Fourth and Fifth Amendment violations and statutory or regulatory violations occurring before or in initiating those proceedings), and to obtain review exclusively in the courts of appeals, 8 U.S.C. § 1252(a)(5), (b)(9).  *See Kowalski*, 543 U.S. at 131–32 (declining to grant attorneys third-party standing to assert Sixth Amendment rights on behalf of indigent clients, where statutorily-available rights of review gave any client "open avenues to argue that denial deprives him of his constitutional rights").

**(b)** **Plaintiff NYIC Lacks Standing to Sue in Its Own Right**

To establish organizational standing, a plaintiff must show "(i) an imminent 'injury in fact' to itself as an organization (rather than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to [the defendant's actions]; and (iii) that a favorable decision would redress its injuries."  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Lujan*, 504 U.S. at 560).  Thus, organizational standing may be established where the defendant's conduct causes an organization to "divert[] its resources away from its current activities," or "a consequent drain on the organization's resources."  *Id.* at 111 (internal quotation marks and alteration omitted).  But an organization's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization adversely affected" so as to confer standing.  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) (internal quotation marks omitted).

Here, NYIC offers no specific facts demonstrating that Defendants' actions burdened its

activities (as opposed to its general advocacy interests) or forced it to spend resources to avoid

such a burden.  Rather, NYIC merely alleges that Defendants' actions have required it to expend

resources raising awareness of ICE's "courthouse arrest policy," instead of "advocacy for other

issues."  Compl. ¶¶ 109–10.  But NYIC is an advocacy organization, Compl. ¶¶ 29–30, 109, that

would reasonably be expected to be engaging in such activities regardless of the alleged

violations.  To establish standing, NYIC must show "harms beyond interference with [its] ability

to advocate on an issue of interest."  *Taylor v. Bernanke*, No. 13-CV-1013, 2013 WL 4811222, at

*11 (E.D.N.Y. Sept. 9, 2013); *Ctr. for Law & Educ.*, 396 F.3d at 1161–62 (government action

that forced organizations to change their lobbying strategies to a more costly form of lobbying

did not have standing); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 23–24

(D.D.C. 2014) (organization's "expenditure of funds to promote its legislative agenda through

research, education, outreach . . . , and litigation is a normal and critical part of its mission and

operations"); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 542 (S.D.N.Y. 2006)

(organization lacked standing where its "entire reason for being is to pursue the sort of advocacy

. . . that it has pursued in this case").

## C.  Plaintiffs' APA Claims Should Be Dismissed

### 1.  Plaintiffs Are Not Within the Zone of Interests of Sections 1226 or 1357

Plaintiffs lack a cause of action under the APA because the interests they seek to

vindicate do not "fall within the zone of interests protected by the law invoked."  *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).  The zone-of-interests test is

"a gloss on the meaning of [5 U.S.C.] § 702," which provides a right of review to a person

adversely affected or "aggrieved by agency action within the meaning of a relevant statute."

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987).  When a court applies the zone-of-

interests test, it must determine whether the interest asserted by a plaintiff suing under the APA

is "'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash v. Patchak*, 567 U.S. 209, 224 (2012) (citations omitted).

Plaintiffs acknowledge that the "INA authorizes civil arrests and governs removal proceedings," and that ICE "may detain an alien without a warrant." *See* Compl. ¶ 40 (citing 8 U.S.C. § 1357(a)(2)). Sections 1226 and 1357 of the INA, by their plain terms, govern the Department of Homeland Security's ("DHS") arrest authorities with respect to *aliens*. Section 1226 generally authorizes arrests of aliens "on a warrant," but also precludes judicial review of the "discretionary judgment regarding the application of this section." 8 U.S.C. § 1226(a), (e). Section 1357(a) grants immigration officers broad authority "to arrest any alien in the United States" without a warrant, authorizing "access to private lands" within "twenty-five miles" of the border, but limiting access to "dwellings" and restricting warrantless entry to "the premises of a farm or other outdoor agricultural operation." *Id.* § 1357(a)(3), (e). Relatedly, section 1229(e) specifically contemplates arrests at "courthouses," but requires ICE to comply with certain confidentiality provisions found at 8 U.S.C. § 1367 in particular contexts. 8 U.S.C. § 1229(e).

