UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOE, *et al.*,

              Plaintiffs,

        v.

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT, *et al*.,

              Defendants

**No. 19-cv-8892 (AJN)**

**BRIEF OF AMICI CURIAE IMMIGRANT DEFENSE PROJECT AND 39 LEGAL
SERVICES ORGANIZATIONS, PUBLIC DEFENDER ORGANIZATIONS, AND
<u>NON-PROFIT ORGANIZATIONS IN SUPPORT OF PLAINTIFFS</u>**

Terry Lawson
Nabilah Siddiquee
Patrick Baker
Immigrant Defense Project
40 West 39th Street, Fifth Floor
New York, NY 10018
Tel: (646) 760-0589

*Counsel for Amici Curiae*

## **TABLE OF CONTENTS**

INTEREST OF AMICI                                                                                     1

SUMMARY OF ARGUMENT                                                                          2

ARGUMENT                                                                                                    3

I.   ICE Has Implemented a Sweeping New Policy of Using New York Courthouses as
     Staging Grounds for Civil Immigration Arrests.                                              3

     A.  The 2018 ICE Courthouse Directive Codified an Unprecedented New Practice of
         Arrests In and Around Courthouses.                                                          4
     B.  Current Data and Trends Show that ICE Continues to Implement the Directive
         Pervasively Despite the 2019 UCS Policy.                                                  5
     C.  The Directive Is a Final Agency Action.                                                    7

II.  ICE's Courthouse Arrests Have a Chilling Effect on the Constitutional Right of
     Access to the Courts, Including Family Courts, Problem-Solving Courts, and Other
     Civil and Criminal Courts.                                                                          9

     A.  ICE Arrests Survivors Seeking Protection from Gender-Based Violence In and
         Around Courthouses.                                                                              9
     B.  ICE Arrests Many Other Litigants Defending Their Due Process Rights In and
         Around Courthouses.                                                                              12
     C.  ICE's Courthouse Enforcement Policy Frustrates Participation in Problem-
         Solving Courts.                                                                                    14
     D.  ICE Courthouse Operations Severely Impact Public Defenders and Defendants in
         Criminal Cases.                                                                                    15


III. ICE's Courthouse Operations Impair Routine Activities of Civil Legal Service
     Providers and Public Defenders Who Represent Immigrants in New York Courts.     16

     A.  Civil Legal Services Providers Suffer from a Daily Drain on Resources.          16
     B.  Public Defenders Must Divert Limited Resources to Responding to ICE Activity
         in the Courthouse.                                                                                17

IV.  ICE Courthouse Arrests Do Not Make the Public More Safe, Contravening the
     Directive's Stated Justification.                                                                  20

     A.  Survivors, Victims, and Witnesses Avoid Court Because of ICE.                    20
     B.  ICE Courthouse Arrests Appear to the Public as Kidnappings and Create Fear in
         the Community Generally.                                                                        21
     C.  Impeding Access to the Courts Reduces Public Safety.                                23

CONCLUSION                                                                                                25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Bennett v. Spear*,
   520 U.S. 154 (1997).                                                                    4, 7

*New York v. U.S. Immigration and Customs Enforcement*,
   19 Civ. 8876 (JSR), 2019 WL 6906274 (S.D.N.Y. Dec. 19, 2019)                            7, 8

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   136 S. Ct. 1807 (2016)                                                                    8

*U.S. Gypsum Co. v. Muszynski*,
   161 F. Supp. 2d 289 (S.D.N.Y. 2001)                                                       7

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)                                                                       7

**OTHER AUTHORITIES**

Alice Kenny, *Yonkers P.D. Arrests Scam Artist Who Targeted Immigrants*, Catholic Charities
   (Apr. 1, 2019), https://catholiccharitiesny.org/blog/yonkers-pd-arrests-scam-artist-who-
   targeted-immigrants                                                                      20

Angela Irvine et al., *The Chilling Effect of ICE Courthouse Arrests: How Immigration and
   Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic
   Violence, Adult Criminal, and Youth Court Hearings* (Oct. 2019),
   https://static1.squarespace.com/static/58ba8c479f7456dff8fb4e29/t/5dae6ba65642ea5d1cef97
   05/1571711914510/ice.report.final.21oct2019.pdf                                       8, 20, 21

Asian-Pacific Institute on Gender Based Violence et al., *Immigrant Survivors Fear Reporting
   Violence, May 2019 Findings*, https://www.tahirih.org/wp-content/uploads/2019/06/2019-
   Advocate-Survey-Final.pdf                                                                10

Beth Fertig, *When ICE Shows Up in Human Trafficking Court*, WNYC (June 27, 2017),
   https://www.wnyc.org/story/when-ice-shows-court/                                         10

David Brand, *Pregnant Queens Village mom freed from brink of deportation*, Queens Daily
   Eagle (Jul. 6, 2019), https://queenseagle.com/all/alma-centeno-santiago-freed-pregnant-ice-
   immigration-deportation                                                                  12

Dean Meminger and Spectrum News Staff, *ICE Official: Elected Officials Lying About Latest
   NY Arrests*, Spectrum News  (Sept. 27, 2019), https://www.ny1.com/nyc/all-
   boroughs/news/2019/09/27/ice--new-york-officials-lying-about-recent-arrest-spree#          7

Declaration of Shani Adess, Associate Director, Matrimonial & Family Law Unit, N.Y. Legal
Assistance Group (Feb. 28, 2019)   24

Declaration of Victoria Goodlof, Senior Staff Attorney, N.Y. Legal Assistance Group (Feb. 27,
2019)   24

Devin Barrett, *DHS: Immigrant Agents May Arrest Crime Victims, Witnesses at Courthouses*
(Apr. 4, 2017), https://www.washingtonpost.com/world/national-security/dhs-immigration-
agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-
9887-1a5314b56a08_story.html?noredirect=on&utm_term=.28f884cf113a   9

Hannah Rappleye et al., *Immigration crackdown makes women afraid to testify against abusers,
experts warn,* NBC News (Sep. 22, 2018),
https://www.nbcnews.com/politics/immigration/immigration-crackdown-makes-women-
afraid-testify-against-abusers-experts-warn-n908271   9

ICE Out of Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE
Courthouse Operations in New York State* (Apr. 2019),
https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-
Our-Courts-Final-Report.pdf   *passim*

Immigrant Defense Project, *The Courthouse Trap: How ICE Operations Impacted New York's
Courts in 2018* (Jan. 2019), www.immigrantdefenseproject.org/wp-
content/uploads/TheCourthouseTrap.pdf   *passim*

Immigrant Defense Project, *ICE Out of Courts*, https://www.immigrantdefenseproject.org/ice-
courts/.   4, 5, 6

Jonathan Blitzer, *The Woman Arrested by ICE in a Courthouse Speaks Out*, The New Yorker
(Feb. 23, 2017), http://www.newyorker.com/news/news-desk/the-woman-arrested-by-ice-in-a-
courthouse-speaks-out   9

*Man Arrested in Immigration Scam Targeting Yonkers Families*, Yonkers Times (Apr. 11, 2019),
https://yonkerstimes.com/man-arrested-in-immigration-scam-targeting-yonkers-families/   20

Melissa Jelsten, *Domestic Abusers Have an Ally in the Trump Era. It's ICE*, The Huffington Post
(Jul. 24, 2018), https://www.huffingtonpost.com/entry/ice-domestic-violence-
abuse_us_5b561740e4b0b15aba914404   9

Michelle Chen, *Kicking ICE Out of the Courthouses*, The Nation (Sep. 5, 2018),
https://www.thenation.com/article/kicking-ice-out-of-the-courthouses/   12

Office of the Chief Administrative Judge, N.Y. State Unified Court System, *Protocol Governing
Activities in Courthouses by Law Enforcement Agencies* (Apr. 17, 2019)   5

Priscilla DeGregory, *Cabbie Nabbed by ICE Outside of Court Gets Stay of Deportation*, N.Y.
Post (Aug. 17, 2018), https://nypost.com/2018/08/17/cabbie-nabbed-by-ice-outside-court-gets-
stay-of-deportation/   12

U.S. Immigration & Customs Enforcement, Directive Number 11072.1: Civil Immigration
    Enforcement Actions Inside Courthouses (Jan. 10, 2018)                    4, 23

Written Testimony of Richard Bailey, Supervising Attorney, Immigration Practice, Brooklyn
    Defender Services, New York City Council Committees on Immigration and the Justice
    System Oversight Hearing on ICE out of New York Courts (Apr. 10, 2019),
    https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3905136&GUID=A7C5673F-
    E49E-457A-BAC7-808DA336AC4B&Options=&Search=                              18, 22

Written Testimony of The Bronx Defenders by Rosa Cohen-Cruz, New York City Council
    Committee on Immigration Jointly with the Committee on Justice System Hearing re:
    Oversight - ICE out of New York Courts (Apr. 10, 2019),
    https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3905136&GUID=A7C5673F-
    E49E-457A-BAC7-808DA336AC4B&Options=&Search=                          13, 18, 19

**INTEREST OF AMICI CURIAE**

Immigrant Defense Project ("IDP") is a nonprofit legal resource and training center dedicated to promoting fundamental fairness for immigrants accused or convicted of crimes. IDP is a leading national expert on issues that arise from the interplay of immigration and criminal law. Since 1997, IDP has provided expert legal advice, training and publications on such issues to criminal defense, family defense, and immigration lawyers; criminal court, family court, and Immigration Court judges; and noncitizens. IDP respectfully submits this brief in support of the Plaintiffs' Opposition to the Government's Motion to Dismiss.

Through daily conversations, exchanges, and interviews with criminal and family defense lawyers and directly-impacted immigrant community members throughout New York State, IDP has developed unique insight into the sharp spike in immigration arrests in New York State courthouses, and has documented the widespread violation of noncitizens' fundamental rights by Defendant Immigration and Customs Enforcement ("ICE") courthouse arrests. IDP has been widely cited on this trend of ICE enforcement and has testified repeatedly about this issue before the New York City Council. As an organization committed to fair treatment for immigrants involved in the criminal justice, family court, and child welfare systems, IDP is concerned that the fundamental right to access to the courts, whether as a victim, defendant, witness, supportive family member, or otherwise, is being impaired. This chilling effect on people's ability to participate in the court system is, in turn, a serious threat to public safety and to the integrity of the New York State court system.

In addition to IDP, the following organizations join this brief as amici curiae: African Communities Together; African Services Committee; Anti-Defamation League; Appellate Advocates; Asian American Legal Defense and Education Fund (AALDEF); Bronx Defenders;

1

Brooklyn Bail Fund; Brooklyn Defender Services; Center for Appellate Litigation; Center for Safety and Change; Central American Legal Assistance; Chief Defenders Association of New York; Columbia County Sanctuary Movement; Day One; Fund for Modern Courts; Her Justice; Hispanic Federation; Immigrant Justice Corps; LatinoJustice PRLDEF; Lawyers for Children; Legal Services NYC; Mobilization for Justice; National Immigration Law Center; Nassau County Legal Aid; Northern Manhattan Immigration Corporation; Neighborhood Defender Service of Harlem; Neighbors Link; New York Civil Liberties Union; New York County Defender Services; New York City Gay and Lesbian Anti-Violence Project; New York Lawyers for the Public Interest; New York Legal Assistance Group; Northern Manhattan Coalition for Immigrant Rights; Queens Law Associates; Rockland Immigration Coalition; Safe Horizon; The Legal Aid Society of Suffolk County; Violence Intervention Program, Inc.; and Yonkers Sanctuary Movement. Their statements of interest are contained in Appendix A.

