**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| John Doe; The Door; Make the Road New York; New York Immigration Coalition; Sanctuary for Families; Urban Justice Center,<br><br><div align=center>Plaintiffs,</div><br><div align=center>v.</div><br>U.S. Immigration and Customs Enforcement; U.S. Department of Homeland Security; Donald J. Trump, in his official capacity as President of the United States; Chad Wolf, in his official capacity as Acting Secretary of Homeland Security; Matthew T. Albence, in his official capacity as U.S. Immigration and Customs Enforcement Acting Director; Thomas Decker, in his official capacity as U.S. Immigration and Customs Enforcement New York Field Office Director,<br><br><div align=center>Defendants.</div> | No. 19 Civ. 8892 (AJN) |

**BRIEF OF IMMIGRATION LAW SCHOLARS**
**AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

Brian A. Sutherland
John P. Kennedy
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
bsutherland@reedsmith.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ................................................................................1

INTRODUCTION .......................................................................................................2

ARGUMENT ..............................................................................................................3

I.   The Courthouse Arrest Directive Seeks to Enlist the States in
     Enforcing Federal Immigration Law .................................................................3

II.  The Common Law Precludes Civil Arrests in the Vicinity of Courthouses or
     While Going to or Returning from Court Proceedings ......................................8

     A.   English-Law Origins of the Common-Law Privilege from Arrest ..........8

     B.   The Federal Common-Law Privilege from Arrest................................10

     C.   New York's Common-Law Privilege from Arrest ...............................12

III. Defendants' Common-Law Arguments Are Meritless......................................15

CONCLUSION..........................................................................................................17

APPENDIX................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
  567 U.S. 387 (2012)................................................................6

*Baumgartner v. Baumgartner*,
  273 A.D. 411 (N.Y. App. Div., 1st Dep't 1948)...................................14

*Blight v. Fisher*,
  3 F. Cas. 704 (C.C.D. N.J. 1809) ...........................................11, 12

*Bours v. Tuckerman*,
  7 Johns. 538 (1811) ........................................................13

*Bridges v. Sheldon*,
  7 F. 17 (C.C.D. Vt. 1880) ..................................................11

*Chase Nat'l Bank v. Turner*,
  269 N.Y. 397 (1936) ........................................................16

*City & County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ..............................................7

*Department of Housing Preservation & Dev. v. Koenigsberg*,
  133 Misc. 2d 893 (Civ. Ct., N.Y. City 1986)................................14

*Engle v. Manchester*,
  46 App. D.C. 220 (App. D.C. 1917)..........................................11

*Frisbie v. Young*,
  11 Hun. 474 (1st Dep't 1877) ..............................................12

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014)................................................6

*Gonzalez v. Immigration and Customs Enforcement*,
  No. 12-cv-9012, 2019 WL 4734579 (C.D. Cal. Sept. 27, 2019)................6

*Hopkins v. Coburn*,
  1 Wend. 292 (1828) .....................................................13, 14

*Larned v. Griffin*,
  12 F. 590 (C.C.D. Mass. 1882) ............................................11

## TABLE OF AUTHORITIES
### (Cont.)

**Page(s)**

*Long v. Ansell*,
  293 U.S. 76 (1934)..........................................................................................8

*Merrill v. George*,
  23 How. Pr. 331 (1862)..................................................................................13

*Miles v. McCullough*,
  1 Binn. 77 (Pa. 1803) ....................................................................................11

*Moreno v. Napolitano*,
  213 F. Supp. 3d 999 (N.D. Ill. 2016) .............................................................6

*New York v. U.S. Immigration & Customs Enforcement*,
  No. 19 Civ. 8876 (JSR), -- F. Supp. 3d --, 2019 WL 6906274 (S.D.N.Y.
  Dec. 19, 2019)..........................................................................................15, 17

*Nichols v. Horton*,
  14 F. 327 (C.C.N.D. Iowa 1882)...................................................................11

*North Fork Bank v. Grover*,
  3 Misc. 3d 341 (Dist. Ct., Suffolk County 2004).........................................13

*Page Co. v. MacDonald*,
  261 U.S. 446 (1923).......................................................................................12

*Parker v. Hotchkiss*,
  18 F. Cas. 1137 (C.C.E.D. Pa. 1849) .......................................................11, 12

*Parker v. Marco*,
  136 N.Y. 585 (1893) ......................................................................................14

*Person v. Grier*,
  66 N.Y. 124 (1876) ..................................................................................13, 14

*Ryan v. United States Immigration & Customs Enforcement*,
  382 F. Supp. 3d 142 (D. Mass. 2019) ...............................................8, 15, 17

*Stewart v. Ramsey*,
  242 U.S. 128 (1916)..................................................................................12, 16

