UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| John Doe, et al.,<br><br>                Plaintiffs,<br><br>   -against-<br><br>U.S. Immigration and Customs Enforcement, et al.,<br><br>              Defendants. | Civil Action No. 19-cv-8892 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

I. Standard of Review ................................................................................................................ 2

II. Plaintiffs Have Constitutional Standing ............................................................................... 2

    A.  Plaintiff John Doe Has Demonstrated an Injury-in-Fact ............................................... 3

    B.  Organizational Plaintiffs Have Demonstrated Injuries-in-Fact ................................... 5

III. Plaintiffs Have Stated Actionable APA claims ................................................................... 9

    A.  Plaintiffs Are Within the Zone of Interests of Sections 1226 and
        1357 ............................................................................................................................. 9

    B.  This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA
        Claims Because the Location of Enforcement Actions Is Not
        Committed to Agency Discretion by Law ................................................................. 11

    C.  This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA
        Claims Because the Directive is a Final Agency Action ........................................... 13

IV. The Complaint States a Claim that the ICE Directive Violates Plaintiffs'
Constitutional Rights ............................................................................................................... 15

    A.  The Complaint Adequately Alleges that the Directive Violates
        Plaintiffs' Right to Access the Courts Under the Fifth and First
        Amendments ............................................................................................................. 15

        1.  The Complaint States a Claim Under the Fifth Amendment's
            Due Process Right to Access the Courts ............................................................. 15

        2.  The Complaint States a Claim Under the First Amendment
            Right to Petition the Government for Redress of Grievances ............................. 17

    B.  The Complaint States a Claim Under the Sixth Amendment ..................................... 20

V. The Complaint States a Common Law Immunity Claim and APA Claim
.................................................................................................................................................. 22

    A.  Defendants' Narrow Interpretation of the Common Law
        Privilege Against Federal Civil Immigration Arrests Is Baseless ............................. 22

B.    Congress Has Not Acted to Displace Prior Common Law on
      Civil Immigration Enforcement Arrests ................................................................... 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 ............................................................................................ 13, 14, 15

*Adam v. Barr*,
No. 18-CV-2106 (AJN), 2019 WL 1426991 (S.D.N.Y. Mar. 29, 2019), *aff'd*, No. 19-925,
2019 WL 6004632 (2d Cir. Nov. 14, 2019)........................................................ 3

*Aquavella v. Richardson*,
437 F.2d 397 (2d Cir. 1971)................................................................ 13-14

*Arizona v. United States*,
567 U.S. 387 (2012)................................................................................ 28

*Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*,
398 U.S. 281 (1970)................................................................................ 25

*BE&K Constr. Co. v. NLRB*,
536 U.S. 516 (2002)................................................................................ 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................ 2

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................ 13

*Boddie v. Connecticut*,
401 U.S. 371 (1971)................................................................................ 16

*Bridges v. Wixon*,
326 U.S. 135 (1945)............................................................................ 16, 18

*Broadgate Inc. v. U.S. Citizenship & Imm. Servs.*,
730 F. Supp. 2d 240 (D.DC. 2010).................................................................. 14

*Brown v. Jacobson*,
No. 98 Civ. 0565 LBS, 1999 WL 1125122 (S.D.N.Y.1999)........................................ 17

*Brown v. Stone*,
66 F. Supp. 2d 412 (E.D.N.Y.1999) ................................................................. 17

*Cayuga Nation v. Tanner*,
824 F.3d 321 (2d Cir. 2016) ............................................................................ 3

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) ............................................................................ 6

*Christopher v. Harbury*,
536 U.S. 403 (2002) ........................................................................................ 15

*Citizens for Responsibility & Ethics in Wash. (CREW) v. Trump*,
939 F.3d 131 (2d Cir. 2019) ............................................................................ 10

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................................ 11

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ........................................................................................ 24

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ................................................................................... 25, 26

*Common Cause/New York v. Brehm*,
344 F. Supp. 3d 542 (S.D.N.Y. 2018) (Nathan, J.) ......................................... 7

*Csoka v. Cty. of Suffolk*,
85 F. Supp. 2d 117 (E.D.N.Y. 2000) ............................................................... 17

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) ....................................................................... 9

*DeCanas v. Bica*,
424 U.S. 351 (1976) ........................................................................................ 28

*De Dandrade v. U.S. Dep't of Homeland Security*,
367 F. Supp. 3d 174 (S.D.N.Y. 2019) ............................................................. 10

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ............................................................................... 11, 12

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .................................................................................... 18-19

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ............................................................... 10

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
48 F. Supp. 3d 1 (D.D.C. 2014) ............................................................. 9

*Frozen Food Express v. United States*,
351 U.S. 40 (1956).............................................................................. 14-15

*Galvan v. Press*,
347 U.S. 522 (1954) ............................................................................... 16

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ...................................................................... 26, 27-28

*Hale v. Wharton*,
73 F. 739 (W.D. Mo. 1896) ................................................................... 23

*Heath v. Alabama*,
474 U.S. 82 (1985)................................................................................. 25

*Heffernan v. City of Paterson*,
136 S.Ct. 1412 (2016)............................................................................ 17

*Hoffman v. Bailey*,
996 F. Supp. 2d 477 (E.D. La. 2014) ..................................................... 18

*Jennings v. Rodriguez*,
138 S.Ct. 830 (2018).............................................................................. 12

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)............................................................................... 16

*Lexmark Intern., Inc. v. Static Control Components*,
572 U.S. 118 (2014)................................................................................ 9

*Lewis v. Casey*,
518 U.S. 343 (1996)........................................................................... 16, 19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).......................................................................... 2, 3, 6

*Make the Road New York v. Cuccinelli*,
No. 19 CIV. 7993 (GBD), 2019 WL 5484638 (S.D.N.Y. Oct. 11, 2019) ......................... 7

*McDonald v. Smith*,
472 U.S. 479 (1985)................................................................................................ 17

*Monsky v. Moraghan*,
127 F.3d 243 (2d Cir. 1997)..................................................................................... 15

*Morello v. James*,
810 F.2d 344 (2d Cir. 1987)..................................................................................... 15

*NAACP v. Button*,
371 U.S. 415 (1963)................................................................................................ 19

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d ................................................................................................................. 14

*New York v. United States Immigration and Customs Enforcement*,
Opinion and Order, No. 1:19-cv-8876-JSR (S.D.N.Y. Dec. 19, 2019), ECF No. 51
(Rakoff, J.) ........................................................ 2, 4, 12, 14, 22, 23, 24, 26, 27, 28

*New York State Citizens' Coal. for Children v. Poole*,
922 F.3d 69 (2d Cir. 2019)....................................................................................... 7

*Nnebe v. Daus*
644 F.3d 147 (2d Cir. 2011)................................................................................... 6, 7

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015)................................................................................................ 28

*O'Shea v. Littleton*,
414 U.S. 488 (1974)................................................................................................ 25

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015).................................................................................................. 14

*Person v. Grier*,
66 N.Y. 124 (1876).............................................................................................. 23-24

*Procunier v. Martinez*,
416 U.S. 396 (1974)................................................................................................ 20

*Prof 1 Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993).................................................................................................. 17

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
525 U.S. 471 (1999)........................................................................................... 19

*Resolution Trust Corp. v. Miramon,*
22 F.3d 1357 (5th Cir. 1994) ............................................................................. 25

*Rice v. Santa Fe Elevator Corp.,*
331 U.S. 218 (1947)........................................................................................... 25

*R.I.L-R v. Johnson,*
80 F. Supp. 3d 164 (D.D.C. 2015)................................................................. 12, 15