Importantly, as noted above, the INA provides a process by which individual aliens can challenge their arrest and the initiation of removal proceedings. *See supra* at p. 12. But the INA does not provide the Organizational Plaintiffs with any right of action. *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality) (construing 8 U.S.C. § 1252 as barring district court "challeng[es to ICE's] decision to detain [aliens] in the first place or to seek removal" of aliens, and permitting such claims in removal proceedings). Indeed, nothing in these provisions governs the Organizational Plaintiffs' conduct or actions in any way, is targeted towards the Organizational Plaintiffs, or creates any entitlement or interest that the Organizational Plaintiffs may invoke. As such, the Organizational Plaintiffs do not fall within the zone of interests of the

INA arrest provisions.  *See De Dandrade v. U.S. Dep't of Homeland Security*, 367 F. Supp. 3d

174, 188–90 (S.D.N.Y. 2019) (non-profit organizations that brought APA challenge to DHS

process of waiving requirement that legal permanent residents pass English language and civics

exams to obtain citizenship were not within INA's "zone of interests," where plaintiffs "d[id] not

point to any provisions of the INA or its legislative history which indicate that Congress intended

to protect the interests of advocacy groups representing clients at immigration hearings").

> **2.     This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims
> Because the Location of Enforcement Actions Is Committed to Agency
> Discretion by Law**

Before review may be had under the APA, "a party must first clear the hurdle of [5

U.S.C.] § 701(a)," which governs when courts may review the actions or inactions of agencies.

*Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  While the APA embodies a presumption of

judicial review, *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), "[t]his is

'just' a presumption, . . . and under § 701(a)(2) agency action is not subject to judicial review 'to

the extent that' such action 'is committed to agency discretion by law.'"  *Lincoln v. Vigil*, 508

U.S. 182, 190–91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).  In

*Heckler*, the Supreme Court articulated the fundamental inquiry for the application of section

701(a)(2):

> [E]ven where Congress has not affirmatively precluded review, review is not to
> be had if *the statute is drawn so that a court would have no meaningful standard
> against which to judge the agency's exercise of discretion*.  In such a case, the
> statute ("law") can be taken to have "committed" the decisionmaking to the
> agency's judgment absolutely.

470 U.S. at 830 (emphasis added).  Accordingly, under *Heckler*, the starting point of any analysis

under section 701(a)(2) must be whether there is a "meaningful standard" provided in the

governing statute.  *Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003).  No review is

possible where the relevant statute is so vague and broad that it does not provide a reviewing court criteria for evaluating the agency's exercise of its discretion.  *See Heckler*, 470 U.S. at 830.

ICE's civil arrest enforcement authority derives from the INA, which provides no "meaningful standard" by which this Court can evaluate the appropriateness of ICE's discretion under the Directive to arrest an alien who may be located in a courthouse.  *See* 8 U.S.C. § 1226(a) ("On a warrant . . . , an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . (2) . . . to arrest any alien in the United States").  The INA's broad language thus grants ICE the discretion to determine the location of a civil enforcement action against an alien present in the United States.  *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (State Department policy relating to location of processing overseas immigrant visa applications was not reviewable under the APA, because the "broad language" of the INA "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured").  Indeed, the choice of where to conduct surveillance or effectuate an arrest "involves a complicated balancing of a number of factors which are peculiarly within" ICE's expertise, *Heckler*, 470 U.S. at 831, including an assessment of safety risks to the public, the alien, and ICE officers.  Directive at 1.

The Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Heckler*, 470 U.S. at 831 (citing cases).  Courts have also held that agency decisions to take—as opposed to refrain from

taking—enforcement actions are unreviewable under the APA when, as here, there are no

judicially manageable standards for reviewing the agency's exercise of discretion.  *See, e.g.,*

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 316–19 (4th Cir.