## SUMMARY OF ARGUMENT

Many of the amici organizations appear in New York's courts on a daily basis, advocating for criminal defendants, witnesses, victims, and survivors of gender-based violence, and observe firsthand the corrosive effects of ICE arrests in and around state courthouses. Amici curiae's clients depend on unfettered access to state court proceedings, yet they have been arrested by ICE while attending court, or are deterred from attending for fear of arrest. Other amici curiae have witnessed and documented the deleterious impact of ICE's 2018 directive, "Civil Immigration Enforcement Actions Inside Courthouses," on the administration of justice. The quantitative and qualitative data gathered by amici curiae demonstrates the pervasive scope of ICE's enforcement actions in and around state courts. As implemented, the policy has dire

legal consequences for the courts and for individuals served by amici, and is thus a final agency action reviewable under the Administrative Procedure Act.

ICE's aggressive enforcement practices violate constitutional rights to full and fair access to courts and to participate in court proceedings. These harms fall disproportionately on New York's most vulnerable immigrants, such as survivors of gender-based violence, who are forced to forego their legal rights to protect and defend themselves. Moreover, amici organizations have experienced disruption to their daily practices. Public defenders and civil legal services providers have diverted substantial time and resources to respond to ICE's courthouse presence that should be spent fulfilling their critical roles in the state judicial system. Finally, amici's findings undermine the Directive's central public safety rationale, showing instead that ICE courthouse arrests embolden abusive partners, deter participation in judicial processes, and create a climate of fear in and around New York's courts.

## ARGUMENT

I.  **ICE Has Implemented a Sweeping New Policy of Using New York Courthouses as Staging Grounds for Civil Immigration Arrests.**

Over the past six years, IDP has collected and verified hundreds of reported enforcement operations by ICE in New York courthouses.[1] The data shows a sweeping and unprecedented policy of using New York courthouses as a staging ground and surveillance site for civil immigration arrests in recent years. Specifically, IDP has documented an increase of over 1700

---

[1] "Operations" refers to both documented civil arrests of noncitizens—where ICE took an individual into custody inside or in the vicinity of a courthouse—and verified sightings of ICE officers or vehicles. Immigrant Def. Project, *The Courthouse Trap: How ICE Operations Impacted New York's Courts in 2018* at 5 (Jan. 2019), www.immigrantdefenseproject.org/wp-content/uploads/TheCourthouseTrap.pdf [hereinafter *Courthouse Trap*].

percent from 2016 through 2018—from 11 reported operations in 2016 to 219 in 2018.[2] Clients of amici have been arrested while attending criminal courts in all five New York City boroughs, at courthouses in Long Island, and in numerous county, town, and village courts upstate. In January 2018, ICE's directive, "Civil Immigration Enforcement Actions Inside Courthouses" (the "Directive"),[3] codified this systematic practice of arrests in and around courthouses. Current monitoring by amici indicates that ICE's courthouse enforcement policy has continued throughout New York State. Contrary to the Government's assertions, amici's reporting shows that this policy is indeed one "from which legal consequences…flow," and has a dramatic chilling effect on the constitutional right of access to the courts.[4]

A. The 2018 ICE Courthouse Directive Codified an Unprecedented New Practice of Arrests In and Around Courthouses.

The Directive, though it purported to set parameters on ICE's policy of surveilling and arresting noncitizens in and around courthouses, did nothing to stop or even limit the agency's practices. To the contrary, as amici's reporting shows, the Directive was followed by the most active period of courthouse enforcement yet—in quantity and in geographic scope. The policy codified by the Directive is systematic, subjecting large populations of noncitizens to the risk of civil arrest and detention while in or near courthouses.

Rather than limiting the discretion of ICE officers to carry out courthouse enforcement, the Directive marked a formalization and expansion of the policy, reflected in a significant uptick in arrests and sightings across the state. In 2018, the year following the issuance of the

---

[2] Immigrant Defense Project, *ICE Out of Courts*, https://www.immigrantdefenseproject.org/ice-courts/. *See also* Compl. ¶¶ 3.
[3] U.S. Immigration & Customs Enf't, Directive Number 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (Jan. 10, 2018).
[4] *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Directive, there was a 27 percent increase in the number of reported courthouse operations from 2017.[5]

In the wake of the Directive, ICE's courthouse operations expanded qualitatively as well as quantitatively. "[M]ost arrests in 2017 focused on larger county or city courthouses," predominantly in New York City's five boroughs.[6] In 2018, ICE increased its operations in town and village courts, some of which had not been affected previously, and was reported in and around courthouses in 19 counties outside NYC.[7] Westchester County, for example, saw "a significant surge…with the county reporting 13 arrests, up from four the previous year."[8] As reporting from amici and other organizations indicates, the year following the issuance of the 2018 Directive was a period of sustained and pervasive ICE activity at a wide cross-section of New York State's courthouses.

B.  Current Data and Trends Show that ICE Continues to Implement the Directive Pervasively Despite the 2019 UCS Policy.

Amici have continued to observe ICE inside and outside state courthouses in recent months, even after the April 2019 issuance of the Unified Court System's policy statement (the "UCS Policy") requiring a judicial warrant or order to conduct an immigration arrest inside a state courthouse.[9] Despite the UCS Policy, ICE has maintained the courthouse enforcement

---

[5] Immigrant Defense Project, *ICE Out of Courts*, https://www.immigrantdefenseproject.org/ice-courts/ (comparing 172 operations reported in 2017 to 219 reported in 2018).

[6] ICE Out of Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* at 5 (Apr. 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf [hereinafter *Safeguarding the Integrity of Our Courts*].

[7] *Id.* at 5-6.

[8] *Id.* at 6.

[9] *See* Office of the Chief Admin. Judge, N.Y. State Unified Court Sys., *Protocol Governing Activities in Courthouses by Law Enforcement Agencies* (Apr. 17, 2019).

policy codified by the Directive.[10] To date in 2019, there have been 176 reported courthouse operations.[11]

ICE continues to make arrests pervasively and without judicial warrants, in and around courthouses. For example, in January 2019, eight individuals—including a domestic violence survivor with no criminal history—were arrested en masse outside a town court in Rockland County.[12] On August 5, 2019, plain-clothes ICE officers attempted to arrest a U.S. citizen immediately outside the Red Hook Community Justice Center, a problem-solving court in Brooklyn.[13] When told that they needed a judicial warrant pursuant to the UCS Policy, the officers responded that the warrant requirement only applied inside the courthouse building.[14]

Such arrests show that ICE has responded to the UCS Policy by conducting its warrantless arrests in the immediate vicinity of courthouses—often on their steps or sidewalks.[15] Significantly, however, ICE has maintained a visible presence inside courthouses and courtrooms as a central element of its operations. ICE agents follow amici's clients through courthouses (even into the bathroom), surveil them inside courtrooms, and in one case informed court officers they would follow a client out of the courtroom and arrest him outside.[16] These recent examples suggest that, notwithstanding the Government's assertion that the Directive has

---

[10] Because individuals arrested by ICE may spend months in detention before securing representation, data on more recent courthouse operations tends to be undercounted. *See Courthouse Trap*, *supra* note 1, at 6 (noting that "we may not hear about an individual's arrest until they finally resurface in immigration court").

[11] Immigrant Defense Project, *ICE Out of Courts*, https://www.immigrantdefenseproject.org/ice-courts/.

[12] Reports on file with IDP.

[13] *Id.*

[14] *Id.*

[15] *See* Compl. ¶¶ 3-4, 77.

[16] *See also* Compl. ¶ 4 (describing arrests that followed the April 2019 UCS Policy).

no bearing on arrests outside courthouses,[17] its implementation purposely involves a seamless web of interconnected activity in and around courthouses. New York ICE Field Office Director Thomas Decker's recent statement makes that clear: "If we're not able to pick them up from the jail and they are a public threat, and they are removable, then we're going to look for them out in the community. And if we don't have the information about where they are at in the community, and then we can pick them up then *around the court*, then that's what we are going to do."[18]

C.  The Directive Is a Final Agency Action.

The Government argues that the Directive is not subject to judicial review under the APA because it is not a final agency action. Rather, it contends that the Directive "does not . . .create legal consequences for Plaintiffs or the aliens who may be the subject of civil enforcement actions" and  "merely explains certain considerations that will guide ICE officers in the exercise of their discretion." [19] But ICE's courthouse enforcement policy "has legal consequences for the aliens who were not previously subject to potential enforcement actions at state courthouses, but who now are."[20] As such, it is an "action …from which legal consequences will flow."[21] And despite the Directive's disclaimer, an agency's "'own behavior [may] bel[ie] the claim that its interpretation is not final.' Ultimately, where an agency's decision is given practical effect, it will be sufficient to trigger judicial review."[22]

---

[17] Defs.' Mem. Supp. Mot. to Dismiss, at 5-6, ECF No. 64.

[18] Dean Meminger and Spectrum News Staff, *ICE Official: Elected Officials Lying About Latest NY Arrests*, Spectrum News (video, 1:50-2:10) (Sept. 27, 2019), https://www.ny1.com/nyc/all-boroughs/news/2019/09/27/ice--new-york-officials-lying-about-recent-arrest-spree# (emphasis added).

[19] Mot. to Dismiss at 17-18.

[20] *New York v. U.S. Immigration and Customs Enforcement*, No. 19 Civ. 8876, 2019 WL 6906274, at *7 (S.D.N.Y. Dec. 19, 2019) (Rakoff, J.).

[21] *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

[22] *U.S. Gypsum Co. v. Muszynski*, 161 F. Supp. 2d 289, 291 (S.D.N.Y. 2001) (alteration in original) (citation omitted) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001)).

Here, that "practical effect" includes not only the unprecedented use of state courthouses for civil immigration seizures, but also the policy's dramatic chilling effect—forcing clients of amici to forego their legal right to access the courts.[23] By subjecting broad populations to potential arrest whenever they exercise that right, ICE's courthouse operations eliminate a "safe harbor" that previously existed in practice and common law, another indicator of administrative finality.[24] Moreover, the Directive itself, as the Government concedes, modifies ICE's prior stated policy by expanding the categories of individuals who may be arrested at courthouses.[25] In sum, the Directive—in light of its implementation and the "magnitude of the change in policy" it formalized[26]—is a sufficiently final agency action to warrant the Court's review.