**Statutes**

U.S. Const. amend. X .........................................................................................7

8 U.S.C. § 1103(a)(10).......................................................................................5

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

8 U.S.C. § 1252c ...................................................................................................5

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, 110 Stat. 3009 ...............................................................5

**Executive Orders**

Executive Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ......................7

**English Case Law**

*Ex Parte Jackson*,
    33 Eng. Rep. 699 (1808) ..........................................................................9, 16

*Lightfoot v. Cameron*,
    96 Eng. Rep. 658 (1776) .................................................................................9

*Meekins v. Smith*,
    126 Eng. Rep. 363 (1791) ...............................................................................9

*Orchard's Case*,
    38 Eng. Rep. 987 (1828) ........................................................................10, 16

*Spence v. Stuart*,
    102 Eng. Rep. 530 (1802) ...............................................................................9

*Walpole v. Alexander*,
    99 Eng. Rep. 530 (1782) ...........................................................................9, 10

**Other Authorities**

3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1768) ......................8, 10

Alexander M. Burrill, *A Law Dictionary and Glossary* (2d ed. 1859) ................................. 13-14

Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. DAVIS L. REV. 171 (2018) ...........................................................6

César Cuauhtémoc García Hernández, *Creating Crimmigration*,
    2013 BYU L. REV. 1457 (2013) ...........................................................................6

Christopher N. Lasch, R. Linus Chan, Ingrid V. Eagly, Dina Francesca Haynes,
    Annie Lai, Elizabeth M. McCormick & Juliet P. Stumpf, *Understanding
    "Sanctuary Cities,"* 59 B.C. L. REV. 1703 (2018) ..................................................3

## TABLE OF AUTHORITIES
### (Cont.)

**Page(s)**

Christopher N. Lasch, *A Common-Law Privilege To Protect State and Local Courts During the Crimmigration Crisis*, 127 YALE L.J. FORUM 410 (2017) .........................7

DAVID GRAHAM, TREATISE ON THE PRACTICE OF THE SUPREME COURT OF THE STATE OF NEW YORK 129 (2d ed. 1836) .................................................................12

Huyen Pham & Pham Hoang Van, *Subfederal Immigration Regulation and the Trump Effect*, 94 N.Y.U. L. REV. 125 (2019) ...........................................................5

Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy*, 97 TEX. L. REV. 1247 (2019) .................................................7

Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control, and National Security*, 39 CONN. L. REV. 1827 (2007) ...............................6

Juliet P. Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367 (2006) ......................................................................3

MAI M. NGAI, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA (2004) ...................................................................................5, 6

Memorandum from James A. Puleo, Acting Associate Commissioner of the Office of Operations, U.S. Immigration & Naturalization Service (May 17, 1993), *available at* https://bit.ly/2Ccdrqe ...................................................................4

17A Moore's Federal Practice - Civil § 120 Historical Appendix (2019)....................10

Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine*, 78 YALE L. J. 52 (1968)...............................................................10

Pratheepan Gulasekaram, Rick Su, & Rose Cuison-Villazor, *Anti-Sanctuary and Immigration Localism*, 119 COLUM. L. REV. 837 (2019) ........................................7

R. TARRANT HARRISON, HARRISON'S ANALYTICAL DIGEST (1846) ...............................8

Sarah Rogerson, *Sovereign Resistance to Federal Immigration Enforcement in State Courthouses*, 32 GEO. IMMIGR. L.J. 275 (2018)...........................................4, 5

Teresa A. Miller, *Citizenship & Severity: Recent Immigration Reforms and the New Penology*, 17 GEO. IMMIGR. L.J. 611 (2003).......................................................3

Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 OHIO ST. L.J. 599 (2015).............................................................6

**TABLE OF AUTHORITIES**
**(Cont.)**

**Page(s)**

Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6
U. Pa. J. Const. L. 1084 (2004) ................................................................................6

## INTEREST OF *AMICI CURIAE*

*Amici*, who are listed in the Appendix, are scholars of constitutional law, criminal law, and immigration law. Collectively, their scholarship addresses the recent history of immigration enforcement, the entanglement of state and local criminal systems in immigration enforcement, and the phenomenon of courthouse immigration arrests and legal issues attendant thereto. *Amici* have expertise and a professional interest in the proper construction and enforcement of constitutional and statutory limits on federal immigration enforcement authority, and bring that expertise and interest to bear here by illuminating historical developments in this area, an understanding of which is critical to a resolution of the claims before the Court.

This Court granted the *amici*'s letter-motion to file this amicus brief. No counsel for a party authored this brief in whole or in part and no person or entity, other than *amici curiae* and their counsel, has contributed money that was intended to fund preparing or submitting the brief.