*Robinson v. Overseas Military Sales Corp.,*
21 F.3d 502 (2d Cir. 1994)................................................................................... 2

*Ryan v. U.S. Immigration & Customs Enf't,*
382 F. Supp. 3d 142 (D. Mass. 2019) .................................................. 2, 8, 22, 26, 29

*Stewart v. Ramsay,*
242 U.S. 128 (1916)........................................................................................... 23

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)............................................................................................. 3

*United Transporation Union v. State Bar of Michigan,*
401 U.S. 576 (1971)........................................................................................... 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
136 S.Ct. 1807 (2016)........................................................................................ 14

*U.S. Gypsum Co. v. Muszynski,*
161 F. Supp. 2d 289 (S.D.N.Y. 2001).................................................................. 13

*United States v. Alabama,*
691 F.3d 1269 (11th Cir. 2012) ......................................................................... 28

*United States v. Carpio-Leon,*
701 F. 3d 974 (4th Cir. 2012) ........................................................................ 18-19

*United States v. Goodwin,*
625 F.2d 693 (5th Cir.1980) .............................................................................. 21

*United States v. Green,*
No. 07-3517-cr, 2008 WL 4104220 (2d Cir. 2008).............................................. 20

*United States v. Green,*
305 F. Supp. 125 (S.D.N.Y. 1969) ........................................................... 22

*United States v. Moffitt, Zwerling & Kemler, P.C.,*
83 F.3d 660 (4th Cir. 1996) ..................................................................... 25

*United States v. Pinto,*
850 F.2d 927 (2d Cir. 1988)...................................................................... 21

*United States v. Portillo-Munoz,*
643 F. 3d 437 (5th Cir. 2011) .............................................................. 18-19

*United States v. Texas,*
507 U.S. 529 (1993)................................................................................... 25

*United States v. Valenzuela-Bernal,*
458 U.S. 858 (1982).................................................................................. 21

*United States v. Verdugo-Urquidez,*
494 U.S. 259 (1990).................................................................................. 18

*Younger v. Harris,*
401 U.S. 37 (1971)...................................................................................... 5

*Zadvydas v. Davis,*
533 U.S. 678 (2001)............................................................................ 12, 18

## **Rules and Statutes**

22 C.J.S. Criminal Procedure and Rights of Accused § 122 ............................. 24

5 U.S.C. § 701(a)(2)........................................................................................ 11

5 U.S.C. § 704 ................................................................................................ 13

8 U.S.C. § 1226(a) .................................................................................... 24, 26

8 U.S.C. § 1229(e) .................................................................................... 26, 27

8 U.S.C. § 1357(a) ............................................................................ 12, 24, 26

Fed. R. Civ. P. 12 ............................................................................................. 2

## PRELIMINARY STATEMENT

The United States, including New York, have a long history of respecting the sanctity of courthouses as a place where victims of crime, criminal defendants, witnesses and participants in civil court proceedings alike can safely seek justice. Defendants, including U.S. Immigration and Customs Enforcement ("ICE"), have recently invaded that sanctity in New York State courts (and in other state courthouses around the Nation) for federal immigration enforcement purposes. They have implemented a policy of making civil immigration arrests in and around New York courts, formalized in ICE Directive Number 11072.1 (the "Directive") (Dkt. 65-2), resulting in a 1736% increase in federal enforcement activity in and around New York state courthouses. Compl. ¶ 3.

ICE's courthouse arrest policy has caused destructive effects across the State. Noncitizen criminal defendants civilly arrested by ICE are forcibly prevented from continuing to participate in criminal proceedings and denied access to their lawyers. Others are dissuaded from exercising their legal rights, such as Plaintiff John Doe, who is too afraid of being arrested by ICE to seek an order of protection from his abusive ex-partner. Still others are deterred from participating in legal proceedings as witnesses. ICE's courthouse arrest policy has also compromised the ability of Organizational Plaintiffs to represent their clients adequately in immigration and other legal proceedings and has required them to divert scarce time and resources to counteract the effects of ICE's unlawful conduct. As set forth in Plaintiffs' complaint, ICE's courthouse arrest policy violates the Administrative Procedure Act ("APA"), the United States Constitution and New York common law.

Defendants attempt to dismiss these claims based on arguments that Plaintiffs lack standing, or have otherwise failed to state a claim. Defendants' Memorandum of Law in Support of Motion to Dismiss, Dkt. 64 ("Defendants' Memorandum" or "Mem."). These arguments boil

down to a bold assertion that ICE has unfettered discretion to conduct civil immigration arrests—wherever it chooses, no matter the cost—notwithstanding that Congress has given no meaningful sign of granting ICE the power in the Immigration and Naturalization Act (the "INA") to abrogate the longstanding privilege against civil arrest in or around courthouses, or that such arrests in any event violate basic First, Fifth and Sixth Amendment rights of meaningful access to courts to vindicate legal rights.  Other courts have already rejected Defendants' position in *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 146 (D. Mass. 2019) and, more recently, in *New York v. United States Immigration and Customs Enforcement* (hereinafter "the *State of New York* action"), Opinion and Order, No. 1:19-cv-8876-JSR (S.D.N.Y. Dec. 19, 2019), ECF No. 51 (Rakoff, J.).  This Court should do the same.

## ARGUMENT

### I.    STANDARD OF REVIEW

It is uncontroversial that, while Plaintiffs bear the burden of establishing subject-matter jurisdiction, including constitutional standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), they "need only make a *prima facie* showing," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  The Court should "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations."  *Id.*

Under Rule 12(b)(6), Plaintiffs need allege only "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads "enough factual matter (taken as true)" to allow the court to draw the reasonable inference that the defendant is liable.  *Id.* at 556.

### II.    PLAINTIFFS HAVE CONSTITUTIONAL STANDING

Each of the Plaintiffs in this action satisfies the three elements for constitutional standing: (1) an injury-in-fact that is "concrete and particularized" and "actual and imminent," (2) that is

"fairly . . . traceable to the challenged action of the defendant," and (3) it is "likely . . . that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (quotation marks and citation omitted). Defendants' constitutional standing arguments, which are limited to the element of injury-in-fact, Mem. 8–13, are meritless.

### A.  Plaintiff John Doe Has Demonstrated an Injury-in-Fact

Defendants assert that Plaintiff Doe has failed to demonstrate an injury-in-fact because he has not pleaded facts sufficient to demonstrate a credible threat of arrest by ICE. Mem. 8–9. According to Defendants, it is not enough that Mr. Doe, as an undocumented immigrant, fears arrest by ICE and has therefore been afraid to go to court to seek legal protection (Compl. ¶ 16); they say he would also need to allege one of

> "the personal factors specified in the Directive that would render him the potential subject of a civil immigration enforcement action inside a courthouse—*e.g.*, a criminal conviction, gang membership, posing a national security or public safety threat, a final order of removal, or a history of re-entering the country illegally after being ordered removed."

Mem. 8–9.

This attempt to impose a heightened standard on Mr. Doe for pleading an injury-in-fact fails. There is no legal requirement that he demonstrate any of the alleged "personal factors" identified in the Directive in order to demonstrate a credible threat of arrest and prosecution, which is "a low threshold and . . . quite forgiving to plaintiffs seeking such preenforcement review." *Adam v. Barr*, No. 18-CV-2106 (AJN), 2019 WL 1426991, at *3 (S.D.N.Y. Mar. 29, 2019), *aff'd*, No. 19-925, 2019 WL 6004632 (2d Cir. Nov. 14, 2019) (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)). Moreover, "[p]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014).