2008) (Secretary of Labor's charging decision for violations of federal statute was a

"discretionary decision" that was not reviewable under the APA because it "rest[ed] on a

'complicated balancing of a number of factors which are peculiarly within' the Secretary's

expertise") (quoting *Heckler,* 470 U.S. at 831).  *Cf. Wayte v. United States*, 470 U.S. 598, 607

(1985) ("[T]he government retains 'broad discretion' as to whom to prosecute . . . This broad

discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited

to judicial review . . . .").  Accordingly, Plaintiffs' APA claims are barred as a matter of law.

### 3.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive Is Not a Final Agency Action

Plaintiffs' APA claims also fail another requirement of the APA's waiver of sovereign

immunity, that the action being challenged constitute a "final agency action."  5 U.S.C. § 704.

An agency action is "final" only if two conditions are met: "'(1) the action must mark the

consummation of the agency's decisionmaking process—it must not be of a merely tentative or

interlocutory nature,' and (2) 'the action must be one by which rights or obligations have been

determined, or from which legal consequences will flow.'"  *Shakhnes v. Berlin*, 689 F.3d 244,

260 (2d Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Although Plaintiffs assert that the "Directive formalizes the Trump Administration's

policy that ICE use state courthouses to arrest anyone suspected of a civil immigration

violation," Compl. ¶ 67, the Directive is not a final agency action because it fails the second

prong of the test.  On its face, the Directive does not compel any action, determine any rights or

obligations, or create legal consequences for Plaintiffs or the aliens who may be the subject of

civil enforcement actions.  Instead, the Directive is a general statement of policy for APA

purposes.  General statements of policy are "'statements issued by an agency to advise the public

prospectively of the manner in which the agency proposes to exercise a discretionary power.'"

*Lincoln*, 508 U.S. at 196–97 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

*See also Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("'general statements of policy'

are rules directed primarily at the staff of an agency describing how it will conduct agency

discretionar[y] functions") (citation omitted); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243,

252 (D.C. Cir. 2014) (a "general statement of policy" is an "agency action that merely explains

how the agency will enforce a statute or regulation—in other words, how it will exercise its

broad enforcement discretion or permitting discretion under some extant statute or rule").

"Legislative or substantive rules are, by definition, final agency action, while interpretive rules

and general policy statements are not."  *Broadgate Inc. v. U.S. Citizenship & Imm. Servs.*, 730 F.

Supp. 2d 240, 243 (D.D.C. 2010).

     The Directive merely explains certain considerations that will guide ICE officers in the

exercise of their discretion concerning whether and when to conduct civil immigration

enforcement actions inside federal, state and local courthouses, and is therefore a general

statement of policy for APA purposes.  Directive at 1.  It expressly "provides only internal ICE

policy guidance," "is not intended to, does not, and may not be relied upon to create any right or

benefit, substantive or procedural," and places "no limitations . . . on the otherwise lawful

enforcement or litigative prerogatives of ICE."  *Id.* at 3.  Because the Directive is a general

statement of policy that does not create substantive rules or rights, *see Perez v. Mortg. Bankers*

*Ass'n*, 135 S. Ct. 1199, 1205 (2015), or "bind" ICE officers, *Broadgate*, 730 F. Supp. 2d at 246, it is unreviewable under the APA.[7]

### D.      Plaintiffs' Constitutional Claims Fail as a Matter of Law

#### 1.      Plaintiffs' Fifth Amendment Claim Fails as a Matter of Law

Plaintiffs' Fifth Amendment claim fails because while that amendment protects the right of access to courts, Plaintiffs have not shown that Defendants' conduct limits Plaintiffs' protected "right to bring to court a grievance." *Lewis v. Casey*, 518 U.S. 343, 354 (1996). The Fifth Amendment does not require that Plaintiffs must be able to "litigate effectively once in court," *id.*, but only protects the right to bring a suit. While the Complaint has alleged an "atmosphere of fear" that "dissuades" parties from accessing the court, Compl. ¶ 6, the possibility that an alien will be arrested does not limit his or her ability to bring a suit. Moreover, as discussed *supra*, the likelihood that an alien would be subject to arrest is conjectural and hypothetical, not actual and imminent. *See* B1.