---

*See also New York v. U.S. Immigration and Customs Enforcement*, 2019 WL 6906274, at *6 ("[T]he 'post-guidance events' alleged . . . show beyond cavil that the Directive actually embodies a legally-consequential change to the agency's interpretation of the INA.").

[23] *See* Angela Irvine et al., *The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings* at 8-9 (Oct. 2019), https://static1.squarespace.com/static/58ba8c479f7456dff8fb4e29/t/5dae6ba65642ea5d1cef9705/1571711914510/ice.report.final.21oct2019.pdf (reporting that significant percentages of witnesses, victims, and defendants nationwide avoid attending court out of fear for their own arrest or that of a family member).

[24] *See U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814-15 (2016) (holding that an agency determination's "denial of [a] safe harbor" to a regulated party created legal consequences and was therefore final).

[25] *See* Mot. to Dismiss at 4-5 ("The Directive differs from the 2014 policy" in part by "add[ing] two categories of targeted aliens" and "articulat[ing] 'special circumstances' in which ICE may arrest non-target aliens[.]").

[26] *New York v. U.S. Immigration and Customs Enforcement*, 2019 WL 6906274, at *7.

II.     **ICE's Courthouse Arrests Have a Chilling Effect on the Constitutional Right of Access to the Courts, Including Family Courts, Problem-Solving Courts, and Other Civil and Criminal Courts.**

   A.   ICE Arrests Survivors Seeking Protection from Gender-Based Violence In and Around Courthouses.

ICE arrests survivors and victims of gender-based violence in and around courthouses in New York and across the country without regard for the consequences. In one of the most publicized cases, ICE detained a woman who went to court to get an order of protection against an abusive ex-boyfriend.[27] Minimizing the impact on gender-based violence survivors' access to the courts, a DHS spokesperson told reporters afterwards, "[j]ust because they're a victim in a certain case does not mean there's not something in their background that could cause them to be a removable alien."[28] In another high-profile ICE courthouse arrest of a mother and her son living in a domestic violence shelter who were in court to contest false charges by an abusive partner, ICE appeared to be responding to a tip by her ex-fiance.[29] When asked about the arrest, ICE Deputy Director Matthew Albence told reporters that similar arrests would continue, whether inside or outside a courthouse, and said:

> [i]f an individual is here illegally in this country, they're always subject to arrest for that criminal violation. . . . We have compassion to all victims of crimes that are

---

[27] *See* Jonathan Blitzer, *The Woman Arrested by ICE in a Courthouse Speaks Out*, The New Yorker (Feb. 23, 2017), http://www.newyorker.com/news/news-desk/the-woman-arrested-by-ice-in-a-courthouse-speaks-out.

[28] *See* Devin Barrett, *DHS: Immigrant Agents May Arrest Crime Victims, Witnesses at Courthouses* (Apr. 4, 2017), https://www.washingtonpost.com/world/national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-1a5314b56a08_story.html?noredirect=on&utm_term=.28f884cf113a.

[29] *See* Hannah Rappleye at al., *Immigration crackdown makes women afraid to testify against abusers, experts warn,* NBC News (Sep. 22, 2018), https://www.nbcnews.com/politics/immigration/immigration-crackdown-makes-women-afraid-testify-against-abusers-experts-warn-n908271; *see also* Melissa Jelsten, *Domestic Abusers Have an Ally in the Trump Era. It's ICE*, The Huffington Post (Jul. 24, 2018), https://www.huffingtonpost.com/entry/ice-domestic-violence-abuse_us_5b561740e4b0b15aba914404.

here illegally. We have compassion toward victims of crimes that are United States citizens that have crimes committed against them by illegal aliens. That said, we have a job to do.[30]

When plain-clothes ICE agents targeted a woman for arrest in the Queens Human Trafficking Intervention Court and the woman's cousin tried to stop them, the ICE agent reportedly shrugged and said, "it is what it is."[31]

Though arrests of victims and survivors are widespread, they are not always reported in the press due to the inter-related fears of abusive partners and deportation.[32] One such case, a mother of two young children arrested in January 2019, shows just how harmful ICE courthouse arrests can be. In late 2018 and early 2019, MC, a client of Center for Safety and Change, had been going to multiple court appearances in Rockland County to contest false charges by her abusive ex-husband.[33] Her husband, who had been arrested and had criminal charges pending against him following MC's cooperation with the police and prosecutors, had alleged that MC was extorting him. MC explained to her attorney that, in fact, it was her request for child support that led the husband to make the criminal complaint.

In January 2019, when she arrived at the courthouse to continue fighting the extortion charges, which the prosecution planned to drop, MC was approached by five plain-clothes ICE officers in the parking lot. They held her mugshot photo in their hand and without identifying

---

[30] Hannah Rappleye et al., *Immigration crackdown makes women afraid to testify against abusers, experts warn,*NBC News (Sep. 22, 2018), https://www.nbcnews.com/politics/immigration/immigration-crackdown-makes-women-afraid-testify-against-abusers-experts-warn-n908271.

[31] *See* Beth Fertig, *When ICE Shows Up in Human Trafficking Court*, WNYC (June 27, 2017), https://www.wnyc.org/story/when-ice-shows-court/.

[32] Asian-Pacific Institute on Gender Based Violence et al., *Immigrant Survivors Fear Reporting Violence, May 2019 Findings*, https://www.tahirih.org/wp-content/uploads/2019/06/2019-Advocate-Survey-Final.pdf.

[33] Memorandum to File (Jan. 24, 2019) (on file with IDP). The account that follows summarizes the contents of this memorandum.

themselves, they asked, "Is this you?" When she didn't answer, an officer blocked her path and took her purse. When she tried to pull away, they said, "Are you going to be a good girl?" and "We need to take you" and "Do not resist." MC began crying and told the officers that she was a victim of domestic violence and that her husband used to hit her before they separated. An ICE agent responded, "The reason we are here is because you are illegal. That's your crime." They took her cell phone, her passport, and denied her request to call her grandmother, whom she needed to pick up her children from school. Unable to attend her court hearing or call her lawyer, MC was pushed into a white van filled with seven other detainees. She observed about twenty ICE officers in total around the perimeter of the courthouse.

After an hour-long drive, MC was brought to an unmarked building in Newburgh, New York and taken into an interview room with a different set of ICE officers. She explained that she had been badly abused by her husband for many years. They told her that they were not looking for "just anyone" and that they were trying to find criminals. They said that immigrants like MC can do a lot of good for our country and they just want to get rid of the bad ones. They asked her if she knew of any "illegal" immigrants who drank too much or used or dealt drugs or did other "bad stuff." After MC gave them the names of two men, they agreed to release her on her own recognizance under an order of supervision, and issued her a Notice to Appear in removal proceedings in immigration court. When MC returned to her home, where she rents rooms to others, her tenants had vacated the property, afraid that they too would be arrested. MC's story illustrates how an ICE courthouse arrest harmed MC, who had both cooperated with the police and the prosecution in the case filed against her husband and was appearing as a defendant in her own case. ICE's warrantless arrest of MC in the courthouse parking lot, blocking her entry, taking her personal items, and refusing to allow her to call anyone for help

illustrate ICE's complete disregard for MC and her rights to defend herself in New York State court proceedings. The harm done by ICE courthouse arrests to MC, her family, her community, and residents all over the state is pervasive and irreversible.

B. ICE Arrests Many Other Litigants Defending Their Due Process Rights In and Around Courthouses.

ICE has detained and deported many of amici's clients when they appeared in court to defend themselves in a variety of civil and criminal case contexts. In one case, a long-time lawful permanent resident was "disappeared from court when he appeared on a non-criminal charge for trespassing in a building" and was "deported quickly despite being diagnosed as 'not competent' to stand trial because of psychological and cognitive problems, 'learning disabilities, physical illness, and a history of trauma.'"[34] In another case, a Queens resident of twenty-five years was arrested by ICE on his way out of court after a case involving a dispute with a driver who nearly ran over his dog was dismissed.[35] In early October 2019, another client was sitting in Manhattan Criminal Court to respond to a traffic-related charge when court officers called his name and told him that ICE was waiting for him.[36] Despite being married to a U.S. citizen who is six months pregnant, ICE arrested and detained him.[37]

In April 2019, ICE arrested Alma Ceteno-Santiago, a pregnant mother of two and client of amicus New York Legal Assistance Group, outside a Queens Court after she appeared in court

---

[34] *See* Michelle Chen, *Kicking ICE Out of the Courthouses*, The Nation (Sep. 5, 2018), https://www.thenation.com/article/kicking-ice-out-of-the-courthouses/.

[35] Priscilla DeGregory, *Cabbie Nabbed by ICE Outside of Court Gets Stay of Deportation*, N.Y. Post (Aug. 17, 2018), https://nypost.com/2018/08/17/cabbie-nabbed-by-ice-outside-court-gets-stay-of-deportation/.

[36] Report on file with IDP.

[37] *Id.*

"to resolve a dispute with her ex-partner."[38] Ms. Ceteno-Santiago developed a severe stomach illness while in ICE detention, and after she complained about the conditions of her detention, her deportation was fast-tracked.[39] When a federal district judge blocked her immediate deportation and ordered her released, a family friend and spokesperson for Ms. Ceteno-Santiago said, "[w]e have lived the nightmare that every immigrant family fears."[40]

The pain caused by ICE courthouse arrests extends beyond the detained individual. One client of amici was arrested in late October 2019, outside of Brooklyn Criminal Court after the client's wife observed a plain-clothes ICE agent sitting on a bench inside the courtroom.[41] After watching four ICE agents take away her husband right outside the courthouse, the client's wife reportedly was traumatized.[42] As Rosa Cohen-Cruz, attorney for amicus The Bronx Defenders, told the New York City Council in April 2019:

> ICE officers treat our clients as less than human during courthouse arrests. They have arrested our clients and taken them away from their young children who had accompanied them to court. For one client, after recognizing an ICE officer following us in the hallways of court, I had to facilitate an opportunity for my client to hug his children goodbye in the courtroom before being arrested, thrown into a vehicle outside the courthouse, and placed in immigration detention, where he remains today, seven months later.[43]

---

[38] David Brand, *Pregnant Queens Village mom freed from brink of deportation*, Queens Daily Eagle (Jul. 6, 2019), https://queenseagle.com/all/alma-centeno-santiago-freed-pregnant-ice-immigration-deportation.

[39] *Id.*

[40] *Id.*

[41] Report on file with IDP.

[42] *Id.*

[43] Written Testimony of The Bronx Defenders by Rosa Cohen-Cruz, New York City Council Committee on Immigration Jointly with the Committee on Justice System Hearing re: Oversight - ICE out of New York Courts (Apr. 10, 2019), at 3, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3905136&GUID=A7C5673F-E49E-457A-BAC7-808DA336AC4B&Options=&Search=.

These stories, and countless others, emphasize the very real legal and practical consequences of the Directive, contrary to the Government's contention.