**INTRODUCTION**

This case presents the question whether a person may be subjected to civil immigration arrest while at a state courthouse or its environs, or while traveling to or from state-court proceedings. The answer to that question is "no." Civil immigration arrests are inconsistent with a longstanding common-law privilege against such arrests. Courts have had few occasions to consider the rule forbidding civil arrests in modern times because, until recently, neither private nor governmental entities asserted that they could effectuate such civil arrests. The law governing this issue is ancient and well settled; what is new is the government's zeal for pursuing noncitizens, at the expense of disrupting the administration of justice in state courts, to make a civil immigration arrest.

The United States argues in its motion to dismiss plaintiffs' complaint challenging the courthouse-arrest practice that no common-law rule against civil arrest applies to limit or prohibit civil immigration arrests. *Amici* write to assist the Court in providing relevant context for that assertion, which is incorrect. The federal government's recently-claimed prerogative to arrest noncitizens inside state courthouses does not arise in vacuum, but instead is part of an ongoing and escalating struggle in which the federal government seeks to compel state and local governments to assist in enforcing immigration law. Enforcement authorities have turned to state courts when they have deemed local cooperation to be insufficient, or simply to ease the burden of locating and apprehending removable individuals. But these efforts run contrary to deeply-ingrained public policy ensuring access to courts, protecting the rights of litigants and witnesses, and preserving the dignity and decorum of courts. In short, the public interest in the administration of justice, as reflected in the common-law privilege from arrest, outweighs the government's interest in effectuating civil arrests inside courthouses.

2

## ARGUMENT

**I.    The Courthouse Arrest Directive Seeks to Enlist the States in Enforcing Federal Immigration Law**

Thirty years of ever-increasing efforts by the federal government to harness state and local criminal systems in the service of immigration enforcement set the stage for the conflict between the parties in this case. After years of the Executive pressuring the States to participate in civil immigration enforcement, the current Administration has focused its gaze on state courthouses as a place where it can leverage state resources to carry out immigration enforcement.

For more than a century, the Supreme Court clearly demarcated separate spheres of responsibility over state and local crime control and federal immigration control. *See generally* Christopher N. Lasch, R. Linus Chan, Ingrid V. Eagly, Dina Francesca Haynes, Annie Lai, Elizabeth M. McCormick & Juliet P. Stumpf, *Understanding "Sanctuary Cities,"* 59 B.C. L. REV. 1703, 1719-23 (2018) (describing recent entanglement of these systems). During the 1980s and 1990s, this clear demarcation began to blur. Congress amended the Immigration and Nationality Act to increase the number and types of crimes that would subject a noncitizen to deportation. In 1988, for example, Congress created a category of "aggravated felonies," which expanded the list of removable offenses. Almost every immigration statute enacted since then has continued to expand the list of crimes resulting in deportation or exclusion from the United States. *See* Teresa A. Miller, *Citizenship & Severity: Recent Immigration Reforms and the New Penology*, 17 GEO. IMMIGR. L.J. 611, 633-34 (2003); Juliet P. Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 AM. U. L. REV. 367, 383 (2006).

As the federal government expanded its enforcement efforts, incursion on sensitive locations became more and more likely. After a series of enforcement actions in churches and one school, the former Immigration and Naturalization Service created a policy in 1993 that prohibited immigration enforcement actions in "sensitive locations." Sarah Rogerson, *Sovereign Resistance to Federal Immigration Enforcement in State Courthouses*, 32 GEO. IMMIGR. L.J. 275, 283-84 (2018). The INS identified churches, hospitals, and schools as "sensitive locations" where immigration enforcement would unnecessarily alarm or harm communities. The "sensitive locations" policy required the INS to "attempt to avoid apprehension of persons and to tightly control investigative operations on [those] premises." Memorandum from James A. Puleo, Acting Associate Commissioner of the Office of Operations, U.S. Immigration & Naturalization Service (May 17, 1993), *available at* https://bit.ly/2Ccdrqe. Enforcement activities in these "sensitive locations" required advance written approval from a District Director, who would consider whether alternative measures were available that would minimize the impact on these institutions and communities. *See* Rogerson, *Sovereign Resistance*, 32 GEO. IMMIGR. L.J. at 283. The 1993 policy memo did not need to identify courthouses as "sensitive locations" because longstanding common law already prohibited civil arrests at these locations. Courthouses would not become a target for decades.