Here, the crux of the complaint is that the Directive places no meaningful restrictions on ICE's immigration enforcement authority in or around New York courthouses.  Compl. ¶ 64. Although the Directive lists various personal factors that could render a noncitizen a potential target for ICE arrest inside a courthouse, these factors are not exhaustive; indeed, the Directive contains no specific procedures or guidance for avoiding enforcement action in courthouses or minimizing the impact of such enforcement on court proceedings.  Rather, as Defendants tacitly concede when they tout their sweeping powers under the INA, Mem. 14, it vests immigration officers with broad authority to make enforcement determinations in New York courthouses based on undefined "special circumstances" and on a case-by-case basis.  *See* Dkt. No. 65-2; Compl. ¶¶ 64–68.

Consistent with the lack of any meaningful restrictions in the Directive on the ability of ICE officers to make courthouse arrests, ICE enforcement actions in and around New York courthouses have skyrocketed since the Trump administration reversed the policies of previous administrations targeting only the most dangerous noncitizens.  *See* Compl. ¶¶ 2–4.  ICE officers have arrested survivors of gender-based violence in and around New York courthouses, including those who do not appear to meet any of the alleged "personal factors" in the Directive, in circumstances similar to those that have made Mr. Doe too fearful to pursue legal relief in state court from his harasser.  Compl. ¶¶ 4, 62, 69; *see State of New York*, No. 19-8876 (JSR) at 5–6 (citing Br. of Amici Curiae Immigrant Defense Project and 40 Legal Services Organizations, Public Defender Organizations, and Non-Profit Organizations in Supp. of Pls. (Nov. 5, 2019), ECF No. 30).

It is therefore notable that Defendants have *not* claimed that Mr. Doe's fears of ICE arrest are unfounded, nor represented that he would not be arrested by ICE while seeking an order of

protection in Family Court against his abusive ex-partner.  Instead, Defendants say that a survivor of gender-based violence will not be arrested by ICE "based *solely* on derogatory information provided by the abuser."  Mem. 9 (emphasis added).  But they do not deny that, so long as ICE has obtained some iota of evidence on Mr. Doe's immigration status from a source *other* than his abusive ex-partner, he could be subject to ICE arrest in or around New York courthouses.  He is therefore at continued risk of being arrested by ICE while seeking an order of protection against his abusive ex-partner, and has pleaded facts sufficient to demonstrate that the threat of being arrested by ICE while pursuing an order of protection in Family Court is credible. *See* Compl. ¶¶ 16, 90–95.

Defendants' citation of *Younger v. Harris*, 401 U.S. 37 (1971) in support of their assertion that Mr. Doe has not alleged a credible threat of prosecution is wildly misplaced. There, plaintiffs—members of the Progressive Labor Party and a high school history teacher— felt "inhibited" from advocating their political beliefs and teaching communism to students as a result of the Criminal Syndicalism Act.  Because none of these plaintiffs alleged that they had "ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," the Supreme Court found that they lacked standing to challenge the Act.  *Id*. at 42.  In contrast, Mr. Doe's fears of arrest, which are based on previous enforcement action by ICE against noncitizens in and around New York courthouses, including survivors of gender-based violence, are more than credible.

### B.  Organizational Plaintiffs Have Demonstrated Injuries-in-Fact

Defendants' claim that Organizational Plaintiffs have no standing to challenge ICE's courthouse arrest policy is equally unfounded.  Defendants assert that Plaintiffs The Door, Make the Road New York, Sanctuary for Families, and Urban Justice Center have not demonstrated associational standing (Mem. 10–12), but their arguments are based on a misapprehension of the

5

theory of standing on which these Plaintiffs rely.  The Door, Make the Road New York, Sanctuary for Families, and Urban Justice Center have standing to challenge ICE's courthouse arrest policy in their own right ("organizational standing"), and have asserted this in the Complaint.  Compl. ¶¶ 17–28, 31, 99–130.  Defendants' arguments as to why these Plaintiffs lack associational standing (Mem. 9–12) are therefore irrelevant.

It is undisputed that the relevant test for establishing organizational standing is the same as the test for individual standing:  (1) an injury-in-fact that is "concrete and particularized" and "actual and imminent," (2) that is "fairly . . . traceable to the challenged action of the defendant," and (3) is "likely . . . that the injury will be redressed by a favorable decision." *See supra* at 2–3; *Lujan*, 504 U.S. at 560–61 (quotation marks and citation omitted).  The Second Circuit has made clear that demonstrating an injury-in-fact by an organizational plaintiff is not hard:  "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (internal quotation marks omitted).  For example, in *Nnebe v. Daus*, organizational plaintiff New York Taxi Workers Alliance (NYTWA) claimed that a policy of suspending drivers' taxicab licenses upon notification of arrest without a hearing was unconstitutional and violated state and municipal law.  644 F.3d 147, 148, 150 (2d Cir. 2011).  NYTWA asserted that it had standing to challenge this policy because it expended resources by providing counseling services and assisting drivers who faced suspension under this policy in obtaining attorneys.  644 F.3d at 157.  The Court of Appeals held that even if only a "few suspended drivers" were counseled by NYTWA in a year, there was "some perceptible

opportunity cost" expended by the organization because those resources could be spent on other activities, and that this was sufficient to demonstrate an injury-in-fact.  *Id.*[1]

Each of the Organizational Plaintiffs in this action has expended time and resources counteracting the harmful effects of ICE's courthouse arrest policy that would have otherwise been spent on other purposes.  Compl. ¶¶ 99–130.  They have devoted considerable attorney time to advising clients on the impact of ICE's courthouse arrest policy and developed new training materials to educate their communities about what to do in response to an ICE courthouse arrest. *Id.*  For example, Plaintiff Make the Road New York has expended so much time and so many resources on responding to community questions and concerns about ICE's enforcement actions, including in and around New York courthouses, that it had to hire a legal fellow and thereafter a full-time raids response attorney.  Compl. ¶ 103.  Attorneys at Plaintiff The Door who represent immigrant clients in proceedings to obtain lawful status have had to change their legal strategies solely in order to avoid trips to court.  For example, prospective guardians for clients seeking special immigrant juvenile status (SIJS) need to go to court to get fingerprinted, but as a result of

---

[1] *See also New York State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 74 (2d Cir. 2019) (affirming that plaintiff had organizational standing because it "alleged violations of the Act has cost it hundreds of hours in the form of phone calls from aggrieved foster families, […] spent nontrivial resources fielding these calls, and […] will continue to have to do so absent relief"); *Make the Road New York v. Cuccinelli*, No. 19 Civ. 7993 (GBD), 2019 WL 5484638, at *4 (S.D.N.Y. Oct. 11, 2019) (organizational plaintiffs, including present Plaintiff Make the Road, had standing to challenge a new rule, Inadmissibility on Public Charge Grounds, promulgated by the Department of Homeland Security, because they expended and will continue to need to expend resources that could and would have been used for other purposes in order to mitigate the harmful effects of the Rule, including by educating their clients, members, and the public about the Rule); *Common Cause/New York v. Brehm*, 344 F. Supp. 3d 542, 548–49 (S.D.N.Y. 2018) (Nathan, J.) (plaintiff advocacy organizations had standing to challenge New York State's voting procedures because they alleged the diversion of resources "responding to [] complaints" about the procedures and "assist[ing]" voters who had been unlawfully disenfranchised, including by organizing press conferences and community events).

the Directive, lawyers at The Door "now routinely write[] lengthy motions to waive [this] New York state requirement," which was plainly unnecessary before ICE's courthouse arrest policy. Complaint ¶ 107.  The foregoing are but a handful of injuries-in-fact alleged by Organizational Plaintiffs, each of which is more than the "perceptible impairment" needed to establish organizational standing.  *See* Compl. ¶¶ 99–130.