Plaintiffs also assert that "Defendants' unlawful surveillance" violates the Fifth Amendment (Compl. ¶ 139), but do not explain how the surveillance is unlawful or how

---

[7] Plaintiffs likewise have not identified a discrete "final agency action" with regards to "surveilling and arresting noncitizens in and around New York State courthouses." Compl. ¶ 160. "'Agency action' includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (holding that challenge to agency action may proceed under APA only if the agency action is "discrete"). By contrast, ICE's practice of conducting civil arrests at or around courthouses has existed since at least 2006. *See supra* at p.3. "Because an on-going program or policy is not, in itself a 'final agency action' under the APA, [this Court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Pearl River Union Free Sch. Dist. v. King*, 214 F. Supp. 3d 241, 261 (S.D.N.Y. 2016) (quoting *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006)).

watching someone in a public place violates the Fifth Amendment.[8]  Indeed, the law is clear that surveillance in public places does not violate the Constitution.[9]

### 2. Plaintiffs' First Amendment Claims Fail as a Matter of Law

Plaintiffs' claim that noncitizens are guaranteed the right to petition under the First Amendment, Compl. ¶ 143, fails to address the threshold question of whether aliens who are present in the country unlawfully have First Amendment rights that would protect them from courthouse arrests.  *See, e.g.*, *Hoffman v. Bailey*, 996 F. Supp. 2d 477, 488 (E.D. La. 2014) ("In considering . . . Supreme Court precedent, it is clear that Defendant, a nonresident alien, is not entitled to First Amendment protections of the United States Constitution.").  The Supreme Court in *United States v. Verdugo-Urquidez* analyzed the meaning of the words "the people" in the First Amendment context and strongly suggested that the answer is no:

> While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.  *See United States ex rel. Turner v. Williams,* 194 U.S. 279, 292, 24 S. Ct. 719, 723, 48 L. Ed. 979 (1904) (Excludable alien is not entitled to First Amendment rights, because "[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law").

---

[8] Plaintiffs make similar claims with respect to the First Amendment (Compl. ¶ 144), Sixth Amendment (Compl. ¶ 150), and the common law privilege against civil arrest (Compl. ¶ 155), and those claims fail for the same reasons as the Fifth Amendment.

[9] *See, e.g.*, *United States v. Knotts*, 460 U.S. 276, 282 (1983) (no constitutional violation for police's visual surveillance from public places, even where surveillance was augmented with technology); *Grossi v. City of New York*, No. 08 Civ. 1083 (RRM) (ALC), 2009 WL 4456307, at *8 (E.D.N.Y. Nov. 30, 2009) ("It is settled law that mere surveillance by government authorities without a showing of illegality and cognizable injury does not give rise to an action for violation of rights guaranteed by the First Amendment.").

494 U.S. 259, 265 (1990); *see also United States ex rel. Turner v. Williams*, 194 U.S. 279, 292

(1904) (An alien "does not become one of the people to whom these things are secured by our

Constitution by an attempt to enter, forbidden by law.").[10]

Courts have rejected also First Amendment challenges brought by non-citizens. *See, e.g.,*

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 474, 488 (1999) (rejecting non-

citizens' argument that the government was selectively enforcing immigration laws against them

in violation of their First and Fifth Amendment rights, and holding that "an alien unlawfully in

this country has no constitutional right to assert selective enforcement as a defense against his

deportation"). And even if the First Amendment does apply to aliens, Plaintiffs' claim fails

nonetheless because there is no right to evade immigration enforcement or be in the country

illegally. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (no

legally protected right to violate immigration law).

Plaintiffs' claim that the Organizational Plaintiffs have constitutional rights to carry out

their duties is also mistaken as they do not have First Amendment rights to "effectively and fully

carry out their duties as officers of the Court." Compl. ¶ 145. In addition, Plaintiffs' First

Amendment claim is based on the right to petition, and the right to petition is an individual right.

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387, 408 (2011) ("This Court's precedents

confirm that the Petition Clause protects the right of individuals to appeal to courts . . . .").