C. <u>ICE's Courthouse Enforcement Policy Frustrates Participation in Problem-Solving Courts.</u>

ICE operations have also been observed in and around problem-solving courts and related programs across the state.[44] After ICE patrolled the hallways outside their offices, Center for Court Innovation staff reported that immigrant participants in problem-solving courts "have voiced concerns about coming to court appearances and clinic appointments," have declined voluntary programs, and "often state that they find the legal system to be increasingly unsafe."[45]

According to Jasmine Velez from amicus Lexington Center for Recovery, who works with individuals sentenced to court-mandated treatment and probation, the risk of an ICE arrest makes her clients feel that they are in a lose-lose situation.[46] If they don't comply with their mandated treatment and probation, they may risk being re-arrested and may encounter ICE at the jail. But if they comply with the terms of their probation by adhering to their mandated appearances, they risk not coming home at the end of the day. When Ms. Velez went out on leave in April 2018 and returned eight weeks later, she had lost seven clients to ICE detention. When her clients are unable to return to treatment within thirty days, she is forced to close their cases, which both interrupts their recovery and their ability to comply with the court's orders.[47]

---

[44] *Safeguarding the Integrity of Our Courts*, *supra* note 6, at 49.
[45] *Id.* at 50.
[46] Notes of conversation with Jasmine Velez, Director of Haverstraw Clinic, Lexington Center for Recovery (Oct. 30, 2019) (on file with IDP).
[47] *See also* Compl. ¶ 84 (describing how the Directive frustrates the purposes of problem-solving courts).

Similarly, the arrests of individuals at Queens Human Trafficking Court erodes the public's trust and deeply frustrates mandated participation in court-ordered programs.[48]

D. ICE Courthouse Operations Severely Impact Public Defenders and Defendants in Criminal Cases.

The presence of ICE in and around New York State Courts negatively impacts defendants and public defenders. The risk of courthouse arrests causes clients of amici to take pleas at arraignments, rather than litigate their cases, to avoid returning to court.[49] As Matt Knecht, Managing Director of amicus Neighborhood Defender Services of Harlem, explained:

> [M]any . . . clients' cases would be dismissed or otherwise resolved favorably, but because of ICE's presence in and around criminal court, clients are more likely to take unfavorable pleas to avoid returning to court. Clients are foregoing their right to have a trial or have a full investigation in their case because they feel pressured to get a case resolved as soon as possible for fear of ICE contact.[50]

Amici The Bronx Defenders, Queens Law Associates, New York County Defender Services, Appellate Advocates, and Legal Aid Society have observed the same phenomenon.[51]

By arresting individuals who appear in court to assert or defend their rights, whether from inside the courthouse or on the steps outside, ICE impairs immigrants' ability to participate in court proceedings to vindicate their legal rights. As described above, the arrests of defendants, parties, and family members, following implementation of the Directive, prevent witnesses from testifying and parties from appearing. Because the policy deters immigrants from attending court, many individuals are unable to have disputes adjudicated by the court because necessary parties

---

[48] *Safeguarding the Integrity of Our Courts*, *supra* note 6, at 50-52.
[49] *Id.* at 40-42.
[50] *Id.*
[51] *Id.*

are afraid to go to court.[52] Disruption of state courts is an inevitable consequence of ICE courthouse arrests.

### III.  ICE's Courthouse Operations Impair Routine Activities of Civil Legal Service Providers and Public Defenders Who Represent Immigrants in New York Courts.

ICE's policy and practice of arresting immigrants in and around courthouses significantly impairs routine activities of civil legal services providers and public defenders who represent them in New York courts. As a result of increased ICE courthouse operations, civil legal services providers and public defenders working in New York courts must divert critical and limited resources to responding to the threat of ICE enforcement, including advising clients of the risk of ICE arrest in and around court, constantly monitoring the courthouse for ICE presence, and adjusting legal case strategy to account for clients' fear of ICE at the courthouse.

A.  Civil Legal Services Providers Suffer from a Daily Drain on Resources.

As a result of ICE courthouse operations, civil legal service providers have been forced to change the way that they advise clients, many of whom fear ICE arrest and detention, when considering whether to appear in court to defend their rights or to seek protections under the law.

Hamra Ahmad, director of legal services at amicus Her Justice, reported that with an increase in ICE courthouse arrests, attorneys now must "help foreign-born clients weigh the risks of pursuing civil court relief or appearing as a witness in court given increased ICE enforcement in and around courthouses."[53] As an example, legal service providers no longer can assure survivors of violence that they do not place themselves at risk of deportation when they seek civil remedies such as protective orders, child custody, divorce, or special immigrant juvenile status. As Dorchen Leidholdt of plaintiff Sanctuary for Families explained, with increased ICE

---

[52] *See* Compl. ¶¶ 6, 69, 80-98.
[53] *Safeguarding the Integrity of Our Courts*, *supra* note 6, at 30.

courthouse arrests, attorneys "must explore with [clients] the possibility that pursuing these remedies may place them and their children at risk of arrest, detention, and eventual deportation."[54] These providers "struggle with balancing clients' often urgent needs for legal remedies against the danger that pursuing these remedies may place them in."[55]

Shani Adess, Associate Director of the Matrimonial and Family Law Unit at amicus New York Legal Assistance Group (NYLAG), states that an increasing number of immigrant survivors express fear about whether it is safe to appear in civil courts to seek orders of protection, or file for custody, support or divorce against their abusers.[56] While NYLAG attorneys formerly evaluated a survivor's safety in relation to the abuser being brought to court, now, she explained, "we have to look to whether [the client's] physical safety in this country is at risk if they come forward."[57] Accordingly, attorneys at NYLAG and other legal service providers must devote attorney time to developing safety plans to address clients' fears that pursuing civil legal remedies will trigger ICE arrest.[58] One advocate at plaintiff Urban Justice Center, who works at the Queens Family Justice Center, described having numerous clients ask her to walk them to the subway after appointments because they feared walking past the court alone.[59]

B. Public Defenders Must Divert Limited Resources to Responding to ICE Activity in the Courthouse.

ICE courthouse arrest operations have significantly impacted public defender organizations by disrupting attorneys' daily work, resource allocation, and morale.[60] These

---

[54] *Id.*

[55] *Id.*

[56] *Id.* at 32.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.* at 3.

developments, in turn, interfere with access to legal representation in those courts. In a report

published by the ICE Out of Courts Coalition in April 2019, public defender organizations

identified significant disruptions to their representation of clients as a result of ICE arrests in

courthouses, including "1) clients' fears of attending court and increased issuance of bench

warrants; 2) barriers to mounting a zealous defense; 3) litigants disappearing into ICE detention;

4) resource drain in public defender offices; and 5) ICE's escalating use of force and

surveillance."[61]

ICE's presence in courthouses requires public defenders to devote significant time to

counseling clients who fear that appearing in court may lead to ICE arrest, detention, and

separation from their family.[62] According to amicus New York County Defender Services'

internal survey, 95% of respondents said that they have had clients fail to appear in court due to

fear of ICE arrest.[63]

ICE activities in and around criminal courts requires public defender offices to direct

additional staff time and resources toward advising clients of the risk of ICE arrest and detention

and assessing how that risk may impact a client's case in criminal court.[64] As Rosa Cohen-Cruz,

attorney for amicus The Bronx Defenders explained, "As *Padilla* attorneys, we must incorporate

the risk of an ICE arrest in court when advising a client who is considering whether to accept a

plea or take a case to trial."[65] Public defender offices, which have a constitutional duty to advise

clients regarding immigration consequences of criminal cases, "are routinely required to describe

---

[61] *Id.* at 38.
[62] *Id.* at 38-39.
[63] *Id.* at 39.
[64] *Id.* at 45.
[65] Written Testimony of The Bronx Defenders by Rosa Cohen-Cruz, *supra* note 43, at 2.

to . . . clients the very real possibility of ICE's presence at court as well as the serious and definite risks of not appearing for their proceedings."[66]

In light of ICE presence in criminal courts, public defenders also must monitor the court for ICE presence as part of their representation. Having to monitor the court in this way — constantly scanning the courthouse for ICE officers while counseling fearful clients—detracts from public defenders' limited time and resources to represent clients.[67] Further, many defense attorneys now escort clients from the courthouse to the subway "in order to witness and invoke their clients' rights in case of ICE arrest."[68] Joshua Epstein, Supervising Immigration Attorney at Queens Law Associates, notes that attorneys in his public defender office escort high-risk clients in and out of court, which "takes a vast amount of attorney time" and is a very stressful process that "impacts the anxiety levels of clients and attorneys."[69]

When ICE does make a courthouse arrest, it often further disrupts public defenders' legal representation of clients by failing to produce detained individuals for their criminal court dates, or transferring detained individuals to far-away detention facilities.[70] Responding to these actions by ICE further drains public defenders' already limited resources.[71]

---

[66] Written Testimony of Richard Bailey, Supervising Attorney, Immigration Practice, Brooklyn Defender Services, New York City Council Committees on Immigration and the Justice System Oversight Hearing on ICE out of New York Courts, at 3 (Apr. 10, 2019), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3905136&GUID=A7C5673F-E49E-457A-BAC7-808DA336AC4B&Options=&Search=.
[67] *Safeguarding the Integrity of Our Courts*, *supra* note 6, at 38.
[68] *Id.* at 45.
[69] *Id.*
[70] Written Testimony of The Bronx Defenders by Rosa Cohen-Cruz, *supra* note 43, at 3; *see also Safeguarding the Integrity of Our Courts*, *supra* note 6, at 42-43.
[71] *Safeguarding the Integrity of Our Courts*, *supra* note 6, at 43-44.

Finally, public defender offices have been compelled to devote resources to developing

and implementing trainings and protocols to address ICE courthouse arrests.[72]

## IV.   ICE Courthouse Arrests Do Not Make the Public More Safe, Contravening the Directive's Stated Justification.

### A.   Survivors, Victims, and Witnesses Avoid Court Because of ICE.

ICE courthouse arrests cause a chilling effect that leads survivors, victims, and witnesses

to avoid court hearings of all types because they fear that they or their family members will be

arrested. In 2019, Ceres Policy Research conducted a nation-wide survey of 1000 people in

mixed immigration status families.[73] Ceres found that 60% of respondents had avoided attending

court as witnesses when they had been a victim of a crime.[74] In addition, 41% of respondents had

avoided a domestic-violence-related hearing when they had been a victim, and 37% of

respondents had avoided appearing in child welfare hearings.[75] Notably, 48% of respondents

who were court-involved believed that judges are helping ICE conduct arrests, and 49% of

respondents who were court-involved believed that prosecutors are helping ICE arrest people.[76]

Amicus Yonkers Sanctuary Movement's Diana Sanchez explained to IDP that when an

out-of-state man was charged with grand larceny for allegedly defrauding 40 Yonkers families,[77]

the affected individuals were afraid to testify in Westchester County Court because of ICE

---

[72] *Id.* at 45 (noting that the Bronx Defenders had to create a training on ethical and professional responsibilities regarding ICE presence in and around courthouses).