The government recognized in its "sensitive locations" policy—implicitly if not explicitly—that the public interest in protecting vulnerable populations and privileged activities may outweigh the public interest in apprehending noncitizens on civil charges sooner rather than later. *See id.* at 285-87. Law enforcement may do more harm than good by making an arrest inside a church or hospital or at a wedding or funeral because such arrests may corrode the relationship between law enforcement and affected communities. And the risk of error inherent

in all human activity, including law enforcement, may require particular certainty and supervisory approval before disrupting people who are exercising important rights. *See id.*

While the "sensitive locations" memo recognized a public interest in balancing civil apprehension against unwarranted intrusions on the exercise of rights and human dignity, it by no means signaled a retreat from enforcement efforts. To the contrary, in 1996, Congress sought to multiply personnel involved in enforcement activities by enacting a bill that invited state and local (hereafter "subfederal," *see* Huyen Pham & Pham Hoang Van, *Subfederal Immigration Regulation and the Trump Effect*, 94 N.Y.U. L. REV. 125 (2019)) law enforcement agencies to help enforce immigration law. Pub. L. No. 104-208, § 133, 110 Stat. 3009, 3009-563 (1996) (amending 8 U.S.C. § 1357 to allow agreements authorizing subfederal officers to carry out the "function of an immigration officer"). Congress also specified narrow circumstances in which subfederal officers can effect civil immigration arrests outside such agreements. *See* 8 U.S.C. §§ 1103(a)(10), 1252c. In each of these instances, the federal government authorized, but did not require, state and local officers to enforce civil immigration law.

After the terrorist attacks on September 11, 2001, though, the federal government aggressively pushed for state and local law enforcement to take an active role in immigration enforcement,[1] taking the position that subfederal law enforcement officers did not need

---

[1] Scholars have documented the evolution of Executive reliance on state and local crime control systems as connected to the racialized portrayal of immigrants as criminal and national-security threats. *See generally* MAI M. NGAI, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA (2004); César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. REV. 1457 (2013); Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control, and National Security*, 39 CONN. L. REV. 1827 (2007); Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 OHIO ST. L.J. 599 (2015); Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation,* 52 U.C. DAVIS L. REV. 171 (2018).

authorization such as that contained in the 1996 legislation, and opining instead that subfederal officers had the "inherent authority" to enforce immigration laws. *See* Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6 U. PA. J. CONST. L. 1084, 1084-88 (2004). The Supreme Court discredited the "inherent authority" argument in *Arizona v. United States*, 567 U.S. 387 (2012), noting the "limited circumstances" in which Congress had authorized immigration arrests by subfederal officers and holding that Arizona's attempt to authorize such arrests beyond the "system Congress created" was preempted. *Id.* at 408-10.

Executive efforts to enlist state and local officers in the immigration enterprise have been repeatedly rejected as overreach by the courts. Federal courts, for example, struck down the notion that subfederal officials could be compelled by federal officials to detain suspected immigration violators, *see Galarza v. Szalczyk*, 745 F.3d 634, 641-45 (3d Cir. 2014) (holding commands for detention were not authorized by the INA and would violate the Tenth Amendment's anti-commandeering doctrine), and also held that federal officials routinely exceeded their authority in even *requesting* such detention without complying with the INA's requirements for civil immigration arrests, *Moreno v. Napolitano,* 213 F. Supp. 3d 999 (N.D. Ill. 2016). Recently, a federal court enjoined immigration officials' practice of requesting detention by subfederal officials lacking any state-law authority for such detention, noting that a "fundamental tenet of federalism requires states to determine the powers and responsibilities of their own officers and any attempt to subvert states' control over their law enforcement runs afoul of the Tenth Amendment." *Gonzalez v. Immigration and Customs Enforcement*, No. 12-cv-9012, 2019 WL 4734579, at *16–18 (C.D. Cal. Sept. 27, 2019).

The Trump Administration, like others before it, has ratcheted up pressure on local governments to enforce civil immigration law. *See* Pratheepan Gulasekaram, Rick Su, & Rose

Cuison-Villazor, *Anti-Sanctuary and Immigration Localism*, 119 COLUM. L. REV. 837, 844-47 (2019) (describing shift from "encouragement" to a "more direct and punitive approach"). In 2017, the President issued an Executive Order that threatened to withhold federal funding from any jurisdiction that the Secretary of Homeland Security, "in his discretion," designated as a "sanctuary jurisdiction." Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017). The Ninth Circuit concluded "that the Administration intends to cripple jurisdictions that do not assist in enforcing federal immigration policy" and affirmed in part the judgment for the California counties that challenged the Executive Order, finding the Executive violated separation of powers principles. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018). Subsequent efforts to defund sanctuary jurisdictions have likewise been struck down as Executive overreach. *See* Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy*, 97 TEX. L. REV. 1247, 1254-84 (2019) (detailing court rulings).