In addition, ICE's courthouse arrest policy has impeded the ability of Organizational Plaintiffs as legal service providers to effectively represent their clients.  *See* Compl. ¶¶ 112–122. Attorneys at Organizational Plaintiffs are unable to assist their clients in obtaining lawful status as a result of ICE's courthouse arrest policy:  their clients are so afraid of being arrested by ICE that they are unwilling to pursue immigration relief to which they are otherwise entitled, leaving Organizational Plaintiffs unable to adequately represent their clients.  Compl. ¶ 116.  This is analogous to the injury-in-fact suffered by the Committee for Public Counsel Services, the public defender agency for the Commonwealth of Massachusetts, which the court recognized as sufficient in and of itself to confer standing in *Ryan*, 382 F. Supp. 3d at 153.

As to Plaintiff NYIC, Defendants have mischaracterized the injuries it has suffered, erroneously alleging that NYIC's harms are restricted to its advocacy efforts.  Mem. 12–13.  In fact, NYIC has had to divert its time and resources aimed at uniting immigrant communities (Compl. ¶¶ 29–30) to addressing the frequent crises that arise as a result of ICE's presence in and around New York state courthouses.  For example, NYIC was forced to develop educational and training materials for its member organizations in order to advise them on responding to ICE arrests in courthouses.  Compl. ¶¶ 109–110, 129.  NYIC has also diverted resources away from its other work as a service coordinator for immigrants in order to respond rapidly to the significant increase in ICE arrests, fielding press calls and reaching out to elected officials to

8

advocate against ICE's courthouse arrest policy.  Compl. ¶¶ 109–110.  These harms are not reflective of a "mere interest in a problem" or general advocacy efforts, but came at the direct expense of NYIC's counseling and other advocacy efforts.  Defendants' out of circuit cases on this issue are clearly distinguishable.  *Compare*, *e.g.*, *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152 (D.C. Cir. 2005) (affirming dismissal of organizational plaintiff's complaint because the challenged rules no more than arguably offended Plaintiffs' policy goals); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1 (D.D.C. 2014) (dismissing complaint with respect to advocacy organization that simply redirected its legislative agenda without injury).  Like the other Organizational Plaintiffs, NYIC has thus suffered concrete injury from ICE's actions.

In sum, each of the Organizational Plaintiffs has suffered injuries-in-fact fairly traceable to the Defendants and capable of redress from this Court.  Accordingly, Organizational Plaintiffs too have standing in this Court to challenge ICE's courthouse arrest policy.

## III.   PLAINTIFFS HAVE STATED ACTIONABLE APA CLAIMS

### A.  Plaintiffs Are Within the Zone of Interests of Sections 1226 and 1357

This Court must determine whether Plaintiffs' claims "fall within the zone of interests protected by the law invoked." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).  In the context of the "generous review provisions of the APA," the test is not "especially demanding," and forecloses suit only when "a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Lexmark*, 572 U.S. at 130 (internal citations omitted).  Contrary to Defendants' assertions (Mem. 13–14),

Organizational Plaintiffs are squarely within the zone of interests of the relevant provisions of the INA.[2]

The INA need not explicitly provide the Organizational Plaintiffs with a right of action for them to be within the "zone of interests." Mem. 14–15. The test "does not require the plaintiff to be an intended beneficiary of the law in question." *Citizens for Responsibility & Ethics in Wash. (CREW) v. Trump*, 939 F.3d 131, 158 (2d Cir. 2019); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ("*East Bay*") (same). In the most relevant case on point, the *Ryan* court held that "participants in the state civil and criminal justice systems," including an organization dedicated to serving immigrants, are "stakeholders affected by civil immigration arrests in state courthouses," and had a "plain interest . . . in the proper enforcement of immigration laws within courthouses," and were thus within the INA's zone-of-interests. 82 F. Supp. 3d at 155. *See also East Bay*, 932 F.3d at 768–69 (certain provisions of the INA "give institutions like the Organizations a role in helping immigrants navigate the immigration process," such as T visa and U visa provisions, and thus these organizations fall under the zone of interests of the INA).[3]

---

[2] Defendants do not argue, nor can they, that Mr. Doe is outside of the zone of interests of Section 1226 or Section 1357 of the INA and thus have accepted that he has prudential standing in this action.

[3] Defendants' reliance on *De Dandrade v. U.S. Dep't of Homeland Security*, 367 F. Supp. 3d 174, 189 (S.D.N.Y. 2019), (Mem. 15) is unavailing. Plaintiffs in that case did not challenge the lawfulness of practices regarding naturalization eligibility, and the court issued a narrow holding restricted to naturalization proceedings. Indeed, Judge Castel distinguished cases where "district courts determined organizations advocating for clients fell within the INA's zone of interest" because the "provisions of the INA at issue did not concern naturalization."

Here, too, Organizational Plaintiffs are organizations plainly interested in the proper enforcement of the INA.  Dedicated to serving immigrant communities in New York, Organizational Plaintiffs are stakeholders affected by civil immigration arrests in and around New York state courthouses.  They represent clients who have either been arrested by ICE while attempting to vindicate their rights in court or who are afraid of coming to, attending, or leaving New York courts out of well-founded fears that they will be arrested by ICE in doing so.  *See* Compl. ¶¶ 99–130.

### B. This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Location of Enforcement Actions Is Not Committed to Agency Discretion by Law

Defendants cannot rebut the "presumption of judicial review" in the APA.  Mem. 15. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).  The APA's narrow exception to judicial review for decisions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), applies only in the "rare instances" where Congress has provided "clear and convincing evidence" that it vested an agency with unfettered discretion, *Overton Park*, 401 U.S. at 410 (quotation marks omitted).  The Supreme Court recently reaffirmed that this exception to the presumption of reviewability should be applied "quite narrowly." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (quotation marks omitted).  Defendants fail to meet the stringent standard for establishing non-reviewability here.

Defendants have not identified any provision of the INA that expressly shields ICE's courthouse arrest policy from judicial review.  Instead, Defendants attempt to show that the APA provides no "meaningful standard" by which a court can evaluate ICE's courthouse arrest policy, relying on the "broad language" of Sections 1226(a) and 1357(a)(2) for arrests with and without

a warrant, respectively.[4]  Mem. 15–17.  However, courts have expressly held they will not construe the INA "to immunize an allegedly unlawful DHS policy from judicial review."  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 177 (D.D.C. 2015).

In any event, Defendants' arguments (Mem. 15–17) go to the ultimate merits.  The plain text of the INA makes clear that, contrary to Defendants' assertions, ICE does not have unfettered discretion to arrest immigrants.  For example, Section 1357(a)(3) provides clear boundaries where Congress has not permitted warrantless civil arrests, such as "dwellings."  8 U.S.C. § 1357(a)(3).  In addition to the INA and as set forth in Plaintiffs' complaint, the common law privilege against civil arrest and the First, Fifth, and Sixth Amendments also constrain ICE's arrest authority.  Compl. ¶¶ 9, 43–52, 67–68, 137–64; *see also State of New York*, No. 19-8876 (JSR) at 14 (holding that the common law privilege, if incorporated in the INA, provides "an obvious standard against which to evaluate the agency's exercise of discretion").

Defendants also err in contending that ICE's courthouse arrest policy is an exercise of unreviewable agency discretion.  Mem. 15–17.  Courts regularly permit challenges to the applicable "statutory framework" that ostensibly permits an unlawful practice under the guise of "discretionary judgment."  *Jennings v. Rodriguez*, 138 S.Ct. 830, 841 (2018) (determining that the "*extent* of the Government's detention authority is not a matter of 'discretionary judgment,' 'action,' or 'decision'" and therefore that the statutory framework allegedly granting that authority was reviewable) (emphasis added); *see also Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (allowing review of the extent of the Attorney General's authority under a statute because "the extent of that authority is not a matter of discretion").[5]  The present case likewise raises a

---

[4] Section 1226(a) deals with arrests upon a warrant, which are not at issue here.