### 3.    **Plaintiffs' Sixth Amendment Claim Fails as a Matter of Law**

Plaintiffs allege that "Defendants' unlawful surveillance and arrests of noncitizens in and

around New York state courts prevent criminal defendant[s] . . . from fully and freely

---

[10] Courts have also noted that "the people" as used in other constitutional Amendments may not include certain aliens. *See, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 978 (4th Cir. 2012) ("Supreme Court's precedent is . . . not clear on whether 'the people' includes illegal aliens"); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011), *as revised* (June 29, 2011).

participating in state court proceedings in which they are defendants in violation of their rights under the Sixth Amendment." Compl. ¶ 150. But this in effect amounts to a backdoor attempt to challenge generally the *removability* of aliens charged with a crime; indeed, the alleged harms arise not out of the particular location of those aliens' arrests, but rather from the fact that ICE arrested them in the first place. However, nothing in the INA precludes ICE from conducting civil enforcement actions or initiating removal proceedings against an alien charged with a crime and who has not been sentenced to a term of imprisonment. *See* 8 U.S.C. § 1231(a)(4)(A).

Moreover, if ICE arrests and detains an alien who is the subject of a state criminal prosecution, it is the state prosecutor's duty under applicable law—not the federal government's—to guarantee the alien's Sixth Amendment right to a speedy trial and ensure the alien's participation in state court proceedings. Under state law, the district attorney of the prosecuting county "may" request that state court issue a writ of *habeas corpus ad prosequendum*, addressed to the Attorney General of the United States, explaining that the alien's attendance "is necessary in the interest of justice," and requesting that the alien be produced on a specific date and time. *See* N.Y. Crim. Proc. § 580.30. The INA vests the Attorney General or his designee with the discretion to grant the request and stay the alien's removal. 8 U.S.C. § 1231(c)(2); 8 C.F.R. § 212.5(b). A state prosecutor's failure to make diligent efforts to produce the alien for prosecution may be grounds for a motion to dismiss a state criminal information or indictment. *See* N.Y. Crim. Proc. §§ 30.30(1) & (4)(e), 170.30(1)(e), 210.20(1)(g). Accordingly, any Sixth Amendment violation of detained aliens'

rights to participate in their criminal prosecutions is chargeable against the state prosecutors responsible for securing their attendance, not against the federal defendants.[11]

To the extent Plaintiffs are asserting that Defendants' policy renders alien witnesses unavailable to appear in court and thereby violates a criminal alien's Sixth Amendment right to "compulsory process" and "to be confronted with witnesses against them," Compl. ¶ 149, they have not pleaded a viable claim.  As the Supreme Court recognized:

> [T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution.  The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment.  A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.

*United States v. Valenzuela-Bernal*, 458 U.S. 858, 872–83 (1982).

**E.    Plaintiffs' Common Law Immunity Claim and APA Claim Fail As a Matter of Law**

Plaintiffs' assertion that Defendants' conduct violates a common law privilege against civil arrests in or around courthouses and court-related proceedings, Compl. ¶¶ 39, 67, 153–57, 160, is mistaken.[12]  Contrary to Plaintiffs' broad contention, there is no state or federal common law immunity from immigration enforcement for those subject to ICE arrest.  And even if there were such an expansive common law privilege, Congress established a comprehensive system of

---

[11] Plaintiffs' suggestion that ICE arrests in or around courthouses violate aliens' Sixth Amendment rights because of an alleged "chilling effect on the willingness of these individuals to attend their own court appearances" in criminal cases against them, *see, e.g.,* Compl. ¶ 83, is meritless.  An individual's voluntary decision not to show up to court to avoid a lawful arrest is not protected by the Sixth Amendment.

[12] As Plaintiffs address New York common law, Compl. ¶¶ 1, 7, 9-10, 39, 153–54, as well as common law generally, *Id.* ¶¶ 39, 41, 67, 154, 160, this brief addresses both state and federal common law.

immigration laws which dictate when and where immigration arrests are lawful, including at courthouses, thereby displacing any such privilege.