[73] Irvine et al., *supra* note 23, at 4.

[74] *Id.* at 8.

[75] *Id.* at 9.

[76] *Id.*

[77] *Man Arrested in Immigration Scam Targeting Yonkers Families*, Yonkers Times (Apr. 11, 2019), https://yonkerstimes.com/man-arrested-in-immigration-scam-targeting-yonkers-families/. *See also* Alice Kenny, *Yonkers P.D. Arrests Scam Artist Who Targeted Immigrants*, Catholic Charities (Apr. 1, 2019), https://catholiccharitiesny.org/blog/yonkers-pd-arrests-scam-artist-who-targeted-immigrants.

courthouse arrests.[78] Ms. Sanchez explained that the families, having lost more than $300,000 in the alleged scam, struggled with the decision to testify at his trial in late 2019, and that at least one family declined due to fear of an ICE courthouse arrest.[79]

Knowledge of ICE arrests has been shown to greatly increase avoidance of court, with Ceres reporting that "[w]hen people knew that ICE arrests had occurred in their communities, they were 40-80% more likely to avoid court" and "200%—or 3 times—more likely to believe that judges and prosecutors are helping with ICE arrests."[80] This study, and amici's experiences, show that ICE courthouse operations have heightened mistrust of the courts.

B. ICE Courthouse Arrests Appear to the Public as Kidnappings and Create Fear in the Community Generally.

IDP and amici organizations have learned of numerous occasions in which immigrants, their family members, or bystanders witnessed an ICE arrest in or around a courthouse and believed it to be a kidnapping, sometimes calling 911. ICE's practice of effectuating arrests in a surreptitious and aggressive manner—often appearing out of nowhere, dressed in plain clothes, refusing to identify themselves, and forcefully taking arrestees into unmarked cars—creates fear in the community rather than promotes public safety. As Luis Bautista of Make the Road New York observed, community members witnessing ICE arrests in and around courthouses "have reported being scared, confused, and not sure how to respond when plainclothes ICE officers are physically detaining their loved one."[81]

---

[78] Notes of conversation with Diana Sanchez, Executive Director, Yonkers Sanctuary Movement (Oct. 30, 2019) (on file with IDP).

[79] *Id. See also* Compl. ¶¶ 85-86 (describing unwillingness of crime victims to participate in investigations or testify).

[80] Irvine et al., *supra* note 23, at 11.

[81] *Safeguarding the Integrity of Our Courts*, *supra* note 6, at 46-47.

The belief of bystanders that they are witnessing a kidnapping is not surprising given ICE's increased use of force and fear tactics. In 2018, IDP observed a striking increase in the use of force in ICE operations, including reports of ICE officers "tackling individuals to the ground, slamming family members against walls, and dragging individuals from cars in front of their children."[82] In 2018, "[r]eports of ICE using violent force to conduct arrests—slamming family members against walls, dragging individuals from cars, and even pulling guns on people leaving court—have become commonplace. Witnesses to ICE arrests have called 911 to report that they were witnessing a kidnapping. ICE has also turned to more aggressive surveillance, trailing attorneys to their offices and eavesdropping on confidential attorney-client conversations."[83]

In an incident in fall 2018, a client of Brooklyn Defender Services appeared for a hearing at Kings County Criminal Court and was approached by two men as he was exiting the courthouse.[84] The client "felt like he was being kidnapped because they did not identify themselves or show a badge," despite the client asking the men if they were ICE.[85]

In another example, a young man and his mother left criminal court in Brooklyn following a court appearance. About one block from the court, two plain-clothes ICE officers suddenly appeared, grabbed the man, and dragged him toward an unmarked car.[86] Fearing that her son was being kidnapped, the mother repeatedly asked the men who they were—even asking if they were immigration—but the men refused to identify themselves.[87] The details of this incident illustrate how ICE's courthouse arrests instill fear in noncitizen communities:

---

[82] *Courthouse Trap*, *supra* note 1, at 8.
[83] *Id.* at 3.
[84] Written Testimony of Richard Bailey, Supervising Attorney, Immigration Practice, Brooklyn Defender Services, *supra* note 66, at 3.
[85] *Id.*
[86] *Courthouse Trap*, *supra* note 1, at 8.
[87] *Id.*

> As the mother cried for help, a third plain-clothes ICE officer came over and pushed her against a wall, causing her head to hit the wall. The officer repeatedly told her to "shut up" and physically blocked her from going over to the unmarked car where her son had been pushed inside. The officers then drove away, leaving his mother sobbing on the street, panicked that her son had been kidnapped. She did not know it was ICE agents who arrested him until she received a call from her son in an ICE processing facility later that day.[88]

In a separate incident reported to IDP, a man had just exited Brooklyn Supreme Court with his attorney and family when he suddenly was surrounded by plain-clothes ICE agents, who threw him against a wall and put his hands behind his back.[89] Two other plain-clothes agents blocked the man from his attorney, and the agents refused to identify themselves.[90] The ICE agents then pulled the man into an unmarked car with no plates.[91] Several bystanders witnessed these events, and one woman, believing that the man was being kidnapped, called 911.[92]

These accounts illustrate how ICE's policies and practices of courthouse arrests create fear and confusion in the community and discourage individuals from attending court. Additionally, by making courts a place to fear, instead of a place to seek justice, ICE's aggressive and surreptitious arrest tactics hurt the public's perception of and willingness to participate in the courts.

C.  <u>Impeding Access to the Courts Reduces Public Safety.</u>

The Directive, along with public statements by ICE leadership, relies on public safety as a primary justification for the courthouse enforcement policy.[93] However, in amici's experience, the

---

[88] *Id.*

[89] *Id.* at 9.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *See* Directive at 1 ("[C]ivil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s), and ICE officers and agents.").

23

Directive's implementation undermines this rationale, which fails to account for how it deters

participation in the courts and creates a climate of fear and violence with aggressive tactics.

The chilling effect of ICE's courthouse operations has had disproportionate consequences

for the safety of amici's most vulnerable clients. For survivors of gender-based violence, going

to court to seek a protective order against an abusive partner may now be too risky. As Shani

Adess of the New York Legal Assistance Group reported, clients "are aware that ICE is now in

our courthouses, and we cannot promise them that there is no risk, especially when their abusive

partner has specifically made threats to call ICE on them."[94] Victoria Goodlof, a senior staff

attorney at NYLAG, stated that clients are unwilling to seek or enforce orders of protection in

family court and to fight custody petitions filed by their abusers.[95] As a result, survivors of

violence are forced to endure continued abuse rather than avail themselves of the court system.[96]

Similarly, tenants facing eviction or living in unsafe conditions are deterred from

attending housing court, where they fear ICE may be waiting. According to Norey Lee Navarro,

an attorney at Bronx Legal Services, clients have declined to challenge eviction proceedings or

pursue remedies against abusive landlords. Many tenants "often adamantly decline to sue their

landlords in [housing court] for repairs and instead continue to live in deplorable & unsafe

conditions in their apartments."[97] As these examples indicate, ICE's presence at New York

courthouses has failed to confer the Directive's purported public safety benefits on amici's

clients. By emboldening abusive partners and landlords, and otherwise deterring witnesses and

---

[94] Decl. of Shani Adess, Assoc. Dir., Matrimonial & Family Law Unit, N.Y. Legal Assistance
Grp., ¶ 4 (Feb. 28, 2019) (cited in *Safeguarding the Integrity of Our Courts*, *supra* note 6, and on
file with IDP).
[95] Decl. of Victoria Goodlof, Senior Staff Attorney, N.Y. Legal Assistance Grp. ¶ 5 (Feb. 27,
2019) (cited in *Safeguarding the Integrity of Our Courts*, *supra* note 6, and on file with IDP).
[96] *See also* Compl. ¶¶ 85-87 (similar reporting from district attorneys' offices).
[97] *Safeguarding the Integrity of Our Courts*, *supra* note 6, at 57-58.

victims from appearing in court, ICE's courthouse policy has had the precise opposite effect. And the use of violent force to make civil immigration arrests, described above, makes the courthouses themselves into sites of danger rather than safety.

## CONCLUSION

For the foregoing reasons, amici curiae respectfully request that the Court deny the Government's Motion to Dismiss.

Dated: December 20, 2019

New York, New York

Respectfully submitted,

/s/ Terry Lawson

Terry Lawson (4438362)
*terry@immdefense.org*
Nabilah Siddiquee (5048996)
*nabilah@immdefense.org*
Patrick Baker (5729371)*
*patrick@immdefense.org*

Immigrant Defense Project
40 West 39th Street, Fifth Floor
New York, NY 10018
Tel: (646) 760-0589
Fax: (800) 391-5713

*Counsel for Amici Curiae*

*Admission to S.D.N.Y. pending*

## Appendix A: Statements of Interests of Amici Curiae

**African Services Committee**

African Services Committee was founded in 1981 by an Ethiopian refugee to give a helping hand to other newcomers. Today, African Services Committee is a multiservice, human rights agency based in Harlem and dedicated to assisting immigrants, refugees and asylees from across the globe. Their programs address the needs of newcomers affected by war, persecution, poverty, and global health inequalities. The agency enhances more than 6500 immigrants' and refugees' prospects of success in this country with a free legal services practice, a low fee immigration clinic called the Immigrant Community Law Center (ICLC), an HIV housing program, a rapid diagnostic testing center that offers HIV, STI, TB, viral hepatitis, diabetes, hypertension screening and navigation to care, case management and mental health counseling, a food pantry and nutrition education program, and an adult literacy program. Many of ASC's immigrant clients need to access the courts in order to enforce their legal rights, divorce, obtain guardianship or custody of minors, protect their right to housing, or a variety of other important legal matters. ICE's presence at various courthouses serves as a deterrence to ASC's immigrant clients from being able to pursue and receive justice or important benefits before the courts because they are worried about being arrested and detained by ICE. ASC does not believe that ICE's presence at courts is appropriate, and that it has been used as an intimidation tactic to deny immigrants their lawful day in court in a variety of non-immigration legal matters.

**Anti-Defamation League**

ADL (the Anti-Defamation League) is a leading anti-hate organization founded in 1913 with a dual mission to stop the defamation of the Jewish people and secure justice and fair treatment to all. ADL has advocated for fair and humane immigration policies since its founding and has been

a leader in exposing anti-immigrant and anti-refugee fervor that has poisoned our nation's debate. In light of this work, ADL is acutely aware of the escalation of Immigration and Customs Enforcement (ICE) arrests in and around New York courthouses, which has had a chilling effect on the reporting of crime and the ability of victims and witnesses to access our justice system. Consistent with its principles and values, ADL accordingly joins this brief.