In the wake of this extensive history of rulings that rejected ongoing efforts to conscript the States into enforcing civil immigration law, the federal government retaliated by increasing arrests in state courthouses. *See* Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 YALE L.J. FORUM 410, 421-22 & nn. 64-67 (2017). In January 2018, the Department of Homeland Security issued the "Courthouse Arrests Directive" that is the subject of this action. Compl. ¶ 3. Driven to coopt state systems in the service of immigration enforcement, the government's policy shifted from protecting sensitive locations to taking unprecedented action to enforce civil immigration law in a setting the common law has regarded as deserving of special protection for hundreds of years.

**II.     The Common Law Precludes Civil Arrests in the Vicinity of Courthouses or While Going to or Returning from Court Proceedings**

At common law, a plaintiff commenced a civil action against a defendant by procuring his arrest. *See Ryan v. United States Immigration & Customs Enforcement*, 382 F. Supp. 3d 142, 155-56 (D. Mass. 2019) (citing authorities). The common-law rule against civil arrests in and around courthouses and while persons travel to and from court proceedings developed in England, where the civil-arrest practice began and was commonplace, and later that rule became part of the law of the United States. *See Long v. Ansell*, 293 U.S. 76, 83 (1934).

**A.     English-Law Origins of the Common-Law Privilege from Arrest**

In his eighteenth-century treatise on English law, William Blackstone summarized the law as providing that:

> Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning. And no arrest can be made in the king's presence, nor within the verge of his royal palace, nor in any place where the king's justices are actually sitting.

3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 289 (1768); *see also* R. TARRANT HARRISON, HARRISON'S ANALYTICAL DIGEST 358-63 (1846) (citing cases).

As indicated, Blackstone's treatise states a rule that applies separately to persons and places. A person attending court upon business shall not be arrested in connection with his or her attendance, which includes travel to and from the courthouse. And "no arrest" can be made at the "place" where the king's justices sit, *i.e.*, the courthouse and its environs. This latter statement of the rule is absolute and includes even those persons who have no "business" before the Court.

The reported English law cases follow Blackstone's statement of the rule that persons going and returning to court may not be arrested in connection with civil claims. In *Meekins v.*

*Smith*, the Court restated the general rule "that all persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in which number bail were included) were intitled to privilege from arrest eundo et redeundo [going and returning], provided they came bonâ fide." 126 Eng. Rep. 363, 363 (1791). In *Spence v. Stuart*, a defendant was privileged against arrest when he appeared for examination under oath before an arbitrator. 102 Eng. Rep. 530, 530-31 (1802). In *Lightfoot v. Cameron*, a party was privileged from arrest while dining with his attorney after attending court proceeding during the day. 96 Eng. Rep. 658, 658 (1776). In *Ex Parte Jackson*, the Court stated that "[t]here is no doubt, that the privilege extends to a Plaintiff, or a Defendant, attending his own cause." 33 Eng. Rep. 699, 700 (1808). As the Court explained, "a party may give useful information, as the cause proceeds." *Id.*

In a 1782 case, a witness from France was arrested in England after he appeared to testify as a witness in connection with another case. *Walpole v. Alexander*, 99 Eng. Rep. 530, 530 (1782). Lord Mansfield stated that "[t]his is the first case of a witness coming from abroad who has required the protection of the Court" (*id.* at 531), meaning that in all prior cases in which the Court had applied the rule against civil arrest, the arrestee was a domestic resident. The Court decided to extend the rule protecting domestic residents, stating that the "protection is extended to witnesses coming from abroad, as well as to those who are resident in this country." *Id.* "Every reason which applies to the protection of a witness at home," the Court stated, "holds more strongly with regard to a witness who comes from abroad." *Id.* Thus, English law recognized that the rationale underlying the rule against civil arrests applied to persons within and outside its jurisdiction.

The reported English law cases also follow Blackstone's statement of the rule that "no arrest" may take place where the king's justices sit. In *Orchard's Case*, an attorney was arrested either inside the court or "in the space between the outer and the inner doors" of the court. 38 Eng. Rep. 987, 987 (1828). The attorney, Orchard, "was not in court for the purpose professional attendance, or of discharging any professional duty." *Id.* But Orchard could not be arrested because no arrest may be made "in any place where the King's justices are actually sitting." *Id.* (quoting BLACKSTONE, *supra*). "To permit arrest to be made in the Court would give occasion to perpetual tumults, and was altogether inconsistent with the decorum which ought to prevail in a high tribunal." *Id.* In *Orchard's Case*, the Court discharged Orchard from custody and "admonished the officer to beware of again acting in a similar manner." *Id.* at 988.