[5] The APA claims can also be assessed "according to the general requirements of reasoned agency decisionmaking."  *Dep't of Commerce*, 139 S.Ct. at 2568–69.  Defendants rely on cases

question of the extent of agency authority: namely, whether the INA or the Constitution allow ICE to extend its immigration enforcement powers to conduct warrantless civil arrests in and around New York courthouses.  This question is clearly reviewable under the APA.

### C. This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive is a Final Agency Action

Applying a "pragmatic" and "flexible" approach, *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967), this Court should conclude that the Directive is a final agency action subject to APA review.  Agency action is final under 5 U.S.C. § 704 if it (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted).

Here, Defendants concede the first prong of the *Bennett* test and argue only the second prong, on the purported grounds that the Directive "does not compel any action, determine any rights or obligations, or create legal consequences for Plaintiffs or the aliens who may be the subject of civil enforcement actions."  Mem. 17–18.  This is wrong.

Courts look to the practical effects of the agency action in evaluating whether the second prong of this test is met.  *U.S. Gypsum Co. v. Muszynski*, 161 F. Supp. 2d 289, 291 (S.D.N.Y. 2001) ("[W]here an agency's decision is given practical effect, it will be sufficient to trigger judicial review."); *Aquavella v. Richardson*, 437 F.2d 397, 404–05 (2d Cir. 1971) ("The impact

---

holding that an agency's decision "not to prosecute or enforce" is absolutely unreviewable for the proposition that ICE's courthouse arrest policy is likewise unreviewable.  Mem. 16–17. These cases are inapposite.  Plaintiffs do not challenge ICE's general ability to prosecute or enforce the INA.  Rather, Plaintiffs challenge a very specific agency action:  ICE's statutory authority to make warrantless civil immigration arrests in and around New York courthouses. Compl. ¶¶ 137–64.

of the challenged action on the parties" rather than "semantic characterizations" informs whether an action is final).

The Directive has clear and practical legal consequences. It has deterred Mr. Doe from seeking an order of protection against his abusive ex-partner. Compl. ¶¶ 93–95. Organizational Plaintiffs have clients and members who are likewise too afraid to appear in court in order to vindicate their rights or otherwise participate in court proceedings. Compl. ¶¶ 100–122. In the *State of New York* action, which challenges the Directive based on the same facts, the court found that "plaintiffs' complaint show[s] beyond cavil that the Directive actually embodies a legally-consequential change to the agency's interpretation of the INA." No. 19-8876 (JSR) at 16 (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d at 252–53). In particular, it "has legal consequences for the aliens who were not previously subject to potential enforcement actions at state courthouses, but who now are." *Id.* at 19. This Court should reach the same conclusion.

Defendants also assert that the Directive is a "general statement of policy" that merely explains how the agency will enforce a statute or regulation and thus does not constitute final agency action. Mem. 18.[6] However, where an agency action "give[s] notice of how the [agency] interpreted" a statute, this action can be final agency action, even if the notice "would have effect only if and when a particular action was brought." *Abbott Labs*, 387 U.S. at 150. Indeed, a warning of serious civil penalties has constituted final agency action. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S.Ct. 1807, 1815 (2016). *See also Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956) (holding that an order that had "no authority" except to give

---

[6] Defendants also claim that interpretive rules are not final agency action, citing *Broadgate Inc. v. U.S. Citizenship & Imm. Servs.*, 730 F. Supp. 2d 240, 243 (D.DC. 2010). However, even interpretative rules are subject to "a variety of constraints on agency decisionmaking—the [APA's] arbitrary and capricious standard being among the most notable." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015).

notice of how an agency interpreted a statute was still reviewable under the APA because those

who failed to heed the order's warning faced "the risk of incurring criminal penalties").[7]

Mr. Doe and other individuals in his position risk facing penalties—here civil arrest—if

they take actions contemplated in the Directive—appearing in court.  Compl. ¶¶ 80–98.  If the

Directive is upheld, undocumented immigrants will lose their right to participate in the legal

process without facing civil arrest.  It is clear that the Directive carries "legal consequences" for

individuals who take the risk to appear in court.  *Abbott Labs*, 387 U.S. at 149–50.

## IV.   THE COMPLAINT STATES A CLAIM THAT THE ICE DIRECTIVE VIOLATES PLAINTIFFS' CONSTITUTIONAL RIGHTS

### A.  The complaint adequately alleges that the Directive violates Plaintiffs' right to access the courts under the Fifth and First Amendments

It is well-established that all persons enjoy the right of access to courts.  *Monsky v.*

*Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997); *Morello v. James*, 810 F.2d 344, 346 (2d Cir.

1987) (collecting cases).  The Supreme Court has grounded this right in both the First

Amendment right to petition for redress and the Due Process Clause of the Fifth Amendment,

*Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002).  Plaintiffs sufficiently allege violations

of the Fifth and First Amendments.

#### 1.   The complaint states a claim under the Fifth Amendment's due process right to access the courts

Defendants' courthouse arrest policy prevents, in the case of those actually arrested

pursuant to this policy, and deters, in the case of those who are too afraid to go to court to vindicate

their rights or otherwise participate in the legal process, undocumented immigrants like Mr. Doe

---

[7] Defendants argue the Directive constitutes an "on-going program or policy" and is thus not agency action.  Mem. 19 n.7.  However, courts have held that it is irrelevant that a policy has been in place prior to its memorialization.  *See R.I.L-R*, 80 F. Supp. 3d at 185 (agency action can be final even where a policy "may technically have been in place prior").

and the Organizational Plaintiffs' clients from seeking judicial relief in connection with claims for child custody, domestic abuse, divorce, and other fundamental interests.  Compl. ¶¶ 93, 95, 97–98, 116.  Such conduct, which inhibits meaningful access to courts and leaves no alternatives to seek relief, renders Plaintiffs' Fifth Amendment rights to due process illusory and cannot be squared with constitutional principles or precedent.  *See Boddie v. Connecticut*, 401 U.S. 371, 380 (1971) (holding that the imposition of a state filing fee on individuals suing for divorce was unconstitutional as-applied to indigent women).  Defendants do not even address this fundamental challenge to the ICE courthouse arrest policy.[8]

Rather, while acknowledging that the Fifth Amendment "protects the right of access to courts," Defendants contend that the "conjectural and hypothetical" likelihood of arrest by ICE merely "dissuades" parties from accessing courts.  Mem. 19.  Defendants are wrong: on the facts alleged in the Complaint, the "atmosphere of fear" that Plaintiffs have alleged is based on actual arrests that discourage Plaintiffs and their clients from bringing meritorious suits, to the point of effectively denying them access to courts.  Compl. ¶¶ 3–6, 58, 60, 62, 69, 77–78, 83–84, 87, 96–98.  The ICE arrests, which "have been widely publicized and are well known…within immigrant communities," Compl. ¶ 6, have signaled to undocumented individuals that vindicating their rights in court comes with the risk of deportation, a consequence that the Supreme Court has indicated may result in the "loss of all that makes life worth living."  *See Bridges v. Wixon*, 326 U.S. 135, 147 (1945) (internal citations and quotations omitted).  The threat of arrest and potential

---

[8] Such egregious constitutional violations are obviously not justifiable merely through reference to the Executive's immigration authority.  *Kleindienst v. Mandel*, 408 U.S. 753, 766–67 (1972) (in enforcing congressional statutory policies "the Executive Branch of the Government must respect the procedural safeguards of due process") (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)).

consequences are therefore not merely conjectural or hypothetical, but actual impediments to Plaintiffs and their clients' ability to access courts.