### 1. There Is No Common Law Privilege Against Federal Immigration Enforcement in Courthouses

Plaintiffs argue that New York state courts, the Supreme Court, and other federal courts recognize a longstanding common law privilege from civil arrest, Comp. ¶ 154. However, the cases upon which they rely relate to a narrower immunity from service of process in a civil suit based on transient jurisdiction, when the only reason that a person is in the jurisdiction is to attend a court proceeding as a witness or a party. *See Stewart v. Ramsay*, 242 U.S. 128, 128 (1916) (service on Colorado resident when in Northern District of Illinois "while in attendance upon the district court as a witness in a case"); *Parker v. Marco*, 136 N.Y. 585, 588 (1893) (service of process on South Carolina resident at ferry terminal in New York when he came to New York "at the instance of the plaintiff to attend an examination of the plaintiff and his witnesses before a notary public"); *Person v. Grier*, 66 N.Y. 124, 124 (1876) (service of summons on Pennsylvania resident while in "attendance . . . as a witness in an action in the Supreme Court"). As the Supreme Court explained in *Stewart*, "[t]he true rule, well founded in reason and sustained by the greater weight of authority, is that suitors, . . . as well as witnesses, *coming from another state or jurisdiction*, are exempt from the *service of civil process* while in attendance upon court, and during a reasonable time in coming and going." *Stewart*, 242 U.S. at 129 (emphasis added).

New York law makes clear that the dispositive factor for common law immunity purposes is whether the person "had come within [the] jurisdiction voluntarily, or whether service was permissible because he had come here by compulsion." *New England Industries v. Margiotti*, 270 A.D. 488, 489 (N.Y. 1st Dep't 1946). As the Court of Appeals held, "[t]he

privilege should . . . not be extended beyond the reason of the rule upon which it is founded," which "rests" upon the fact that the "person claiming the privilege is a free moral agent who may come into or depart from the jurisdiction or not as he pleases." *Netograph Mfg. Co. v. Scrugham*, 197 N.Y. 377, 380, 382 (1910).

While admittedly there are some old New York cases that discuss a common law privilege against "arrests," where the term arrest is used, it often refers to an "arrest" that occurred as part of civil service of process, not the type of arrest at issue here. *See Person*, 66 N.Y. at 125 (protecting "suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home"); *Bours v. Tuckerman*, 7 Johns. 538 (N.Y. Sup. Ct. 1811) (discussing arrest on "*capias ad respondendum*").[13]

Contrary to Plaintiffs' broad statement of the privilege, the privilege thus applies when a jurisdiction would otherwise lack authority over the person but for his or her appearance in the jurisdiction to attend a court proceeding. As the Court explained in *United States v. Green*:

> The rule of immunity was seen as generally applicable to persons ordinarily without the jurisdiction of a court, and, therefore, necessarily not amenable to its service of process, who appeared within that jurisdiction solely with respect to the cause there already underway. Such persons were viewed as giving up the 'safety' of one jurisdiction to serve the interests of justice, and their natural state of immunity was held to be generally respected.

*United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969); *see also N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 62–63 (1st Cir. 2001) (the privilege should be used to fill "the gap only where it needs to be filled that is, in cases where a district court wishes to shield an

---

[13] This makes sense because the cases are from an era when arrests initiated civil suits between parties, a practice that was replaced by process service. *See In re Kimball*, 14 F. Cas. 474, 474 (S.D.N.Y. 1867) (bankrupt debtor on his way to register's office for purpose of being examined under an order previously served on him was "arrested by the sheriff, upon an order of arrest issued as mesne process in a civil suit in the supreme court of the state of New York"); *Sanford v. Chase*, 3 Cow. 381 (N.Y. 1824) (witness residing in Massachusetts who was subpoenaed to attend as a witness before arbitrators in New York was then "arrested and holden to bail").

individual from service of process to encourage his or her travel to the forum state, but would be unable to do so absent the power to grant immunity").