**Appellate Advocates**

Appellate Advocates is a non-profit public defender organization which represents individuals who have been convicted of both felonies and misdemeanors in Brooklyn, Queens, and Staten Island and are assigned to our office by the court. In addition to our appellate practice, we also represent defendants in post-conviction relief motions and hearings, often on behalf of non-citizen defendants whose rights were violated when they did not receive legally-mandated advice about the immigration consequences of their convictions. We also represent victims of human trafficking seeking to vacate convictions related to their victimization. We have an interest in this case because court attendance is essential for both our post-conviction relief and human trafficking clients. With respect to these clients, their criminal convictions – often the very convictions that subject them to immigration consequences – are, by definition, tainted by legal or constitutional defects. Our clients, who have been wrongfully convicted, need to access the courts in order to correct those errors and vindicate their rights. But, as long as ICE is free to use the courts to effectuate arrests, we are obligated to inform them that they risk arrest by ICE if they choose to exercise the rights that are guaranteed to them under the law. The courthouse should be a safe place for everyone, but especially those who have been wronged by the criminal justice system and seek recourse in its error-correcting mechanisms.

**Asian American Legal Defense and Education Fund (AALDEF)**

The Asian American Legal Defense and Education Fund (AALDEF), founded in 1974, is a national organization that protects and promotes the civil rights of Asian Americans. By combining litigation, advocacy, education, and organizing, AALDEF works with Asian American communities across the country to secure human rights for all. AALDEF advocates for fair immigration policies that recognize the human rights of undocumented immigrants in the United States, promote family reunification, enforce worker protections for all, eliminate racial and ethnic profiling, and end other discriminatory practices that violate due process. We also provide legal assistance to undocumented immigrants who are eligible for visa status as victims of trafficking and crime, as well as individuals who are seeking to adjust their status to lawful permanent residence based on their T or U visa status.

**Bronx Defenders**

The Bronx Defenders is a public defender non-profit that is radically transforming how low-income people in the Bronx are represented in the legal system, and, in doing so, is transforming the system itself. BxD seeks thoughtful, creative, energetic individuals with a strong commitment to social justice to join our dynamic and diverse staff. Our staff of over 350 includes interdisciplinary teams made up of criminal, civil, immigration, and family defense attorneys, as well as social workers, benefits specialists, legal advocates, parent advocates, investigators, and team administrators, who collaborate to provide holistic advocacy to address the causes and consequences of legal system involvement. Through this integrated team-based structure, we have pioneered a groundbreaking, nationally-recognized model of representation called holistic defense that achieves better outcomes for our clients. Each year, we defend more than 20,000 low-income Bronx residents in criminal, civil, child welfare, and immigration cases,

and reach thousands more through our community intake, youth mentoring, and outreach programs. The Immigration Practice of the Bronx Defenders provides advice and counsel to nearly 1,000 non-citizen clients each year throughout the pendency of their cases in both Criminal and Family Court to avoid or mitigate negative immigration consequences and provides removal defense services to hundreds of detained and nondetained immigrants in removal proceedings.  Through impact litigation, policy advocacy, and community organizing, we push for systemic reform at the local, state, and national level. We take what we learn from the clients and communities that we serve and launch innovative initiatives designed to bring about real and lasting change.

**Brooklyn Community Bail Fund**

Brooklyn Community Bail Fund (BCBF) is committed to challenging the racism, inequality, and injustice of the criminal legal and immigration enforcement systems through the payment of bail and bond. BCBF's clients are impacted by ICE courthouse arrests practices in several ways. Since 2015, BCBF has posted bail for nearly 5,000 New Yorkers facing misdemeanor charges in the New York City criminal courts. Our clients include many non-citizens who express fear of returning to court because ICE may be lurking in or near the court. Over the past year, BCBF has also begun a new program that has bonded out more than 320 New Yorkers who are held in immigration detention facilities. A number of these individuals have ended up in detention and sought BCBF's assistance with paying immigration bond after being apprehended during an ICE courthouse arrest.

**Brooklyn Defender Services**

Brooklyn Defender Services ("BDS") is a public defender organization that represents nearly 30,000 low-income residents of Brooklyn and elsewhere each year in criminal, family, civil, and

immigration proceedings, providing interdisciplinary legal and social services since 1996.  Since 2009, BDS has counseled or represented more than 15,000 clients in immigration matters including deportation defense, affirmative applications, and advisals, as well as immigration consequence consultations in Brooklyn's criminal court system.  Since 2013, BDS has represented more than 1,400 detained immigrants through the New York Immigrant Family Unity Project.

**Center for Appellate Litigation**

The Center for Appellate Litigation ("CAL") is a non-profit, public-defense firm. CAL represents indigent defendants in appeals and post-conviction proceedings arising out of convictions in New York and Bronx counties. CAL represents numerous noncitizen clients in post-conviction proceedings seeking vacatur of prior convictions based on constitutional legal defects. Since the drastic increase of ICE civil arrests in or around courthouses in New York, many of CAL's noncitizen clients have had to weigh the risk of ICE arrest and resulting separation from their homes and families against the opportunity to vindicate their due process rights and claims. CAL believes that all New Yorkers, including noncitizens, should have equal access to our state's judicial system and enjoy equal opportunity to pursue their legal claims. ICE civil arrests at courthouses effectively curtail our noncitizen clients' equal access and opportunity.

**Center for Safety and Change**

For 40 years, Center for Safety & Change has offered life-saving and life-changing programs and services to thousands  in Rockland County and beyond. Center is the only victim-centered non-profit organization in Rockland County and serves survivors of domestic violence, human trafficking, sexual assault and other serious crimes. Center operates  a 24-7 hotline and shelter;

provides therapeutic services, case management and support groups for adults and children; provides legal representation in family court, matrimonial and immigration cases; operates the county's rape crisis program which includes forensic services in the hospitals; and houses a prevention and social justice program that sends educators out into the community. Center serves all survivors regardless of immigration status, religion, gender identity, sexual orientation,  and race. Approximately 25% of Rockland County is foreign born and a significant percentage of the people we serve are immigrants. ICE has had a notable presence in Rockland County with raids regularly being conducted in homes, in parking lots outside of businesses in immigrant neighborhoods, outside of justice courts and even near schools. As a result, crime victims are afraid to report to the police or to seek the protection of the courts for fear of being arrested by ICE. In a similar vein, clients and their neighbors are afraid to go to court to serve as witnesses or to respond if they have been summoned. This interferes with the administration of justice and makes the community at large less safe. Center believes that ICE needs to be banned from conducting immigration enforcement actions at or near the courthouses in order for crime victims to be able to pursue safety and justice.

**Central American Legal Assistance**

Central American Legal Assistance (CALA) is a Brooklyn based non-profit organization that has been representing immigrants in removal proceedings since 1986. CALA's client population is comprised primarily of trauma survivors from Central and South America who fear persecution or torture in their home countries. Our clients need to be able to safely access New York Courts both as Defendants resolving open criminal matters and also as witnesses. Fear that they may be apprehended by Immigration and Customs Enforcement negatively impacts their ability to

resolve criminal matters and to report crimes, seek protection from law enforcement, and support criminal prosecutions as witnesses.

**Chief Defenders Association of New York**

The Chief Defenders Association of New York ("CDANY") is a membership organization of appointed public and conflict defenders, executive directors of nonprofit indigent defense offices, and assigned counsel administrators throughout the state. It advocates for executive and legislative policy measures that will promote the fair treatment of indigent criminal defendants. The recent, dramatic increase of ICE civil arrests conducted in and around New York's courthouses have become a barrier to justice for CDANY's noncitizen clients and a hurdle for pursuing the best criminal justice outcomes for CDANY's attorneys. Fear of potential ICE arrest have led to instances of CDANY's noncitizen clients accepting less favorable pleas to avoid having to return to court, while CDANY attorneys are forced to balance their pursuit of the best possible disposition for their clients' cases with the risk of ICE arrest. Intrinsic to the fair treatment of indigent criminal defendants is unfettered and equal access to our state's judicial system. ICE's courthouse enforcement operations are depriving noncitizen defendants of equal access to New York's criminal justice system.

**Columbia County Sanctuary Movement**

Columbia County Sanctuary Movement organizes with immigrants and allies to collectively support, empower and defend our communities. Our office is located in Hudson, NY and our programming occurs throughout Columbia, Greene, Rensselaer and Albany county. Due to the alarming number of attempted court house raids by Immigration and Customs Enforcement (ICE) CCSM has created a court support program. CCSM refers community members to trusted attorneys and assists in coordination of their case. This includes, but is not limited to, providing

A7

interpreters, transportation, evaluation referrals, gathering of legal documents and physically accompanying community members into court when needed. Since our founding in October of 2016, our community has reported and in several cases CCSM was witness to approximately 15 attempted court house raids throughout Columbia County. To our knowledge a judicial warrant was present in just two of these attempted raids. Our members have been affected in a myriad of ways. Defendants are taken before their right to a hearing, victims are detoured from reporting crimes and there has been an extreme deterioration in trust in law enforcement and the judicial process. This too has affected United States Citizens. US born children have been separated from their parents. Our executive director was pulled over by ICE while providing two community members a ride from court to their attorneys office. ICE tried to intimidate him into relinquishing his 4th amendment rights but he refused. We wholeheartedly support all efforts to halt these unjust practices including the recent OCA directive, pending state legislation and the NY State Attorneys General's current litigation.

**Day One**

Since its launch in 2003, Day One has become the primary voice of expertise in New York City on the issue of dating abuse and domestic violence among youth. Day One was founded to provide critical education and direct services to New York City's youth. Day One has educated more than 100,000 young people about how to identify and maintain healthy relationships, obtain legal protection when necessary, and assist others experiencing abuse. Day One has trained more than 8,000 professionals to identify relationship abuse among youth and to provide supportive, nonjudgmental guidance to teens. Additionally, we've represented hundreds of young people in court, provided them with individual or group counseling, guided them through a safety planning process, or counseled them on their legal rights and responsibilities, among

other things. Through Day One's leadership programs, students have organized awareness projects that have reached over 6,000 students. We are also involved in a range of community partnerships and policy initiatives to increase young people's rights related to intimate partner violence. As many of Day One's clients are immigrant youth whose experiences intersect with violence, trauma, and the legal system, we support efforts to stop ICE's chilling effect on our clients' ability to seek justice and safety through the courts.

**Fund for Modern Courts**

The Fund for Modern Courts is an independent, statewide court reform organization committed to improving the state's judicial system for all New Yorkers. The Fund for Modern Courts was founded in 1955 by concerned citizens, prominent lawyers, and business leaders. By building relationships with legal service and advocacy organizations, community members, bar associations and state and local governments, Modern Courts works with those who want to ensure an independent, diverse and highly qualified judiciary and provide equal access to justice for all New Yorkers. In light of its commitment to ensuring equal access to justice, in 2017 Modern Courts investigated the impact of ICE enforcement activities and published a report entitled [“Protecting the Administration of Justice in New York State: Impact of ICE Arrests on New Yorkers” Access to State Courthouses.”](#) In addition to documenting the relevant factual background, the Modern Courts' report proposed four new policies and protocols to ameliorate fear and intimidation on the part of immigrants seeking justice that has been caused by substantially increased ICE enforcement in and near state courthouses.