### B.     The Federal Common-Law Privilege from Arrest

Until recently, courts in the United States had relatively few occasions to consider whether a common-law rule precluded civil arrest inside courthouses and while going and returning to court. England largely abolished the practice of civil arrest in 1838. *See* Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine*, 78 Yale L. J. 52, 68 & n.75 (1968). The practice "has all but disappeared" in the United States as well. 17A Moore's Federal Practice - Civil § 120 Historical Appendix 02 n.30 (2019). Because American courts continued a legacy of English common law in which the privilege against civil *arrest—i.e.*, taking the defendant into custody—was firmly established, much American case law focuses on the question whether the privilege protects persons and places from civil *service of process* in and near courthouses. The proposition that a person may not be arrested in a courthouse or its vicinity was and is well settled. As demonstrated below, cases addressing the

scope of the privilege against service of process expand upon, and certainly do not supersede or replace, the privilege against civil arrest.

In *Parker v. Hotchkiss*, for example, the court considered whether the "uniform" practice of protecting person and place from civil arrest should extend to civil service of summons. 18 F. Cas. 1137, 1138 (C.C.E.D. Pa. 1849). In *Miles v. McCullough*, the defendant moved to set aside service of summons and the plaintiff responded that the defendant "was privileged from arrests alone." 1 Binn. 77 (Pa. 1803); *Bridges v. Sheldon*, 7 F. 17, 44 (C.C.D. Vt. 1880) (describing *Miles*); *see also Nichols v. Horton*, 14 F. 327, 329-30 (C.C.N.D. Iowa 1882) (noting distinction between civil arrest and civil service of summons).

In *Larned v. Griffin*, the court stated that "[i]t has long been settled that parties and witnesses attending in good faith any legal tribunal, with or without a writ of protection, are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning." 12 F. 590, 590 (C.C.D. Mass. 1882) (citing cases). The question presented was whether "this immunity extends to all kinds of civil process[.]" *Id.* at 594; *see also Engle v. Manchester*, 46 App. D.C. 220, 228-29 (App. D.C. 1917) (same). These cases likewise confirm and build upon the rule against civil arrest, extending it to reach civil service in which the defendant is not detained.

An early federal case, *Blight v. Fisher*, explicitly distinguished between arrest and summons in determining whether the defendants had a personal privilege against summons that entitled them to dismissal of the suit. 3 F. Cas. 704, 705 (C.C.D. N.J. 1809). The court held that both civil arrest and summons are a contempt that the *court* may punish. The court held, however, that an *individual* has a right and privilege only against arrest and denied a motion to dismiss based on improper service of summons. *See id.* ("the privilege of a suitor or witness

extends only to an exemption from arrest"). In *Stewart v. Ramsay*, the Supreme Court observed that *Blight* was overruled by *Parker v. Hotchkiss*, *supra*, because *Blight* did not go far enough, *i.e.*, while the common-law rule protecting courts and individuals obviously covers arrests, it *also* covered civil service of summons. 242 U.S. 128, 130-31 (1916).

Thus, the United States Supreme Court fully accepted and endorsed the rule against civil arrest and, like courts before it, decided only whether an individual defendant had a personal privilege against civil process. *See id.* (affirming dismissal based on improper service of summons); *see also Page Co. v. MacDonald*, 261 U.S. 446, 447-49 (1923) (same). As the Court reasoned, "Courts of justice ought everywhere to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them." *Stewart*, 242 U.S. at 129 (quotation marks omitted).

### C.    New York's Common-Law Privilege from Arrest

Consistent with its English common-law heritage, federal law, and the law of other States, New York has long recognized a rule against civil arrest in and around courthouses and while going and returning to court proceedings on business. *See* DAVID GRAHAM, TREATISE ON THE PRACTICE OF THE SUPREME COURT OF THE STATE OF NEW YORK 129 (2d ed. 1836) ("As a general rule, every person who has any relation to a suit, whether his presence be compulsory or not, is exempt from arrest, *eundo*, *morando*, *et redeundo* [going, staying, and returning]."). Like their sister courts, New York's courts distinguished between an arrest—taking a person into custody—and civil process that did *not* involve taking the defendant into custody. *See Frisbie v. Young*, 11 Hun. 474, 475 (1st Dep't 1877) ("As a resident witness, he was exempt *only from arrest* while attending for examination, and not from the service of process." (emphasis in original)).

12

In *Hopkins v. Coburn*, for example, the Supreme Court of Judicature of New York stated that a New York resident who was attending a trial as a party to a lawsuit "was undoubtedly privileged from arrest." 1 Wend. 292, 293 (1828); *see also Bours v. Tuckerman*, 7 Johns. 538 (1811) ("The defendant was privileged from arrest ...."). In *Hopkins*, however, there "was not an arrest" because "bail was not demanded." 1 Wend. at 293. In other words, the plaintiff served the defendant but did not require him to post a bond as a condition of release, and so he was not detained. Because the defendant in *Hopkins* was a New York resident, he had no personal privilege against service of process. *See id.* But even a New York resident, under the early cases, could not be taken into custody and required to post a bail bond. *See Merrill v. George*, 23 How. Pr. 331, 334-36 (1862) (citing cases).