Noncitizens' fear of being arrested if they go to court—the chilling effect Defendants have dismissed as mere "dissua[sion]," Mem. 19—is precisely the kind of prejudice and constitutional harm that courts have found to violate the Fifth Amendment. *Csoka v. Cty. of Suffolk*, 85 F. Supp. 2d 117, 120–21 (E.D.N.Y. 2000) (fear of police harassment causing plaintiff to forgo divorce proceeding sufficient to violate Fifth Amendment right to access courts); *Brown v. Stone*, 66 F. Supp. 2d 412, 435 (E.D.N.Y.1999) (plaintiff's allegation that he considered withdrawing lawsuit sufficient to meet "actual injury" test); *Brown v. Jacobson*, No. 98 Civ. 0565 LBS, 1999 WL 1125122 (S.D.N.Y.1999) (threats causing an individual to discontinue pursuit of litigation sufficient to survive a motion to dismiss); *see also Heffernan v. City of Paterson*, 136 S.Ct. 1412, 1419 (2016) (employer's threat of retaliation against employee for filing a grievance sufficient to state a Fifth Amendment violation). Plaintiffs have thus more than sufficiently stated a Fifth Amendment claim.

   2. *The complaint states a claim under the First Amendment right to petition the government for redress of grievances*

Plaintiffs also sufficiently allege a violation of the First Amendment, including the right to petition, which extends to all types of court relief. *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 526 (2002) (citing *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993)); *McDonald v. Smith*, 472 U.S. 479, 490 (1985) (Brennan, J., concurring) ("[W]e have recurrently treated the right to petition similarly to, and frequently as overlapping with, the First Amendment's other guarantees of free expression."). Defendants fail to address Plaintiffs' well-pled allegations of First Amendment violations, instead insisting that "aliens who are

17

present in the country unlawfully" have no First Amendment rights at all.  Mem. 20.  This so-called "threshold" issue is wholly unsupported by Defendants' own case law.

Notwithstanding Defendants' quotation of plurality dicta in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (Mem. 20), the First Amendment protects *all* persons within the territory of the United States, whether citizen or noncitizen, documented or undocumented. Defendants fail to mention that *Verdugo-Urquidez* involved the search of a non-resident's home in *Mexico*, and accordingly considered an extraterritorial extension of constitutional protections not at issue here.  494 U.S. at 262.  The *Verdugo-Urquidez* Court itself acknowledged that noncitizens residing within the United States receive constitutional protections, including under the First Amendment.  *Id.* at 271; *see also Bridges*, 326 U.S. at 148 (resident aliens have First Amendment rights); *Zadvydas*, 533 U.S. at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").  *Hoffman v. Bailey*, 996 F. Supp. 2d 477, 481 (E.D. La. 2014), on which Defendants also rely, Mem. 20, likewise concerned the extraterritorial application of First Amendment protections to a U.K. resident whose only connection with the United States was an email sent to Louisiana.  Defendants' own parenthetical shows that the holding was limited to that context.  *Id*. (citing *Hoffman*, 996 F. Supp. 2d at 488) ("it is clear that Defendant, a *nonresident* alien, is not entitled to First Amendment protections") (emphasis added).  Whether constitutional protections are afforded to persons outside of U.S. territory is not relevant here, because Defendants' conduct, by definition, targets residents of New York.[9]

---

[9] The other two cases that Defendants cite (Mem. 21 n.10), *United States v. Carpio-Leon*, 701 F.3d 974, 978 (4th Cir. 2012) and *United States v. Portillo-Munoz*, 643 F. 3d 437, 442 (5th Cir. 2011), *as revised* (June 29, 2011) are Second Amendment cases analyzing the meaning of "the people" in the specific context of the right to bear arms, a right that the Supreme Court has

Defendants also assert that "there is no right to evade immigration enforcement or be in the country illegally," Mem. 21 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.* in support. 525 U.S. 471, 474, 488 (1999)).  However, Plaintiffs do not contend that there is a right to violate immigration laws or to evade their enforcement.  Their complaint challenges ICE's warrantless civil arrests of noncitizens in and around New York courthouses in excess of ICE's statutory and constitutional authority.  Compl. ¶¶ 137–164.  On Defendants' reasoning, ICE would also have the authority to break into noncitizens' homes to make warrantless civil arrests, but even they do not claim that to be permissible.

Critically, by preventing meaningful access to courts, Defendants would leave resident noncitizens with no avenue of redress.  *See Lewis*, 518 U.S. at 351.  Access to courts is vital for noncitizens, for whom litigation may be the only way of petitioning the government for critical benefits, including those specifically provided by the INA.  *NAACP v. Button*, 371 U.S. 415, 430 (1963)  (noting that litigation "may well be the sole practicable avenue open to a minority to petition for redress of grievances").  For instance, Plaintiffs have alleged that they are in effect barred from attending proceedings that would help them to secure T and U visas, Compl. ¶¶ 116–17—documents that could establish the very legal status that Defendants erroneously insist is a prerequisite to bringing a First Amendment claim.[10]

_____

acknowledged is subject to unique restrictions, and are accordingly not relevant here.  *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008).

[10] It is also noteworthy that, contrary to Defendants' assertions, Mem. 21, the Supreme Court has long recognized that the right of access to the courts extends to organizations.  *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585–586 (1971) ("collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment").

### B.  The complaint states a claim under the Sixth Amendment

Plaintiffs have sufficiently alleged a claim under the Sixth Amendment.  Defendants'
courthouse arrest policy interferes with Plaintiffs' efforts to pursue legal claims, to be confronted
with or offer testimony from noncitizens, *see U.S. v. Green*, No. 07-3517-cr, 2008 WL 4104220,
at *1 (2d Cir. 2008), and to access counsel without fear of arrest.  *Procunier v. Martinez*, 416
U.S. 396, 419 (1974) ("Regulations and practices that unjustifiably obstruct the availability of
professional representation or other aspects of the right of access to the courts are invalid.").
Compl. ¶¶ 5, 7, 67, 69–71, 78, 81–84.  Defendants do not, and cannot, refute these allegations.

Defendants nevertheless distort Plaintiffs' Sixth Amendment claim in an effort to insulate
ICE's courthouse arrest policy from review, asserting that Plaintiffs have made "a backdoor
attempt to challenge generally the *removability* of aliens charged with a crime," Mem. 22.
However, the federal government's authority to determine the removability of noncitizens is not
in dispute.  As discussed above, *see supra* at 15–17, the essential point of Plaintiffs' claims is
that ICE's arrests in and around courthouses deprive, *inter alia*, criminal defendants and
potential witnesses of their rights by chilling them from participating in criminal proceedings.
Contrary to Defendants' assertion that the "alleged harms arise not out of the particular location"
of the arrests (Mem. 22), Plaintiffs allege that individuals' participation in criminal proceedings
is disrupted specifically because of their fear of arrest *in and around courthouses*, Compl. ¶¶ 81–
87, not by post-arrest removal generally.

Defendants also err in asserting that the Sixth Amendment violations alleged by Plaintiffs
are not chargeable to federal defendants.  Mem. 22–23.  Even if state prosecutors are
"responsible for securing….attendance" of criminal defendants in state criminal proceedings,
Mem. 22–23, these arguments ignore that it is Defendants' *own conduct* that deters criminal

defendants who have not yet been arrested by ICE from clearing their name in court and amounts to a separate and independent violation of the Sixth Amendment.[11]   *See* Compl. ¶¶ 81–87.