Other than one very recent case that addresses the Directive (*see Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 156 (D. Mass. 2019), *appeal filed*, No. 19-1838 (1st Cir. Sept. 5, 2019),[14] in no case has a court suggested that this privilege would be applicable to immigration enforcement, where the federal government has the authority to initiate process against the alien. In other contexts, courts have held that the immunity privilege does not apply to parties that were personally served while in different jurisdictions if they could have been served through other means. *See, e.g., Brause 59 Co. v. Bridgemarket Assocs.*, 216 A.D.2d 200, 201 (N.Y. 1st Dep't 1995) ("Since it cannot be disputed that personal jurisdiction over defendant Baldwin could have been obtained by serving him outside of New York . . . , he cannot avail himself of the doctrine of immunity in this matter.").[15] In *Green*, for example, defendants argued that they were immune to service of subpoenas under the privilege laid out in *Lamb v. Schmitt*, 285 U.S. 222 (1932), stating that they "might not voluntarily attend the examination armed with the knowledge of possible liability to service of the subpoenas." *Green*, 305 F. Supp. at 127–28. The court noted, however, that "there is no jurisdiction in which petitioners could have avoided service of process as an original matter, because their conditions of bail restricted their travel to the continental United States." *Id.* at 128. Given that "defendants were not lured into jurisdictional quicksands that imperiled their rights or privileges," the service of process was not the "type of activity meant to be prevented in *Lamb*." *Id.* at 129.

---

[14] The *Ryan* case was on preliminary injunction, 382 F. Supp. 3d at 145, not a motion to dismiss. The case also wrongfully ignored the plenary power of the federal government over immigration.

[15] *See also Cont'l Indus. Grp., Inc. v. Altunkilic*, 633 F. App'x 61, 62–63 (2d Cir. 2016) ("New York law does not permit a nondomiciliary to claim immunity from personal service—even if he is in New York only to testify in legal proceedings—if he could be served outside the state.") (citing cases).

Here, aliens are subject to federal law enforcement jurisdiction anywhere in the United States.  *See* 8 U.S.C. § 1226(a) (providing for arrests "[o]n a warrant" without jurisdictional limitation); 8 U.S.C. § 1357 (providing for warrantless arrests without jurisdictional limitation); 8 U.S.C. § 1226 (dictating when detention is required or optional); 8 U.S.C. § 1231 (mandating detention of aliens with final removal orders).  Like the defendants in *Green* who could be served with process in any location, aliens can be subjected to immigration custody in any jurisdiction, and thus the rationale behind the common law privilege does not apply.

In addition, the privilege against civil arrest while being present within a jurisdiction gave way to personal service of summons or other form of notice such that parties could be served if they had certain minimum contacts.  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).  By the time Congress codified the current civil immigration arrest statute, 8 U.S.C. § 1231, in the INA in 1952, the privilege was discussed as a process immunity privilege against transient jurisdiction.  That privilege does not apply in the instant context and therefore Plaintiffs' common law immunity and APA claims fail—Plaintiffs cannot show that the Directive is "not in accordance with the law" if there is no common law right to evade immigration arrests.

### 2. Congress Established a Comprehensive Immigration Detention Scheme That Displaced any Prior Common Law on Civil Immigration Enforcement Arrests

Even if a privilege did exist in the form that Plaintiffs claim, the federal statutory immigration scheme comprehensively addresses immigration arrests, thus supplanting any prior common law on the issue.  Although the Supreme Court had long since proclaimed that "[t]here is no federal general common law," *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), to the extent that any federal common law exists, it only applies until that "field has been made the subject of comprehensive legislation or authorized administrative standards."  *City of Milwaukee*

*v. Illinois & Michigan*, 451 U.S. 304, 313–14 (1981) (internal quotation marks and citation omitted).  Once Congress addresses the issue, courts rely on the new federal laws and regulations instead of continuing to rely on federal common law.  *Id.* at 315.[16]  In determining whether a statutory scheme displaces federal common law, courts consider the entire statutory scheme.  *Am. Elec. Power Co. Inc. v. Connecticut,* 564 U.S. 410, 424 (2011).  "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue."  *Id.* at 424.

To the extent Plaintiffs rely on state common law, it cannot override federal statutory law such as the federal government's ability to conduct immigration enforcement actions, something within Congress' "broad, undoubted power."  *Arizona*, 567 U.S. at 394.  Likewise, because the INA specifically addresses immigration arrests, under the Supremacy Clause, "federal courts may not use state common law to re-write a federal statute."  *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986).  Given the plenary federal power over immigration, state common law cannot bar the federal government from arresting aliens in public places.  *See Cunningham v. Neagle*, 135 U.S. 1, 58 (1890) (a federal officer cannot be arrested by state officials for acting in discharge of their duties); *In re Tarble*, 80 U.S. 397, 404 (1871) (state court lacks jurisdiction "to interfere with the authority of the United States, whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal").