**Her Justice**

Since 1993, Her Justice has been dedicated to making quality legal representation accessible to low-income women in New York City in family, matrimonial and immigration matters. We

recruit and mentor volunteer attorneys from the City's law firms to stand side-by-side with women who cannot afford to pay for a lawyer, giving them a real chance to obtain legal protections that transform their lives. Our immigration practice focuses on representing immigrant survivors of gender-based violence pursuing relief under the Violence Against Women Act (VAWA) including U nonimmigrant status. Her Justice has appeared before Courts of Appeals and the United States Supreme Court in numerous cases as amicus. As up to 70% of Her Justice clients were born abroad, we have been working to ensure that civil court is a safe place for our clients and all immigrants to access to justice and remedies crucial to their and their families' well-being. We have long fought against ICE's practices of impeding this right by their presence in our courthouses.

**Hispanic Federation, Inc.**

Hispanic Federation, Inc. is a nonprofit membership organization that works to empower and advance the Hispanic community through public policy advocacy, leadership development and community revitalization projects. Established in 1990, Hispanic Federation ("HF") has grown to become one of the premier Latino organizations in the nation. Through its network of nearly 100 affiliated community-based organizations, HF reaches thousands of Hispanics each year.  The presence of ICE officers in and around our courthouses creates chaos in an already volatile environment.  Individuals experience a level of stress and anxiety which is exacerbated with ICE disrupting court systems.  The communities we serve have been increasingly hesitant to show up to their court dates or even cooperate with local police enforcement on ongoing investigations for fear they will be turned over to ICE, instilling a deep level of distrust and fear of law enforcement and courthouses amongst our immigrant communities. This puts our most vulnerable community members at risk of remaining in dangerous situations due to cases left

unresolved. Continued presence of ICE around courthouses will prevent access to our justice system that is set in place to ensure proper due process and protect our community.

**Immigrant Defense Project**

Immigrant Defense Project ("IDP") is a nonprofit legal resource and training center dedicated to promoting fundamental fairness for immigrants accused or convicted of crimes. IDP is a leading national expert on issues that arise from the interplay of immigration and criminal law. Since 1997, IDP has provided expert legal advice, training and publications on such issues to criminal defense, family defense, and immigration lawyers; criminal court, family court, and Immigration Court judges; and noncitizens. Through daily conversations, exchanges, and interviews with criminal and family defense lawyers and directly-impacted immigrant community members throughout New York State, IDP has developed unique insight into the sharp spike in immigration arrests in New York State courthouses, and has documented the widespread violation of noncitizens' fundamental rights by ICE courthouse arrests. IDP has been widely cited about this trend of ICE enforcement, and has testified about this issue before the New York City Council. As an organization committed to fair treatment for immigrants involved in the criminal justice, family court, and child welfare systems, IDP is concerned that the fundamental right to access to the courts, whether as a victim, defendant, witness, supportive family member, or otherwise, is being impaired. This chilling effect on people's ability to participate in the court system is, in turn, a serious threat to public safety and to the integrity of the New York State court system.

**Immigrant Justice Corps**

The first and only fellowship of its kind, Immigrant Justice Corps identifies promising young lawyers and advocates passionate about immigration, places them with not for profit

organizations where they can make the greatest difference, and supports them with training and expert insights as they provide direct legal assistance to low income immigrants. Our fellows' clients must be able to use the state court system without fear of immigration enforcement so they can assert their right to due process and seek protection when needed for themselves and their families. ICE presence in the courts harms and destabilizes the immigrant communities IJC fellows serve.

**LatinoJustice PRLDEF**

LatinoJustice PRLDEF, founded as the Puerto Rican Legal Defense & Education Fund in 1972, is a national non-profit civil rights legal defense fund who has advocated for and defended the constitutional rights of all Latinos to ensure their equal protection under the law. LatinoJustice which champions an equitable society through advancing Latino civil engagement, cultivating leadership, and protecting civil rights and equality, has both brought and supported law reform litigation challenging discriminatory federal immigration enforcement policies and practices that adversely impact Latino immigrants' rights.

**Lawyers for Children**

Lawyers For Children ("LFC") is a not-for-profit legal corporation dedicated to protecting the legal rights of individual children in New York City and compelling system-wide child welfare reform.  Since 1984, LFC has provided free legal and social work services to children in more than 30,000 court proceedings involving foster care, abuse, neglect, termination of parental rights, adoption, guardianship, custody and visitation. This year, our attorney-social worker teams will represent children and youth in close to 3,000 court cases in New York City Family Courts. LFC's clients include U.S.-born and immigrant children, and children with immigrant family members, caretakers and legal guardians. Through our Immigration Rights Project, two

attorneys and a masters-level social worker who have a particular expertise in issues affecting

immigrant youth provided advocacy for immigrant clients who are seeking Special Immigrant

Juvenile Status ("SIJS") and have been found by the Family Court to have been abused,

abandoned and/or neglected.  LFC's insight into the issues raised in the instant case is borne of

more than thirty years experience representing children in New York courts.

**The Legal Aid Society of Suffolk County**

Established in 1964, The Legal Aid Society of Suffolk County provides zealous, holistic criminal

defense, certain family court representation, and social work assistance to eligible Suffolk

County residents. As defenders, our focus centers on the well-being of our clients, legal and

otherwise. Through a combination of high quality courtroom advocacy and a client-centered

community approach, The Legal Aid Society of Suffolk County strives to safeguard the rights of

the indigent and assure equal access to justice. Our goal of equal access to justice includes the

right of our numerous noncitizen clients to defend themselves in court, without fear of

courthouse arrests by ICE. ICE's practices in and around our courthouses have long served as an

impediment to justice and a harm to our communities.

**Legal Services NYC**

Legal Services NYC is one of the largest civil legal service providers in the country, with over

500 staff that help over 100,000 low-income New Yorkers annually in a wide range of services,

including immigration, housing, and education law.  For many years, LSNYC has helped

domestic violence victims seek legal protections in NY courts.  LSNYC also helps thousands of

clients in NY Housing Court and NY Family Court.  The potential for ICE to conduct arrests

near NY courthouses is a concern for many LSNYC clients and affects our work in many NY

courts.  It also affects our work with LSNYC clients who are victims of domestic violence.  For these reasons, LSNYC has a strong interest as amicus curiae in this case.

**Mobilization for Justice**

Mobilization for Justice envisions a society in which there is equal justice for all. Mobilization for Justice's mission is to achieve social justice, prioritizing the needs of people who are low-income, disenfranchised or have disabilities. We do this by providing the highest quality direct civil legal assistance, conducting community education and building partnerships, engaging in policy advocacy, and bringing impact litigation.

**Nassau County Legal Aid Society**

At the Nassau County Legal Aid Society we represent indigent defendants in criminal court, many of whom are noncitizens. We have seen firsthand the chilling impact ICE's presence in NY courts has had on noncitizens who have contacts with the criminal justice system. We have received numerous reports from our criminal attorneys that their noncitizen clients refused to attend, or were anxious to attend criminal court for fear of ICE arrest. Courts cannot properly serve their integral purpose when defendants do not feel safe to avail themselves of their rights in court. We support the efforts to have ICE be prohibited from making these disruptive and improper arrests.

**National Immigration Law Center**

The National Immigration Law Center (NILC) is the primary national organization in the United States exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families.  Over the past 35 years, NILC has won landmark legal decisions protecting fundamental rights, and advanced policies that reinforce our nation's values of equality, opportunity, and justice.  NILC engages in lawsuits, policy advocacy, and

communications work to defend the fundamental and constitutional rights of all Americans, including low-income immigrants and their families. This work has included working with individuals who have been directly affected by immigration enforcement policies, including arrests at or near courthouses, and defending due process for all individuals.  NILC engages in this work to help empower these communities to be able to secure equal access to justice and the courts in ways that ensure that all people who live in the United States have an equal opportunity to have their day in court.

**Neighborhood Defender Service of Harlem**

Neighborhood Defender Service of Harlem (NDS) is a community-based public defense office serving the residents of Northern Manhattan. NDS's unique holistic defense model provides clients with zealous, client-centered advocacy in a wide array of legal issues. As a result, NDS advocates for clients in courthouses across New York City including criminal court, family court, housing court, and civil court, as well as in immigration proceedings. NDS has a strong interest in protecting the rights of its clients and all New Yorkers to access the courts without fear, regardless of race, income, or immigration status.

**Neighbors Link**

Neighbors Link is a holistic organization that utilizes education, empowerment and employment in our mission, to strengthen the whole community through the healthy integration of immigrants. Our strategies to educate, empower and employ families include a Worker Center, English as a Second Language (ESL) education, workforce development, parent education, early childhood programs, academic support for school-age children of immigrants and legal services and advocacy. Our legal department, the Neighbors Link Community Law Practice, provides direct representation for individuals and families in all aspects of immigration relief. Many times

this immigration relief requires our clients to engage with New York state court system. However, since ICE's policy of courthouse arrests our clients are afraid to use this system.  They are afraid that by seeking custody of their child or filing for an order of protection they open themselves up to ICE enforcement. This limits their ability to seek immigration relief and to avail themselves of opportunities for stability and security.

**New York City Gay and Lesbian Anti-Violence Project**

New York City Gay and Lesbian Anti-Violence Project is a non-profit organization founded in 1980 that empowers lesbian, gay, bisexual, transgender, queer (LGBTQ) and HIV-affected communities and allies to end all forms of violence through organizing, education, counseling, direct legal representation, and advocacy.  AVP's legal services include immigration support for LGBTQ immigrants.  AVP is also the convener for the National Coalition of Anti-Violence Programs, which addresses the needs of LGBTQ communities nationally, including LGBTQ immigration support.

**New York Civil Liberties Union**

Amicus curiae the New York Civil Liberties Union ("NYCLU") is a nonpartisan, non-profit membership organization with approximately 190,000 members statewide and serves as the New York State affiliate to the American Civil Liberties Union. The NYCLU's mission is to defend and promote the fundamental principles and values embodied in the United States and New York State Constitutions. In furtherance of its mission, the NYCLU litigates, advocates, and educates on a wide range of civil rights issues impacting New Yorkers — citizens and non-citizens alike. The NYCLU frequently serves as counsel or amicus in litigation concerning New Yorkers' access to courts and vital government services. See, e.g., Kearns v. Cuomo, 1:19-CV-902 (W.D.N.Y. filed Jul. 8, 2019) (amicus in case challenging the State of New York's recently

enacted law providing undocumented New Yorkers access to driver's licenses); De Jesus
Martinez v. Nielsen, 341 F. Supp. 3d 400, 411 (D.N.J. 2018) (counsel in case challenging ICE's
detention of petitioner at his immigration interview where he was seeking relief from removal),
appeal dismissed sub nom. Martinez v. Sec'y, United States Depart, No. 18-CV-3478, 2019 WL
2064450 (3d Cir. Feb. 15, 2019); Hurrell-Harring v. State, 15 N.Y.3d 8, 27 (2010) (counsel in
case on behalf of indigent criminal defendants challenging the State of New York's failure to
provide meaningful and effective assistance of counsel). By impeding access to courthouses
throughout New York State, the ICE policy at issue here deprives millions of immigrant New
Yorkers of equal access to our justice system, and threatens the NYCLU's ability to vindicate its
clients' rights in court.