Against this common-law backdrop, the New York Court of Appeals stated in 1876 that "[i]t is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." *Person v. Grier*, 66 N.Y. 124, 125 (1876). The Court commented that "[t]his rule is *especially* applicable in all its force to suitors and witnesses from foreign States, attending upon the courts of this State," thereby indicating that the rule was also applicable to domestic parties and witnesses. *Id.* (emphasis added); *see North Fork Bank v. Grover*, 3 Misc. 3d 341, 344 (N.Y. Dist. Ct., Suffolk County 2004) (construing *Person*).

The Court of Appeals observed that in some prior cases the privilege against civil arrest meant only that a resident defendant could not be taken into custody and required to post a bond. Such defendants, the Court explained, have "been discharged from arrest upon filing common bail" (*Person*, 66 N.Y. at 125), which was "intended only to express the appearance of the defendant, in a case where special bail is not required." Alexander M. Burrill, *A Law Dictionary*

13

*and Glossary* 174 (2d ed. 1859) (defining "Bail, Common"); *see also Hopkins*, 1 Wend. at 293

("The indorsing of an appearance is equivalent to filing common bail."). The Court further

observed that a non-resident defendant was not only privileged against arrest, such that he could

not be taken into custody, but also privileged against service of process, such that service of

process "has been absolutely set aside." *Person*, 66 N.Y. at 125. The Court opined that whether a

"distinction" between residents and non-residents "should or does in fact exist, is at least

doubtful" in view of the reasons for the rule. *Id.* at 126. The Court explained:

> This immunity is one of the necessities of the administration of justice, and courts
> would often be embarrassed if suitors or witnesses, while attending court, could
> be molested with process. Witnesses might be deterred, and parties prevented
> from attending, and delays might ensue or injustice be done.

*Id.* (affirming order setting aside service on non-resident); *see also Parker v. Marco*, 136 N.Y.

585, 589 (1893) ("[the privilege] is deemed necessary for the maintenance of its authority and

dignity and in order to promote the due and efficient administration of justice").

Consistent with *Person* and *Parker*, subsequent New York courts have commented that

they do not "look with favor on the service of civil process in any part of a courthouse building

unless there is some compelling reason for such service …." *Baumgartner v. Baumgartner*, 273

A.D. 411, 412 (N.Y. App. Div., 1st Dep't 1948); *see Dep't of Hous. Pres. & Dev. v.

Koenigsberg*, 133 Misc. 2d 893, 898-99 (Civ. Ct., N.Y. City 1986). While these courts stopped

short of imposing contempt sanctions on parties that served civil process on a resident defendant,

they disapproved the practice and reserved the power to do so—and these cases address only

service, not forcible detentions. And throughout New York's history, the state courts have

uniformly maintained a firm rule against civil arrest—taking a defendant into custody—in

connection with a civil suit, regardless of whether the defendant is a resident or non-resident.

III.    **Defendants' Common-Law Arguments Are Meritless**

Defendants argue that "there is no state or federal common law immunity from immigration enforcement for those subject to ICE arrest." Def. Mem. 23 (ECF No. 64). But their argument focuses largely on case law holding that a non-resident is immune from service of process while attending judicial proceedings in another State, and ignores case law holding that residents and non-residents alike may not be arrested and taken into custody in connection with a civil claim. *See id.* at 23-27. Because the plaintiffs here challenge courthouse *arrests* and detentions in jails and other prison-like facilities, the defendants' attempt to confine the common-law privilege to one concerning service of papers is inapposite and historically inaccurate. As Judge Rakoff explained in denying the government's motion to dismiss in *New York v. U.S. Immigration & Customs Enforcement*, later decisions regarding service of process do not support the notion that the privilege was *narrowed* over time but rather demonstrate that the privilege was *broadened* to encompass not only courthouse arrests but service of process as well. No. 19 Civ. 8876, -- F. Supp. 3d --, 2019 WL 6906274, at *9 (S.D.N.Y. Dec. 19, 2019). "Far from being abandoned, therefore, the privilege was being expanded." *Id.*; *see also Ryan,* 382 F. Supp. 3d at 156 ("Such an 'absolutely indispensable' privilege, so fundamental to the functioning of both federal and state judiciary, cannot be assumed to have disappeared simply with the passage of time." (citations omitted)).