Defendants also challenge the viability of Plaintiffs' Sixth Amendment claim as it relates to guarantees of criminal defendants to compulsory process and to be confronted with witnesses against them unwilling or unable to appear in court.  Mem. 23. In support of this argument, Defendants rely on *United States v. Valenzuela-Bernal* for the proposition that "the mere fact that the Government deports [favorable] witnesses is not sufficient to establish a violation of the… Sixth Amendment."  458 U.S. 858, 872–73 (1982).  However, *Valenzuela-Bernal* involved a criminal defendant's *post-arrest* challenge to the federal government's deportation of a potential eyewitness, which is plainly not relevant here.  *Id*. at 871.  Even if *Valenzuela-Bernal* were relevant, the Supreme Court recognized that the federal government's conduct could amount to a Sixth Amendment violation, if the "evidence lost would be both material and favorable to the defense," which the courthouse civil arrest of an undocumented witness who would otherwise be available to testify on a defendant's behalf could plausibly cause.  *Id*. at 873.

---

[11] Defendants attempt, in Orwellian fashion, to reframe the chilling effect of ICE's courthouse arrest policy as a "voluntary decision not to show up in court." Mem. 23 n.11.  Far from being "voluntary," the ICE courthouse arrest policy forces noncitizens to choose between participating in their own criminal cases or risk being arrested, which courts have previously found sufficient to establish constitutional violations.  *U.S. v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988) ("intimidation or threats that dissuade a potential defense witness from testifying" may establish constitutional violations); *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir.1980) ("government interference with a defense witness's free and unhampered choice to testify" may establish constitutional violations).

## V.   THE COMPLAINT STATES A COMMON LAW IMMUNITY CLAIM AND APA CLAIM

### A. Defendants' narrow interpretation of the common law privilege against federal civil immigration arrests is baseless

Defendants assert there is no common law privilege against federal immigration enforcement arrests.  Mem. 26–27.  However, as the Defendants concede (Mem. 26), the court in *Ryan* has already rejected Defendants' argument.  On a motion for a preliminary injunction, Judge Talwani held that "a privilege against civil arrest remained present at common law when Congress enacted" the INA and that the plaintiffs in that action have a strong likelihood of success on the merits that the Courthouse Civil Arrest Directive exceeds ICE's enforcement authority in violation of that common law privilege.  *Ryan*, 382 F. Supp. 3d at 157–59.  Judge Rakoff in this District reached a similar conclusion on a motion to dismiss.  *See State of New York*, No. 19-8876 (JSR) at 34.

In an attempt to distinguish *Ryan*, Defendants place heavy reliance on *United States v. Green*, 305 F. Supp. 125 (S.D.N.Y. 1969), which upheld the service of grand jury subpoenas on defendants during a preliminary examination.  *Id*. at 129–130.  Defendants cite *Green* for the proposition that there is no common law privilege against civil arrest in the federal immigration enforcement context because ICE has federal enforcement authority over noncitizens anywhere in the United States.  Mem. 26–27.  However, *Green* does not stand for this far-reaching proposition.  In a narrow holding, the court in *Green* declined to apply the common law privilege because "the primary interest of justice in both the preliminary examination and the grand jury investigation, is the determination of probable cause to believe that the defendants are guilty of some crime."  *Id.* at 129.  The court reasoned that "[i]f the subpoenas were to be quashed, this determination would be seriously hampered" and thus did "not amount to an interference with the due administration of justice."  *Id.*

The court's rationale in *Green* for declining to apply the privilege with respect to service of a subpoena in a criminal proceeding is plainly inapplicable here, where the complaint involves *civil* immigration arrests of noncitizens who are appearing in and around New York courthouses on matters unrelated to the subject of the arrest.  For example, Mr. Doe is too afraid of being arrested by ICE to seek an order of protection against his abusive ex-partner.  Compl. ¶¶ 89–95. Other immigrants are afraid to vindicate their rights in court and clear their names against criminal charges against them.  Compl. ¶¶ 81–84.  Still others are afraid of participating in legal proceedings necessary to effectuate justice as witnesses or participants.  Compl. ¶¶ 85–87.

Defendants also assert that the common law privilege is restricted to immunity from service of process, not civil arrest.  Mem. 24–27.  However, there is no credible basis for such a narrow interpretation of the privilege.  As the Supreme Court recognized in its seminal case on the privilege, "[c]ourts of justice ought everywhere to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them," leaving litigants and witnesses "free from the fear of molestation or hindrance."  *Stewart v. Ramsay*, 242 U.S. 128 (1916).  This rationale is equally applicable to immunity from both service of process in a civil suit and, *a fortiori*, civil arrest.  *See State of New York*, No. 19-8876 (JSR) at 34.

Moreover, the privilege, which initially immunized witnesses from service of process, was routinely "extended."  *See Hale v. Wharton*, 73 F. 739, 741 (W.D. Mo. 1896).  By the time the Supreme Court had issued its decision in *Stewart*, the privilege applied to "plaintiffs as well as defendants, and to witnesses attending voluntarily as well as those under subpoena."  *Stewart*, 242 U.S. at 130.  Indeed, the New York Court of Appeals recognized that "[t]his immunity is one of the necessities of the administration of justice, and courts would often be embarrassed if suitors or witnesses, while attending court, could be molested with process" and accordingly

23

believed that "[w]hether any distinction should or does in fact exist [as to the applicability of the privilege between residents and non-resident witnesses and suitors] is at least doubtful." *Person v. Grier*, 66 N.Y. 124, 126 (1876). *See also State of New York*, No. 19-8876 (JSR) at 25.

Defendants have not cited any case that expressly restricts the common law privilege to immunity from service of process.[12]  To the contrary, Defendants admit that New York courts have recognized a common law privilege against civil arrest in or around courthouses, but attempt to distinguish these cases as "old."  Mem. 25.  According to Defendants, "[b]y the time Congress codified the current civil immigration arrest statute," the INA, the common law privilege "was discussed as a process immunity privilege against transient jurisdiction." *Id*. 27. Even if it were true that the common law privilege was "discussed" in terms of immunity from service of a summons in 1952 when the INA was enacted—a claim for which Defendants have provided no support—this is not a credible reason for restricting the application of the common law privilege to service of process alone, particularly given its foundational role in the administration of justice.

### B.  Congress Has Not Acted to Displace Prior Common Law on Civil Immigration Enforcement Arrests

Like any agency, ICE can exercise only the powers Congress has given it. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  Defendants claim that they are authorized to conduct civil immigration arrests in and near state courthouses under the INA's generic grants of arrest authority, 8 U.S.C. §§ 1226(a), 1357(a)(2)—even though these provisions say nothing

---

[12] Indeed, well-respected authorities have classified a civil arrest as a form of civil process.  22 C.J.S. Criminal Procedure and Rights of Accused § 122 ("An arrest in a civil action is the apprehension of a person by civil process to answer the demand against him or her."). Defendants do not challenge this historic legal fact.

about state courts—"[o]nce Congress addresses the issue." Mem. 27–30. That argument ignores two critical presumptions that defeat Defendants' arguments and support Plaintiffs' claims.

First, Congress presumptively intends to leave "long-established and familiar" common law principles—including state common law—intact unless a statute "speak[s] directly to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation marks omitted); *see United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667–68 (4th Cir. 1996) (holding that Congress left state common-law remedies intact); *Resolution Trust Corp. v. Miramon*, 22 F.3d 1357, 1360 (5th Cir. 1994) (presumption favoring common law "applies to . . . state common law"). Here, both state and federal courts recognized a common-law privilege against civil arrests in and around courthouses when Congress enacted the INA's civil-arrest provisions.