Here, the congressional scheme shows that Congress spoke directly to the issue of immigration arrests, thus displacing any common law.  Through the INA, Congress created a

---

[16] "Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision."  *City of Milwaukee*, 451 U.S. at 312.  "The enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress."  *Id.* at 312–13.

comprehensive scheme governing arrests of removable aliens.  "On a warrant issued" by DHS attesting to an alien's removability, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8U.S.C. § 1226(a).  DHS shall "detain the alien," during the removal period, and certain aliens deemed at "risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period."  8 U.S.C. § 1231(a)(2), (a)(6).  The relevant statutes set only one limitation – DHS cannot take an alien into custody who is currently serving a criminal sentence; instead, DHS must await until completion of the imprisonment.  *Id.* §§ 1226(c), 1231.

Congress also spoke directly to immigration officers' power "to arrest any alien in the United States" without a warrant, providing broad authority.  *Id.* § 1357(a)(2); *supra* at pp. 2–3.  Congress, however, limited the authority to search for aliens in specific locations.  *Id.* § 1357(a)(3), (e); *supra* at p.14.   These location exceptions imply that an immigration officer's search (and arrest) power is not restricted at other locations.  *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (applying the negative-implication canon).

In addition, in 2006, Congress added 8 U.S.C. § 1229(e)(1), which expressly addresses immigration enforcement actions against aliens at courthouses.  *Supra* at p. 3.  Thus, Congress knew that ICE was making courthouse arrests, in spite of any purported common law privilege, and provided certain requirements that ICE must follow.  As such, given that Congress comprehensively laid out DHS's immigration arrest authority, any common law privilege from arrest, even if it existed, would have been displaced by the congressional scheme.  *See, e.g., Am. Elec. Power Co*, 564 U.S. at 424 ("We hold that the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants.").

Moreover, the context in which this issue is arising is significant.  Because the federal government has exclusive authority over immigration, it has regulatory authority over all aliens within the United States.  *Cf. Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347 (2001) ("The relationship between a federal agency and the entity it regulates is inherently federal because it originates from, is governed by, and terminates according to federal law.").  Congress thus has the power to create a system that permits arrests of aliens notwithstanding the status of federal or state court proceedings.  *See Herrera-Inirio v. INS.*, 208 F.3d 299, 307 (1st Cir. 2000) ("Because Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters."); *id.* at 307–08 ("After all, in areas in which plenary federal power exists, 'the Supremacy Clause permits no other result,' notwithstanding that Congress may enact laws that 'curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important.'") (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 290 (1981)).  The "comprehensive and unified system" specifically "instructs when it is appropriate to arrest an alien during the removal process."  *Arizona*, 567 U.S. at 401–02, 407.  As the "removal process is entrusted to the discretion of the Federal Government," any attempt to allow states to alter the comprehensive removal scheme "creates an obstacle to the full purposes and objectives of Congress" and thus is "preempted by federal law."  *Id.* at 409, 410.[17]

---

[17] *See also United States v. Alabama*, 691 F.3d 1269, 1294, 1296 (11th Cir. 2012) (state statute which was a "thinly veiled attempt to regulate immigration" and an attempt to "impinge on an area of core federal concern," was "preempted by the inherent power of the federal government to regulate immigration" because the power to expel aliens "is retained only by the federal government"); *Milardo v. Kerilikowske*, No. CV316MC00099 (VLB), 2016 WL 1305120, at *8 (D. Conn. Apr. 1, 2016) (enforcing subpoena against ICE's discretionary decision to deny petitioners' requests to return to the United States "would conflict with th[e] constitutionally derived federal power to regulate immigration" because "protection of the nation's borders" is an area "fully occupied" by the federal government) (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons,  the Court should dismiss Plaintiffs' complaint in its entirety.

Dated: December 4, 2019
New York, New York

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:    */s/*
REBECCA R. FRIEDMAN
TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:  (212) 637-2614/2721
Fax:  (212) 637-2686
Email: rebecca.friedman@usdoj.gov
tomoko.onozawa@usdoj.gov