**New York County Defenders Services**

New York County Defender Services ("NYCDS") is a public defender office in Manhattan that
represents approximately 15,000 clients annually. In addition to direct representation of indigent
criminal defendants, NYCDS engages in extensive law reform and policy work centered around
protecting and expanding the rights of our vulnerable client communities. Because many of
NYCDS's clients are foreign-born, we have a particular interest in preventing ICE arrests in and
around the courthouse that would interfere with their ability to exercise their constitutional
rights.

**New York Lawyers for the Public Interest**

For more than four decades New York Lawyers for the Public Interest (NYLPI) has been a
leading civil rights and legal services advocate for New Yorkers seeking to oppose being
marginalized on the basis of race, poverty, disability, and immigration status. Through our
community lawyering model, we bridge the gap between traditional civil legal services and civil

A17

rights, building strength and capacity for both individual solutions and long-term impact. NYLPI has a long commitment to immigrant justice. NYLPI's Health Justice Program brings a racial justice and immigrant rights focus to health care advocacy in New York City and State. Through the UndocuCare program, NYLPI provides representation to undocumented immigrants who are experiencing health emergencies and need better health care. NYLPI also has a Medical-Legal Community Partnership that connects detained immigrants to volunteer medical professionals in order to advocate for better medical care in detention. ICE enforcement actions at courthouses in New York State harm our clients' lives and have a chilling effect on the ability of our clients and their families to access justice. NYLPI advocated for a client who fell victim to these tactics while reporting to traffic court. Before the client could appear at his hearing, he was detained by ICE, and subsequently denied adequate medical care. We have spoken with family members who fear obtaining legal guardianship over their ill loved ones because they are undocumented and expect to be detained at the courthouse. We have heard clients express their fear of cooperating with law enforcement and going to the courthouse because they dread that ICE will detain them. These practices harm our client's civil cases, they inhibit courts from accomplishing their roles, and they risk the safety of families and communities across New York.

**New York Legal Assistance Group**

Founded in 1990, the New York Legal Assistance Group (NYLAG) is a leading not-for-profit civil legal services organization advocating for adults, children, and families that are experiencing poverty or have low income. We tackle the legal challenges and systematic barriers that threaten our clients' economic stability, well-being, and safety. We are committed to diversity, equity, and inclusion and constantly improving how we respond to systemic issues of racism that affect our clients in their pursuit of justice. We address emerging and urgent needs

with comprehensive, free civil legal services, direct representation, impact litigation, policy advocacy, financial counseling, medical-legal partnerships, and community education and partnerships. Last year, we affected the lives of 90,800 people, 35,900 of whom are immigrants. The Immigrant Protection, Domestic Violence Law, and LegalHealth Units in particular, provide substantial assistance to immigrant individuals and families throughout New York City. Core objectives at NYLAG include helping clients obtain access to justice through in court litigation and advocacy. Specifically, the Immigrant Protection and LegalHealth Units provide free legal consults and workshops for immigrants in their communities, as well as representation in a variety of immigration matters. The Immigrant Protection Unit serves particularly vulnerable populations, and LegalHealth primarily represents immigrants who are chronically or seriously ill.  Clients often have concurrent cases in State Courts in New York, through which we do advocacy on behalf of clients. The Domestic Violence Law Unit represents survivors of intimate partner violence and sexual assault, providing representation in Family and Supreme Court, and advocacy in pending criminal proceedings in which they are the protected party. Whether survivors feel safe engaging with systems impacts their willingness to seek court intervention or continue with court cases, without which their rights under the law and their physical safety may be at grave risk. NYLAG therefore is in a unique position to provide information relevant to the case to the court, and has a strong interest in the outcome of this proceeding.

**Northern Manhattan Coalition for Immigrant Rights**

Northern Manhattan Coalition for Immigrant Rights (NMCIR) is a highly respected community-based non-profit organization that provides quality immigration-related legal and education services. Its mission is to educate, defend and protect the rights of immigrants. Founded in 1982, NMCIR has provided legal and educational services, including ESOL and civics instruction, for

over 36 years. NMCIR currently serves over 8,000 families each year. Many of our clients are deterred from attending court--whether to respond to allegations against them, support family members in judicial processes, seek help against domestic violence abusers, or testify as witnesses and thereby assist in the justice process--due to ICE courthouse operations. With the threat of ICE detention, the price of accessing justice becomes too high for them to bear. In addition, ICE courthouse operations feed into a general fear of law enforcement among the communities we serve, leaving them without recourse or means of enforcing their rights.

**Northern Manhattan Immigration Corporation**

Northern Manhattan Improvement Corporation (NMIC) is a nonprofit organization that was founded in Washington Heights in 1979 with a mission to serve as a catalyst for positive change in the lives of people within the community on their paths to secure and prosperous futures. NMIC's presence as the largest community-based organization in upper Manhattan has made it a pillar of the community with a high level of social capital and neighborhood trust. Currently, NMIC serves over 14,000 clients annually and has a staff of over 150 full and part time employees. NMIC offers a variety of services that range from crisis-mitigation such as eviction prevention, intervention for domestic violence survivors, and food pantry assistance, to those that support self-sufficiency such as ESOL and GED classes, a weatherization unit to help clients upgrade their apartments, benefits access, and ongoing case management. NMIC's Legal, Organizing and Advocacy Unit represents and counsels a high volume of Immigrants in proceedings at NYC Housing and Family Courts. ICE's troubling pattern of conducting arrests at Courthouses is disruptive to State legal processes and has chilling effect on our community. Immigrant New Yorkers should not have to fear detention and deportation for exercising their rights in our legal system. NMIC therefore has a strong interest as amicus curiae in this case.

**Queens Law Associates**

Founded in 1996, Queens Law Associates (QLA) is one of two public defender organizations in Queens, New York. ICE's presence at the Queens County Criminal Court negatively impacts our criminal case representation in a variety of ways. QLA's immigration attorneys frequently recommend at-risk clients accept plea agreements at arraignments to avoid returning to court. In many cases, these clients could have received a form of a dismissal (i.e. CPL § 30.30 dismissal, adjournment in contemplation of dismissal (ACD)) at a subsequent adjournment date. Additionally, QLA's clients in ICE detention receive worse plea offers from the Queens County District Attorney's office. This is because clients in detention cannot access programs that are contingent on receiving ACDs or non-criminal dispositions such as disorderly conduct violations. These programs include assistance for anger management, parenting skills, sex-offenders, and alcohol and substance abuse.

**Rockland Immigration Coalition**

The Rockland Immigration Coalition is a non-partisan multi-disciplinary volunteer organization that believes immigrants are an essential part of our community. For the past twenty years, the Coalition has actively provided community education, conducted outreach efforts in various immigrant communities, run legal and community identification clinics, raised funds to help with emergencies (such as earthquake in Haiti), and pursued legislation and policies that ensure equal justice for immigrants. Over the past two years, the Coalition has received a steady stream of reports of ICE presence outside of justice courts and in various neighborhoods throughout the county. As a result, immigrants are afraid of seeking the help of the courts or law enforcement for fear of being deported or setting into motion the deportation of family members or neighbors. Coalition has turned its efforts toward bearing witness at the justice courts and initiating a rapid

response network to help immigrants get connected to legal counsel when they are picked up by ICE, and to help provide for their loved ones who are left behind and traumatized and often struggling to pay for basic needs. The Coalition firmly believes that ICE should not be able to subvert the integrity of the court system to carry out immigration enforcement actions – this phenomenon is destabilizing to our community.

**Safe Horizon**

Safe Horizon is the nation's leading victim assistance organization based in New York City. For over three decades, Safe Horizon's Immigration Law Project has assisted thousands of low-income immigrant survivors of crime, abuse, violence, trafficking and torture seek safety and protection under our immigration laws. In the past, our clients have had access to the courts to report crimes, obtain orders of protection, serve as witnesses and otherwise assist in the investigation or prosecution of a crime without fear of deportation. However, since 2017, ICE's enforcement activities in and around courthouses have effectively silenced these immigrant victims and witnesses—we have heard from our clients that they are now afraid to go to court to exercise their rights and to participate in the justice process—and given abusers the power to act with impunity. That is why this practice must end.

**Violence Intervention Program, Inc.**

The Violence Intervention Program, Inc. (VIP) partners with Latina/o/x communities to end gender-based violence. Created as a grassroots response to domestic and sexual violence, VIP has always centered survivors in its leadership and has worked to create a community of staff that reflects the rich national, ethnic and racial diversity of the communities it serves. VIP operates three community-based social service programs, two residential shelter and housing programs, a 24/7 hotline, innovative economic justice and sexual violence programs, and a

robust communications and outreach team. Established in East Harlem in 1984, the organization has grown, and now operates five locations across heavily immigrant neighborhoods in East Harlem, Bronx and Queens. The majority of VIP's clients are immigrants to the United States, who find themselves navigating unfamiliar systems during crisis. VIP runs three community-based social service programs and two residential shelter and housing programs. In 2017, VIP launched its Economic Justice and Survival Program, with an emphasis on small business and worker's cooperatives owned by immigrant survivors of DV/SV. Through funding from the Fund for Me Too Movement and Allies in 2019, VIP launched its Sexual Violence Project, specializing in addressing complex sexual trauma experienced by immigrant survivors and connecting them to online tools and technologies to help them reclaim their survival stories. For the past three years, anti-immigrant rhetoric and escalating tactics to arrest, detain and deport immigrants has created a stark chilling effect among those who are suffering domestic violence here in New York City. Options to address that daily violence have always included seeking civil and criminal court-issued protective orders, where victims may also request additional relief such as custody of their children, child support and other protections that help to protect themselves and their children against violence. With the increased presence of Immigration and Customs Enforcement seeking to arrest immigrants in courthouses, this option has failed survivors who fear unintended consequences for seeking protection from abusive partners. Increased risk of ICE engagement has led to decreased safety for immigrants suffering domestic and sexual violence at the hands of intimate partners and family members. For this reason, VIP supports the relief sought in the attached complaint, seeking to end the tactics that have functionally weakened protections for victims of domestic violence.

**Yonkers Sanctuary Movement**

Yonkers Sanctuary Movement is a grassroots organization that educates and mobilizes

immigrants and allies in Yonkers, New York to keep immigrant families safe from detention and

deportation, and to fight for justice for the undocumented community of Yonkers. ICE's

presence in and around courthouses creates a climate of fear that prevents victims of crimes from

seeking justice.

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed using the Court's CM/ECF

system. I certify that all participants are CM/ECF users and that service will be accomplished via

CM/ECF system.

Date:   12/20/2019                                    /s/ Terry Lawson

                                                     Terry Lawson
                                                     Immigrant Defense Project