The continuing vitality of the common-law privilege and its applicability to courthouse immigration arrests is supported by the public policy rationales underlying the rule against civil arrests in courthouses, all of which apply to federal civil immigration arrests. *New York,* 2019 WL 6906274, at *10. The rule is necessary to encourage witnesses to testify and to encourage parties to participate in their own case. A noncitizen who fears civil immigration *arrest* at the

courthouse may not be willing to assist prosecutors in testifying against a criminal defendant, or to assist a family member in seeking a restraining order against an abusive spouse, or to assist parties in other matters. To encourage individuals to participate in the judicial process and thereby advance the administration of justice in all manner of cases, the rule against civil arrest extends not only to arrests within the courthouse itself, and its environs, but also to arrests of people going to and returning from court proceedings. *See* Section II, *supra*. To paraphrase the Supreme Court, courts of justice ought to be open and protect those who approach them. *Stewart*, 242 U.S. at 129.

The rule against civil arrests not only encourages witnesses and parties to appear, but also minimizes disruption to proceedings and the flow of information. After all, if the federal government removes a witness from the courtroom, he or she is no longer available to "give useful information" to the court [*Ex Parte Jackson*, 33 Eng. Rep. at 700] or assist or consult with counsel representing them. *Chase Nat'l Bank v. Turner*, 269 N.Y. 397, 399 (1936). An arrest physically prevents testimony and therefore disrupts proceedings even more than civil service of process. No matter where the witness resides, if she cannot testify because officers have taken her away in connection with a civil immigration charge, the courts, parties, and public will suffer for lack of information that she might have otherwise provided.

Finally, the rule against civil arrest protects the courts from "perpetual tumults" [*Orchard's Case*, 38 Eng. Rep. at 987] that would arise if federal immigration officers could arrest noncitizens in the vicinity of the courthouse. Taking a person into custody—by force, if necessary—would generally be far more disruptive than handing a person papers or refraining from initiating immigration proceedings in courthouses altogether. And there is no reason why arresting residents would be any less disruptive than arresting non-residents. In short, nothing in

16

the common-law rule against civil arrest suggests that it applies only to non-residents or "when a "jurisdiction would otherwise lack authority over the person but for his or her appearance in the jurisdiction to attend a court proceeding," as defendants argue. Def. Mem. 25.

Two federal cases directly on point now support plaintiffs' position. *Ryan*, 382 F. Supp. 3d 142; *New York*, 2019 WL 6906274. And defendants' position finds no support for good reason: Until very recently, conducting federal immigration enforcement inside state courts was unthinkable except in extraordinary circumstances. The rule against civil arrest has not played a prominent role in litigation over the last one hundred years precisely because the law so clearly forbid courthouse arrests. In fact, the federal government has recognized that important policy interests warrant restraint in conducting civil immigration enforcement at sensitive locations. And state courthouses are more than just another "sensitive location"; they are an essential part of government, as recognized by common-law decisions dating back to the time of the King's justices. The rule that protects them from interference by civil arrest should apply to the civil immigration enforcement arrests at issue here.

## CONCLUSION

*Amici curiae* respectfully submit that the Court should conclude that immigration officers may not arrest persons on civil immigration charges at or in the vicinity of courthouses or while they are going to or returning from court proceedings.

Dated: December 27, 2019

Respectfully submitted,


/s/ Brian A. Sutherland

Brian A. Sutherland
John P. Kennedy
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
bsutherland@reedsmith.com

*Counsel for Amici Curiae*

## APPENDIX

### List of *Amici Curiae*

(Institutional affiliations provided for identification purposes only)

Jennifer M. Chacón
Professor of Law
University of California Los Angeles School of Law

Rose Cuison-Villazor
Professor of Law
Rutgers Law School

Alina Das
Professor of Clinical Law
New York University of School of Law

Ingrid V. Eagly
Professor of Law
University of California Los Angeles School of Law

Dina Francesca Haynes
Professor of Law
New England Law School

Pratheepan Gulasekaram
Professor of Law
Santa Clara University School of Law

Annie Lai
Clinical Professor of Law
University of California Irvine School of Law

Christopher N. Lasch
Professor of Law
University of Denver Sturm College of Law

Sarah F. Rogerson
Professor of Law
Albany Law School

Rick Su
Professor of Law
University of North Carolina School of Law

Yolanda Vázquez
Associate Professor of Law
University of Cincinnati College of Law

Michael J. Wishnie
William O. Douglas Clinical Professor of Law
Yale Law School

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed using the Court's CM/ECF system. I certify that all participants are CM/ECF users and that service will be accomplished via CM/ECF system.

/s/ Brian A. Sutherland

Brian A. Sutherland

*Counsel for Amici Curiae*