Second, Congress also presumptively preserves "the historic police powers of the States" when it legislates. *City of Milwaukee v. Illinois*, 451 U.S. 304, 316 (1981) (quotation marks omitted). That presumption can be overcome only when a statute reflects Congress's "clear and manifest purpose" to preempt the State's police powers. *Id.* (quotation marks omitted); *see also Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (requiring clear statement before presuming that Congress sought to preempt a "field which the States have traditionally occupied"). Here, the Constitution reserves to the States "the maintenance of state judicial systems for the decision of legal controversies," *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970), and the Supreme Court has long recognized the importance of avoiding federal interference with state judicial proceedings and preserving the States' "inherent sovereign[]" power to prosecute crimes, *Heath v. Alabama*, 474 U.S. 82, 89 (1985) (quotation marks omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 500 (1974).

Nothing in the INA's generic grant of civil arrest authority evidences any congressional intent—let alone a clear and manifest one—to preempt the common-law privilege against civil arrests in or near courthouses, or to interfere with state judicial proceedings and prosecutions. Neither of the INA's provisions authorizing arrests, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2), refers to courthouses. Nor do these provisions include any "clear statement" of Congress's intent to displace the States' historic police powers in this area. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quotation marks omitted). Given Congress's silence on both these fronts, the INA's grant of arrest authority cannot be read to override the longstanding and familiar common-law privilege or to endorse ICE agents' interference with state courts and prosecutions. *See Ryan*, 382 F. Supp. 3d at 157-59; *State of New York*, No. 19-8876 (JSR) at 29–30.

Defendants thus err in asserting that Congress merely needed to "sp[eak] directly to the issue of immigration arrests" to "displac[e]" the common-law privilege. Mem. 28. That more lenient standard applies when Congress legislates in an area where *federal* common law applies, since "it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *City of Milwaukee*, 451 U.S. at 317. But a stricter test applies when, as here, a federal statute touches on *state* common law or the States' police powers: courts simply do not presume that Congress intended to "alter the usual constitutional balance between the States and the Federal Government" unless it "make[s] its intention to do so unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460 (quotation marks omitted). The INA includes no such "unmistakably clear" language.

Defendants also misplace reliance on a reference to courthouses in a different subsection of the INA—passed decades after Congress enacted INA's civil-arrest provisions—to support their argument that Congress did intend to authorize ICE arrests in state courthouses. Mem. 29–30. That subsection, 8 U.S.C. § 1229(e), requires federal immigration officers who conduct "an

26

enforcement action leading to a removal proceeding" in certain court proceedings (including

cases "relating to domestic violence, sexual assault, trafficking, or stalking") to certify that they

did not decide to remove an arrestee based solely on information provided by an abuser.

Defendants assert that this language contemplates civil arrests in state courthouses.

They are incorrect. Section 1229(e)'s undefined reference to "an enforcement action"

says nothing about *civil* arrest, and given the purpose of the statute, likely meant *criminal* arrests.

This reading comports with the fact that Section 1229(e) was intended to *protect* noncitizens by

assuring them that federal immigration authorities would not misuse information from their

abusers to support their removal—thus encouraging noncitizens to participate in state-court

proceedings seeking justice against those who "battered or subject[ed] [them] to extreme

cruelty." *Id.* It would be perverse to rely on § 1229(e) to support a Directive that undermines

those very objectives—for example, by leading to arrests of domestic-violence victims and

arrests at the courts specializing in protecting abused adults and minors, *see* Compl. ¶ 53.

Another court in this District has already agreed with Plaintiffs' interpretation of Section

1229(e). As the court in the *State of New York* action found:

> [Section 1229(e)] could fairly be read as referring to criminal
> arrests, against which the state common law privilege does not
> protect. Furthermore, this provision does not necessarily speak to
> ICE's arrest authority at all; rather, it may be anticipating criminal
> arrests by state and local police forces, which lead to eventual ICE
> removal proceedings. Furthermore, the provision is plausibly
> viewed as a prophylactic against ICE actions that target aliens
> based on their participation in judicial proceedings; [...] it would
> be odd to view a provision meant to encourage aliens' attendance
> at court as evidence of Congressional intent to allow ICE to
> undermine that very objective.

Thus, Section 1229(e)'s goal of making courthouses *safer* for noncitizens precludes reading the

statute as an "unmistakably clear" expression of Congress's intent to make courthouses *less safe*

by affirmatively authorizing ICE civil courthouse arrests. *See Gregory*, 501 U.S. at 461

(quotation marks omitted); *State of New York*, No. 19-8876 (JSR) at 34 ("[S]ection 1229(e) of the INA does not demonstrate that Congress unambiguously intended to displace the state common law privilege against courthouse civil arrests.").

Finally, Defendants appear to argue that the federal government's "exclusive authority over immigration" requires this Court to interpret the INA's arrest provisions as implicitly authorizing interference with state courts. Mem. 30. But there is no support for Defendants' extraordinary proposition that the federal government's "regulatory authority over all aliens within the United States" (*id.*) allows it to disregard *any* state laws of general application. Instead, courts have relied on the federal government's primacy over immigration only to override state laws that effectively seek to regulate immigration itself. *See Arizona v. United States*, 567 U.S. 387, 402 (2012). For example, in the Eleventh Circuit case Defendants cite (Mem. 30), the court found preempted a state statute that was a "thinly veiled attempt to regulate immigration" by barring undocumented immigrants "from enforcing contracts for basic necessities." *United States v. Alabama*, 691 F.3d 1269, 1293, 1296 (11th Cir. 2012).

Here, by contrast, neither the common-law privilege against civil courthouse arrests nor the States' administration of their judicial systems represents any attempt by the State to regulate immigration specifically—as shown by the fact that these principles would prohibit *any* civil arrests in or near New York courthouses, not simply arrests by ICE officers or agents. *See State of New York*, No. 19-8876 (JSR) at 32–33 (holding that the INA did not displace state common law on the privilege against civil arrest); *see also Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 387 (2015) (federal Natural Gas Act did not preempt generally applicable state laws "not aimed at natural-gas companies in particular, but rather all businesses in the marketplace"); *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) ("the fact that aliens are the subject of a state statute does not render it a regulation of immigration"). Plaintiffs here are not seeking to alter whom the federal

government may remove, or on what grounds, *see Ryan*, 382 F. Supp. 3d at 158, but only invoke the state common law privilege regarding the place where civil arrests may lawfully be made. That the INA authorizes arrests in the immigration context does not provide an automatic override of general state common law on this issue of location.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: December 27, 2019
New York, New York

Respectfully submitted,

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

By:  /s/ Jonathan I. Blackman

Jonathan I. Blackman
*jblackman@cgsh.com*
Rikki S. Stern
*rstern@cgsh.com*
Lee Hill
*leehill@cgsh.com*
Vishakha S. Joshi
*vjoshi@cgsh.com*

One Liberty Plaza
New York, NY 10006
Tel: (212) 225 2000
Fax: (212) 225 3999

*Attorneys for Plaintiffs*

**THE LEGAL AID SOCIETY**

Hasan Shafiqullah
*hhshafiqullah@legal-aid.org*
Janet Sabel
*jsabel@legal-aid.org*
Adriene Holder
*aholder@legal-aid.org*
Judith Goldiner
*jgoldiner@legal-aid.org*
Susan Cameron
*scameron@legal-aid.org*
Susan E. Welber
*sewelber@legal-aid.org*

199 Water Street, 3rd Fl.
New York, NY 10038
Tel: (212) 577 3300