

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/28/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

John Doe, *et al.*,

        Plaintiffs,

     –v–

U.S. Immigration and Customs Enforcement, *et al.*,

        Defendants.

---

19-cv-8892 (AJN)

OPINION & ORDER

**ALISON J. NATHAN, District Judge:**

Plaintiff John Doe and Organizational Plaintiffs The Door, Make the Road New York, New York Immigration Coalition, Sanctuary for Families, and the Urban Justice Center bring this suit against Defendants U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security, and several federal officials acting in their official capacities.[1]  They allege that ICE's policy of carrying out federal immigration arrests of noncitizens in and around New York state courthouses without judicial warrants violates the common law privilege against civil arrests while coming to, attending, and returning from court; the Administrative Procedure Act; and the First, Fifth, and Sixth Amendments to the United States Constitution.  Now before the Court is Defendants' motion to dismiss Plaintiffs' Complaint on jurisdictional and substantive grounds.  For the reasons that follow, Defendants' motion is DENIED with respect to all but Plaintiffs' Sixth Amendment claim and GRANTED with respect to Plaintiffs' Sixth Amendment claim.

---

[1] These officials include Donald J. Trump, President of the United States; Kevin McAleenan, then-Acting Secretary of Homeland Security; Matthew T. Albence, ICE Deputy Director and Senior Official Performing the Duties of the Director; and Susan Quintana, then-ICE New York Field Office Director.

## I.     BACKGROUND

The Immigration and Nationality Act, enacted by Congress in 1952, authorizes civil immigration arrests and governs removal proceedings.  Two Sections of this statute, Sections 1226(a) and 1357(a)(2), authorize civil immigration arrests with and without a warrant respectively.  *See* 8 U.S.C. §§ 1226(a) and 1357(a)(2).

According to the Complaint, in January 2017, ICE began dramatically increasing arrests of noncitizens appearing in state courts.  Compl. ¶¶ 3, 60.  This courthouse arrest policy was allegedly memorialized in a directive issued by the Department of Homeland Security on January 10, 2018.  *Id.*  The Directive provides that courthouse enforcement actions should include

> actions against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed, when ICE officers or agents have information that leads them to believe the targeted aliens are present at that specific location.

Dkt. No. 65-2 at 1.  It further provides that under "special circumstances," including "where the individual poses a threat to public safety or interferes with ICE's enforcement actions," ICE officers and agents may take civil immigration enforcement action against "[a]liens encountered during a civil immigration enforcement action inside a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding."  *Id.*  ICE officers and agents are instructed to make such enforcement determinations on a "case-by-case" basis.  *Id.* at 1 & n.1.

This Directive followed prior guidance, since supplanted, concerning enforcement actions at courthouses, which advised ICE officers and agents that enforcement actions at or near courthouses should only be undertaken against a narrower category of "Priority 1 aliens," including

aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security; aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; aliens not younger than 16 years of age who participated in organized criminal gangs; aliens subject to outstanding criminal warrants; and aliens who otherwise pose a serious risk to public safety.

Dkt. No. 65-1 at 1.  Unlike subsequent guidance, this prior guidance further provided that enforcement actions at or near courthouses would take place *only* against these "specific, targeted aliens," and not against "individuals who may be 'collaterally' present, such as family members or friends who may accompany the target alien to court appearances or functions."  *Id.*

As a result of ICE's change in policy and the subsequent memorialization of that change in the Directive, ICE courthouse enforcement in and around courts in New York allegedly increased 1736% from late 2016 to April 10, 2019.  Compl. ¶ 3 (citing Immigrant Defense Project, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* 46–47 (Apr. 10, 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguardingthe-lntegrity-of-Our-Courts-Final-Report.pdf).  The Complaint alleges that, pursuant to the Directive, ICE regularly arrests vulnerable groups, including survivors of violence and sexual violence, young people, trafficking victims, and pregnant women in criminal, family, and civil courts.  Compl. ¶ 77.  The Complaint further alleges that these arrests, as well as the "atmosphere of fear" they have engendered, have kept numerous noncitizens—including Plaintiff Doe—from pursuing legal claims or defending themselves in New York state courts.  *See, e.g.*, *id.* ¶¶ 6; 81–84, 88–98.  For their part, Organizational Plaintiffs—organizations that provide services, including legal services, to the immigrant community, *see* Compl. ¶¶ 17–31—allege that the Directive has frustrated the direct representation of their clients in numerous ways and that they have been forced to expend significant resources to mitigate the institutional and individual harms it has engendered.  *Id.* ¶¶ 31; 99–130.

Plaintiffs filed this action on September 25, 2019, seeking a declaration that Defendants' policy of making civil immigration arrests of people without a judicial warrant while coming to, attending or returning from court is illegal and unconstitutional, as well as a permanent injunction ordering Defendants not to make a civil immigration arrest without a judicial warrant of any individual coming to, attending or returning from court.  At the same time, the State of New York and the District Attorney of Kings County filed suit against ICE and others asserting APA and Tenth Amendment violations arising from the same courthouse arrest policy at issue here.  In that action, Judge Rakoff denied Defendants' motion to dismiss, *see State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019), and subsequently granted summary judgment in Plaintiffs' favor, *see New York v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876(JSR), 2020 WL 3067715 (S.D.N.Y. June 10, 2020).

Defendants have now moved to dismiss the Complaint in this action, which Plaintiffs have opposed.  This motion was fully briefed on January 16, 2020.  *See* Dkt. Nos. 64, 74, 81. The Court held oral argument on the motion on February 12, 2020 and reserved judgment at that time.  *See* Dkt. No. 94.

## II.    DISCUSSION

Defendants have moved to dismiss Plaintiffs' Complaint on both jurisdictional and substantive grounds.  For the reasons that follow, Defendants' motion is denied as to all but Plaintiffs' Sixth Amendment claim.

### A.  Defendants' Motion to Dismiss on Jurisdictional Grounds is Denied

The Court first considers Defendants' arguments to dismiss the Complaint pursuant to Rule 12(b)(1).  A motion brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the Court's subject matter jurisdiction to hear the case.  *See* Fed. R. Civ. P. 12(b)(1). Pursuant to Rule 12(b)(1), dismissal for lack of subject matter jurisdiction is appropriate if the

4

Court determines that it lacks the constitutional or statutory power to adjudicate the case. *See id.*; *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). To survive a Rule 12(b)(1) motion to dismiss, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations and internal quotation marks omitted). In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court "may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

Defendants argue that all of Plaintiffs' claims should be dismissed because they have failed to allege constitutional standing. They further argue that Plaintiffs' APA claim, in particular, should be dismissed for several additional reasons—namely, that Plaintiffs do not have a cause of action under the APA because they do not fall within the zone of interests of the relevant statutory provisions; that the location of civil enforcement actions by ICE is committed to agency discretion by law; and that the Directive does not constitute final agency action. The Court concludes, for the reasons set forth below, that each of these arguments is without merit.

### 1. Constitutional Standing

Defendants argue that Doe and Organizational Plaintiffs fail to adequately allege facts establishing constitutional standing. To sufficiently allege Article III standing, a plaintiff must allege "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)). A plaintiff need only "clearly allege facts demonstrating each element" in order to survive a motion to dismiss on jurisdictional grounds. *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (citation omitted).

### a)  John Doe

Defendants argue that Doe's allegations are insufficient to support his standing to bring suit because "the injuries alleged are conjectural and hypothetical."  Dkt. No. 64 at 8.  Because Defendants restrict their standing argument with respect to Doe to the element of injury in fact, *see* Dkt. No. 64 at 8–9, the Court need not address the causality and redressability prongs of the standing inquiry.  *See N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (addressing only the challenged "injury-in-fact" prong, and then concluding there was standing).

 "For an alleged injury to support constitutional standing, it must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Knife Rights*, 802 F.3d at 383 (quoting *Susan B. Anthony List*, 573 U.S. at 158).  As a general matter, "[p]reenforcement challenges . . . are cognizable under Article III."  *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016).  When a Plaintiff "assert[s] injury from threatened prosecution," or, in this case, enforcement action, "the Supreme Court has instructed that imminence does 'not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.'"  *Knife Rights*, 802 F.3d at 384 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)). Instead, "in the context of pre-enforcement challenges . . . , imminent injury can be established by plausible allegations that a plaintiff 'inten[ds] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by . . . statute, and there exists a credible threat of prosecution thereunder.'"  *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159).  The credible fear of prosecution—or enforcement—standard "sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review."  *Cayuga Nation*, 824 F.3d at 331 (quoting *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013)). However, "[t]he identification of

a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue." *Cayuga Nation*, 824 F.3d at 331 (quoting *Knife Rights*, 802 F.3d at 384). A credible threat will not be found "where plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Id.*

Here, Doe has alleged both a concrete intention to seek an order of protection against his former partner and a credible threat of being arrested by ICE while pursuing such an order of protection in family court. With respect to Doe's concrete intention to seek an order of protection, the Complaint alleges the following: Doe's former partner physically and verbally abused him. Compl. ¶ 90. After Doe fled their shared home, his former partner harassed him through email, text messages, and voicemail and threatened to report Doe to ICE. *Id.* ¶ 91. His former partner also sued him in small claims court for alleged expenses incurred during their relationship and threatened Doe that he would broadly distribute intimate photos of him if Doe did not pay the amount claimed in the small claims court action. *Id.* ¶ 92. Doe and his lawyer considered seeking an *ex parte* order of protection against his former partner, but obtaining such an order requires appearing in family court. *Id.* ¶ 93. Because Doe was so afraid of being arrested by ICE when appearing in court, he ultimately decided not to seek an order of protection. *Id.* But were it not for his fear of being arrested by ICE when appearing in court, Mr. Doe would seek an order of protection in family court against his former partner. *Id.* ¶ 95. Doe has thus sufficiently alleged a concrete intention to seek an order of protection against his former partner.

Doe has also adequately alleged a credible threat of being arrested by ICE while pursuing an order of protection in family court. In evaluating preenforcement standing, courts look to,

among other things, "the history of past prosecution or enforcement." *Oklevueha*, 676 F.3d at 835. Doe alleges that from late 2016 to April 2019, pursuant to ICE policy ultimately memorialized in the Directive, ICE courthouse enforcement in and around courts in New York has increased by 1736%. Compl. ¶ 3. This dramatic increase in enforcement activity indicates that, were he to pursue an order of protection in family court, enforcement against Doe would be *at least* remotely possible, if not likely. *Cayuga Nation*, 824 F.3d at 331. The "low threshold" for alleging a credible threat of arrest is thus met by these allegations. *Id.*

Defendants argue, to the contrary, that Doe has failed to allege a credible threat of enforcement, but these arguments are without merit. Defendants argue first that Doe has not alleged any of the "personal factors" specified in the Directive and articulated above that would render him the potential subject of a civil immigration enforcement action inside a courthouse. *See* Dkt. No. 64 at 8–9; *see also* Dkt. No. 65-2 at 1 (listing the so-called personal factors). But the Directive's list of "personal factors" is not exhaustive—indeed, the Directive allows arrest of those who do not meet any of its "personal factors" under special circumstances, on a case-by-case basis. *See* Dkt. No. 65-2 at 1 & n.1. In light of the enforcement discretion accorded ICE and the dramatic increase in enforcement activity noted above, the fact that Doe has not alleged any of the personal factors specified in the Directive does not diminish the credibility of the threat of enforcement alleged.

Defendants also point to statutes that provide that a domestic violence victim is not in danger of being arrested by ICE in court based solely on derogatory information provided by their abuser. Dkt. No. 64 at 9; *see also* 8 U.S.C. §§ 1229(e), 1367. However, these provisions, too, do not undermine Doe's allegations of a credible threat of enforcement because, as Plaintiffs

point out, these provisions do not protect Doe against arrest so long as ICE obtains information regarding his immigration status from a source *other than* his abusive ex-partner.

In light of the foregoing, and Defendants' arguments to the contrary notwithstanding, the Court concludes that the injury alleged in the Complaint is anything but conjectural or hypothetical; rather, it is actual and imminent and thus sufficient to support Doe's constitutional standing to bring suit.

### b) Organizational Plaintiffs

Even were the Court to find the Complaint's allegations insufficient to support Doe's constitutional standing, it would nonetheless find the Complaint's allegations sufficient to support Organizational Plaintiffs' constitutional standing. In determining whether Organizational Plaintiffs have adequately alleged standing, the Court "conducts the same inquiry as in the case of the individual."[2] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). Because Defendants again restrict their argument with respect to the standing of Organizational Plaintiffs to the element of injury in fact, *see* Dkt. No. 64 at 8–9, the Court need not address the causality and redressability prongs of the standing inquiry with respect to these Plaintiffs either. *See N.Y. Civil Liberties Union*, 684 F.3d at 295.

The Second Circuit has "repeatedly held that only a *perceptible impairment* of an organization's activities is necessary for there to be an injury in fact." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (emphasis added) (internal quotation marks and citations omitted). A diversion of resources may constitute an injury in fact for purposes of organizational standing, *see Havens*, 455 U.S. at 379; *Nnebe v.*

_____

[2] Though organizations may also assert association standing, which requires the Court to engage in a distinct standing inquiry, Organizational Plaintiffs do not rely on a theory of associational standing here. *See* Dkt. No. 74 at 5–6.

*Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993), and the diversion of resources need not be monetary, *see Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174–75 (2d Cir. 2005) (an organization expending resources to locate, recruit, manage, train, and supply volunteers conferred standing). Additionally, when a defendant's actions impede an organization's ability to carry out its responsibilities, the plaintiff has suffered an injury in fact. *See Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 110.

Under this standard, the Complaint adequately alleges injuries in fact with respect to the Organizational Plaintiffs sufficient to confer standing. Indeed, the Complaint alleges that Organizational Plaintiffs have had to divert resources away from other purposes in order to address the effects of the Directive. *See* Compl. ¶¶ 99–130. The Complaint also alleges that the Directive impedes Organizational Plaintiffs, which are legal services providers, from providing legal services to their clients, *see id.* ¶¶ 112–122, and thereby impedes their abilities to carry out their responsibilities. These alleged injuries are sufficient to satisfy the low threshold for pleading injury in fact. *Cf. Make the Rd. New York v. Pompeo*, No. 19-cv-11633 (GBD), 2020 WL 4350731, at *8 (S.D.N.Y. July 29, 2020) (finding organizational plaintiffs alleged standing where complaint demonstrated that "they will have to expend—and have *already* expended— significant time and resources to provide new services as a direct result of" the challenged agency action); *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 153 (D. Mass. 2019), *vacated on other grounds*, ---- F. 3d. ----, 2020 WL 5201945 (1st Cir. Sept. 1, 2020) (finding allegations that the Directive impedes a legal services organization's representation of its clients sufficient to constitute an injury in fact).

Defendants argue, to the contrary, that Organizational Plaintiffs assert organizational

standing to sue in their own right *only* with respect to the Complaint's First Amendment claim.

*See* Dkt. No. 64 at 9–10; Dkt. No. 81 at 2.  In support of this argument, they cite to Count Two of

the Complaint, which they argue is the only Count that *explicitly* alleges organizational injuries.

*See* Dkt. No. 64 at 10; Dkt. No. 81 at 2.  This argument fails for the simple reason that Plaintiffs'

Complaint is rife with allegations of organizational injury sufficient to establish standing, *see*

*infra*; *see also* Compl. ¶¶ 99–130, and each Count of the Complaint incorporates by reference

"each and every allegation contained in the preceding paragraphs," *see* Compl. ¶¶ 137, 142, 148,

153, 158.

### 2.  Zone of Interests

Defendants next argue that Plaintiffs cannot state an actionable claim under the APA

because the interests they assert do not fall "within the zone of interests to be protected or

regulated by" the INA.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S.

150, 153 (1970)).

"[A] statutory cause of action extends only to plaintiffs whose interests 'fall within the

zone of interests protected by the law invoked.'"  *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted).  In the context of the APA and its

"generous review provisions," this test is not "especially demanding."  *Id.* at 130.  Under this

"lenient approach," the test only forecloses suit "when a plaintiff's interests are so marginally

related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

assumed that Congress authorized that plaintiff to sue."  *Id.* (internal quotation marks and

citation omitted).  In considering whether a plaintiff's interests are related to or consistent with

the purposes of the relevant statute, the Court is "not limited to considering the statute under which [plaintiffs] sued, but may consider any provision that helps [it] to understand Congress' overall purposes" in the act at issue. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987). The Supreme Court has instructed that in the context of APA claims, any doubt as to whether a plaintiff's interests fall within the zone of interests protected by the law invoked should be resolved in the plaintiff's favor. *See Lexmark*, 572 U.S. at 129.

As an initial matter, Defendants do not contest that Doe falls within the INA's zone of interests. *See* Dkt. No. 14:7–10. Accordingly, the Court considers only whether Organizational Plaintiffs fall within the INA's zone of interests and concludes that they do. Organizational Plaintiffs argue that their interests fall within the zone of interests protected by the INA because they are "stakeholders affected by civil immigration arrest in and around New York state courthouses." In particular, they allege that they are legal services organizations that serve clients who have been arrested by ICE in or around New York courts or are afraid of coming to, attending, or leaving New York courts out of fear that they may be arrested by ICE pursuant to the Directive. Dkt. No. 74 at 11; Compl. ¶¶ 99–130. In light of the generousness of the APA review provisions—and resolving all doubts in Plaintiffs' favor, as the Court must—these allegations satisfy the "lenient" zone of interests test with respect to Organizational Plaintiffs. *Cf. State v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876 (JSR), 2019 WL 6906274, at *4 (S.D.N.Y. Dec. 19, 2019). Indeed, Organizational Plaintiffs—"organization[s] serving immigrants" whose "clients include individuals who are directly impacted by the particular governmental actions at issue," *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 155 (D. Mass. 2019), *vacated on other grounds*, ---- F. 3d. ----, 2020 WL 5201945 (1st Cir. Sept. 1, 2020); *Make the Rd. New York v. Pompeo*, No. 19-cv-11633 (GBD), 2020 WL 4350731, at

*10 (S.D.N.Y. July 29, 2020)—have a "plain interest" in "the proper enforcement of immigration laws within courthouses," *Ryan*, 382 F. Supp. 3d at 155.  This interest alone is sufficient to render the Organizational Plaintiffs at least "arguably within the zone of interests to be protected or regulated by" the INA.  *Id.* (quoting *Patchak*, 567 U.S. at 224–25); *see Make the Rd. New York*, 2020 WL 4350731, at *10 (finding organizational plaintiffs whose "very mission is to aid immigrants" fell within zone of interests of INA); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768–69 (9th Cir. 2018) (finding that nonprofit organizations that provide legal assistance to asylum seekers fall within the zone of interests protected by the INA).

Moreover, this conclusion is bolstered by numerous provisions of the INA, which the Court must consider as a whole in order to understand its overall purposes.  *See Clarke*, 479 U.S. at 401; *Make the Rd. New York*, 2020 WL 4350731, at *10 ("In considering whether Plaintiffs satisfy the zone-of-interests test, this Court is not limited to the specific provision at issue, but rather should consider Congress's overall purpose in enacting the INA.").  Even a cursory review of the INA makes clear that numerous provisions of that Act "give institutions like [Organizational Plaintiffs] a role in helping immigrants navigate the immigration process."  *E. Bay Sanctuary Covenant*, 932 F.3d at 769 (citing several provisions of the INA).  And these provisions, "which directly rely on institutions like the [Organizational Plainitffs] to aid immigrants, are a sufficient 'indicator that the plaintiffs are peculiarly suitable challengers of administrative [action] . . .  support[ing] an inference that Congress would have intended eligibility" to bring suit.  *Id.* (alterations omitted) (quoting *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir. 1988)).

Defendants' arguments to the contrary misapprehend the case law that defines the contours of the zone of interests test.  In support of their argument that Organizational Plaintiffs

do not fall within the INA's zone of interests, Defendants point to the fact that the INA does not

provide Organizational Plaintiffs with any right of action and that the relevant provisions—

Sections 1226 and 1357—do not target Organizational Plaintiffs, govern their conduct, or create

any entitlement they may invoke. *See* Dkt. No. 64 at 14–15.  However, it is immaterial whether

or not the INA itself provides any right of action because Plaintiffs do not assert any cause of

action under the INA.  Rather, Plaintiffs allege violations of the APA, and the "APA's omnibus

judicial-review provision . . . permits suit for violations of numerous statutes of varying character

that do not themselves include causes of action for judicial review."  *Lexmark*, 572 U.S. at 130.

And Organizational Plaintiffs need not be a "subject of the contested regulatory action" or an

intended beneficiary of the relevant statute to challenge it.  *Clarke*, 479 U.S. at 399–400.

Moreover, Defendants' focus on only Sections 1226 and 1357 of the INA reflects a crabbed

conception of the zone of interests test, which explicitly exhorts this Court to consider "*any*

provision" in the INA "that helps [it] to understand Congress' overall purposes." *Id.* at 401.

> For the reasons articulated above, proper application of the zone of interests test compels

the Court to conclude that Organizational Plaintiffs fall within the zone of interests of the INA.

### 3.  Reviewability of APA Claim

> Defendants further argue that even if Plaintiffs have stated an actionable APA claim, that

claim is not reviewable in this Court because the location of ICE enforcement actions is

committed to agency discretion by law, and the Directive is not a final agency action.  The Court

disagrees on both counts.

> "There is a strong presumption favoring judicial review of administrative action."

*Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016).  "In the absence of an express statutory

prohibition, the agency 'bears the heavy burden of overcoming the strong presumption that

Congress did not mean to prohibit all judicial review of [its] decision.'" *Id.* (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)).

But this presumption is subject to some qualification.  First, Section 701(a)(2) provides that the APA's judicial review provisions do not apply where an "agency action is committed to agency discretion by law."  5 U.S.C. § 701.  Whether an agency action is committed to agency discretion by law hinges on "whether the statutes and regulations at issue . . . 'are drawn in such broad terms that . . . *there is no law to apply*.'"  *Salazar*, 822 F.3d at 76 (emphasis added) (quoting *Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir.2015)). The Supreme Court has recognized that this is a "very narrow exception" that applies only in "rare instances."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). Second, Section 704 provides that an agency action must be final in order to be reviewable.  5 U.S.C. § 704.  An agency's action is considered final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Salazar*, 822 F.3d at 82 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  With respect to the second prong of this test— which is the only prong Defendants contest—the "core question" is "whether the result of [the agency's decisionmaking] process is one that will directly affect the parties."  *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008).

At bottom, the finality inquiry is a "pragmatic" one.  *See FTC v. Standard Oil of Cal.*, 449 U.S. 232, 239 (1980).  Agency action that has a "substantial practical impact" is of "sufficient legal force" to constitute final agency action and thus warrant judicial review.  *Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 98 (2d Cir. 2013); *see also Salazar*, 822 F.3d at 82–84.

### a)  Committed to Agency Discretion by Law

Defendants cite Sections 1226 and 1357 of the INA—which authorize the arrest of non-citizens pursuant to and without a warrant respectively—in support of their argument that the INA provides no law by which the Court can evaluate the appropriateness of ICE's exercise of discretion under the Directive.  *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have power without warrant . . . (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest.").  In particular, they argue that the "broad language" of these provisions grants ICE complete and unfettered discretion to "determine the location of a civil enforcement action against an alien present in the United States."  Dkt. No. 64 at 16.

"To determine the extent of [ICE]'s discretion and whether there is 'law to apply' in this case," the Court "look[s] to the [relevant] statutory provisions."  *Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015); *see also Salazar*, 822 F.3d 61, 76–82 (2d Cir. 2016) (reviewing the statute's text and legislative history to determine whether or not the statute constituted a "grant of unbridled discretion").  This inquiry, then, overlaps in sum and substance with Plaintiffs' contention, on the merits, that the INA incorporates a common law privilege against civil courthouse arrests.  Indeed, if, as Plaintiffs argue, the INA can be read to incorporate this common law privilege, such a privilege would provide clear law "against which

16

to evaluate the agency's exercise of discretion." *State v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876 (JSR), 2019 WL 6906274, at *5 (S.D.N.Y. Dec. 19, 2019) ("[P]laintiffs allege that the INA incorporates a pre-existing common law privilege against civil arrest of those present at a courthouse and those necessarily coming and going.  If true, this would provide an obvious standard against which to evaluate the agency's exercise of discretion.").  For the reasons stated below, the Court concludes, on the merits, that the INA *does* incorporate a common law privilege against civil courthouse arrests.  *See infra* Section II.B.1.  But irrespective of that conclusion, in light of the "very narrow" nature of this exception, which applies only in "rare instances," *Overton Park*, 401 U.S. at 410, this Court agrees with Judge Rakoff that "[e]ven assuming *arguendo* that plaintiffs were wrong on the merits of this argument, their contention satisfies their burden at this stage of the litigation to present a *prima facie* case for reviewability." *State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 385 (S.D.N.Y. 2019); *see also Washington v. U.S. Dep't of Homeland Sec.*, ---- F. Supp. 3d ----, 2020 WL 1819837, at *6 (W.D. Wash. Apr. 10, 2020) ("[I]f the State prevails on its argument that those two provisions of the INA incorporate a pre-existing state and/or federal common-law privilege against civil arrest while at or in transit to or from a courthouse, then 'an obvious standard against which to evaluate the agency's exercise of discretion' would exist.  This possibility belies defendants' assertion that the validity of their 'courthouse arrest' policy is unreviewable." (citation omitted)).

Defendants' arguments to the contrary confuse the nature of Plaintiffs' APA claim.  They rely on *Heckler v. Chaney*, 470 U.S. 821 (1985), to make the uncontroversial argument that an agency's decisions regarding whether to undertake an enforcement action or prosecute an individual are committed to that agency's discretion.  *See* Dkt. No. 64 at 15–16; *Heckler*, 470

U.S. at 831 ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). But, as was the case in the action before Judge Rakoff, "Plaintiffs do not challenge ICE's decision to arrest particular aliens as opposed to others; they challenge instead what they allege to be a categorical policy to conduct immigration arrests in particular places where the statute (implicitly) and the common law (explicitly) do not permit such arrests." *State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 385–86 (S.D.N.Y. 2019).

Defendants also rely on *Webster v. Doe*, 486 U.S. 592 (1988), to argue for the first time on reply that Plaintiffs' arguments regarding reviewability and the common law privilege improperly conflate Section 701(a)(2) of the APA—which prohibits review of "agency action . . . committed to agency discretion by law"—and Section 706(2) of the APA—which requires courts to *set aside* agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Compare* 5 U.S.C. § 701(a)(2) with *id.* § 706(2)(A); *see* Dkt. No. 81 at 6–7. Not so. With respect to the *reviewability* of their APA claim, Plaintiffs do not use the common law privilege to argue that ICE has abused its discretion or acted contrary to the law; rather, they argue that the privilege simply provides a meaningful standard against which ICE's exercise of its discretion may be measured. As articulated above, at this juncture, the Court agrees.

### b) Final Agency Action

Defendants finally argue that Plaintiffs' APA claim is unreviewable for the additional reason that the Directive does not constitute "final agency action." As an initial matter, Defendants concede that the first prong of the test—that the Directive marks the "consummation of the agency's decisionmaking process"—is satisfied. Accordingly, the Court confines its

analysis to the second prong of the test—that the Directive constitutes an agency action "by which rights or obligations have been determined, or from which legal consequences will flow."

Under a "pragmatic" view of finality, the Complaint adequately alleges that the Directive constitutes final agency action subject to judicial review. Indeed, legal consequences flow from the Directive for noncitizens who were not previously subject to potential enforcement actions at New York state courthouses but now are. *Compare* Dkt. No 65-1 (former policy provided that courthouse enforcement actions would only take place against "specific, targeted aliens") *with* Dkt. No. 65-2 (Directive expands the category of targeted aliens and provides that non-targeted aliens may be arrested under special circumstances, "such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions"); *see also State v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876 (JSR), 2019 WL 6906274, at *6 (S.D.N.Y. Dec. 19, 2019).

Moreover, the facts of the Complaint allege a "substantial practical impact" following issuance of the Directive. The Complaint alleges that from late 2016 to April 2019, the Immigrant Defense Project documented an increase in enforcement in and around New York courthouses of over 1700%. Compl. ¶ 3; *see also* Dkt. No. 70 (documenting an increase in courthouse enforcement from 11 reported operations in 2016 to 219 reported operations in 2018). This substantial practical impact demonstrates that "the Directive actually embodies a legally-consequential change to the agency's interpretation of the INA," *see State v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876 (JSR), 2019 WL 6906274, at *6 (S.D.N.Y. Dec. 19, 2019), and is not simply, as Defendants argue, a general statement of policy intended to guide ICE officers in the exercise of their discretion, *see* Dkt. No. 64 at 17–18. Accordingly, it is of sufficient legal force to constitute final agency action and thus warrant judicial review.

**B.  Defendants' Motion to Dismiss on Substantive Grounds is Denied**

Having concluded that Plaintiffs' Complaint should not be dismissed on jurisdictional grounds, the Court next considers Defendants' substantive arguments for dismissal for failure to state a claim pursuant to Rule 12(b)(6).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party.  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

To survive a motion to dismiss, the complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In other words, "the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal citations and alterations omitted) (quoting *Twombly*, 550 U.S. at 555, 570).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Generally, "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" may be considered in assessing whether a claim is sufficient to survive a Rule 12(b)(6) motion.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  Defendants argue that Plaintiffs' common law immunity and APA claims fail to state a claim.  They further argue that Plaintiffs' constitutional claims, brought under the First, Fifth, and Sixth Amendments, fail to state a claim.

For the reasons that follow, the Court disagrees with Defendants with respect to all but Plaintiffs'

Sixth Amendment claim, which it dismisses for failure to state a claim.

### 1.  Common Law Immunity and APA Claims

Defendants argue that Plaintiffs' common law immunity and APA claims—which turn on

the existence of a common law privilege against civil courthouse arrests—fail to state a claim

and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  First,

they argue that there is no common law privilege against civil courthouse arrests and that the

absence of such a privilege is fatal to both Plaintiffs' common law and APA claims.  Second,

they argue that even assuming such a privilege exists, the INA has displaced it.  The Court

addresses—and rejects—each contention in turn.

With respect to Defendants' first contention, the Court concludes, in accord with Judge

Rakoff's decision in *State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y.

2019), that a common law privilege against civil courthouse arrests exists.  Case law and

contemporary commentaries indicate that such a privilege derives from English common law.

This privilege emerged at a time when civil arrest was commonplace, because a civil action was

commenced by way of civil arrest of the defendant.  In Blackstone's Commentaries on the Laws

of England, "on which early U.S. courts heavily relied in incorporating English common law into

the laws of the several states and the United States," *State v. U.S. Immigration & Customs Enf't*,

431 F. Supp. 3d 377 (S.D.N.Y. 2019), Blackstone describes the privilege as follows:

> Suitors, witnesses, and other persons, necessarily attending any courts of record upon
> business, are not to be arrested during their actual attendance, which includes their
> necessary coming and returning.  And no arrest can be made in the king's presence, nor
> within the verge of his royal palace, nor in any place where the king's justices are
> actually sitting.

3 William Blackstone, Commentaries on the Laws of England 289 (1768); *see also, e.g.*,

*Meekins v. Smith*, 126 Eng. Rep. 363, 363 (1791) ("[A]ll persons who had relation to a suit

which called for their attendance, whether they were compelled to attend by process or not, (in which number bail were included) were intitled to privilege from arrest eundo et redeundo [going and returning], provided they came bona fide.").  The rationales underpinning the existence of the privilege illustrate that it existed as much for the benefit of the courts as it did for the benefit of the individual: To permit arrest to be made in court or while persons were coming or returning "would give occasion to perpetual tumults," *Orchard's Case*, 38 Eng. Rep. 987, 987 (1828), discourage witnesses from coming forward voluntarily, *see Walpole v. Alexander*, 99 Eng. Rep. 530, 530 (1782), and "was altogether inconsistent with the decorum which ought to prevail in a high tribunal," *Orchard's Case*, 38 Eng. Rep. at 978.

Case law and contemporary commentaries further illustrate that by at least the mid-nineteenth century, the privilege was firmly established in New York common law.  Indeed, David Graham's Treatise on the Practice of the Supreme Court of the State of New York noted in 1836 that "[a]s a general rule, every person who has any relation to a suit, whether his presence be compulsory or not, is exempt from arrest, eundo, morando, et redeundo [going, staying, and returning]."  David Graham, Treatise on the Practice of the Supreme Court of the State of New York 129 (2d ed. 1836); *see also, e.g.*, *Hopkins v. Coburn*, 1828 WL 2235 (N.Y. Sup. Ct. 1828) ("The defendant, as a suitor, was undoubtedly privileged from arrest . . . .").  Even after service of process had largely replaced civil arrest as the chief means of initiating a civil action, the New York Court of Appeals confirmed the continued vitality of the privilege in the context of service of process, noting that "[i]t is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home."  *Person v. Grier*, 66 N.Y. 124, 125 (1876).  Like the English courts before it, the Court of Appeals found that the privilege was necessary "[to] the administration of justice,"

22

because in its absence "[w]itnesses might be deterred, . . . parties prevented from attending, and delays might ensue or injustice be done." *Id.* at 126; *see also Parker v. Marco*, 136 N.Y. 585, 32 N.E. 989 (1893) (finding the privilege "is not simply a personal privilege, but . . . is also the privilege of the court, and is deemed necessary for the maintenance of its authority and dignity and in order to promote the due and efficient administration of justice.").

The Court agrees with Judge Rakoff that the "[t]he continuing availability of the common law privilege, and its breadth, is shown by the fact that even after the former kind of civil arrest had become obsolete, and before regulatory civil arrests had become common, . . . the highest court of New York . . . continued to apply the privilege even when the intrusion was not an actual arrest but only a disruptive service of process." *State v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876 (JSR), 2019 WL 6906274, at *9 (S.D.N.Y. Dec. 19, 2019).

The Court also agrees with Judge Rakoff that the continued vitality of the common law privilege is made manifest when one examines "the policy objectives cited for hundreds of years by English and American courts to justify" it. *State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 391 (S.D.N.Y. 2019). As discussed above, the privilege evolved as a means to encourage parties, as well as witnesses, to appear in court voluntarily and to enable the proper, expeditious, and uninterrupted functioning of courts. These policy objectives apply equally—if not with greater force—to modern-day civil immigration arrests and compel this Court to conclude, as Judge Rakoff did, that the common law privilege against civil arrests in and around courthouses persists in the common law of New York State. *Id.* Indeed, a privilege "so fundamental to the functioning of both federal and state judiciary[] cannot be assumed to have disappeared simply with the passage of time." *Id.*

23

Having concluded that the common law privilege persists in New York common law, the question remains whether this privilege places any constraints on the INA. Plaintiffs argue that the INA has not overridden the privilege—and thus implicitly incorporates it—and, as a result, conducting civil arrests in and around courthouses exceeds ICE's authority. *See* Dkt. No. 74 at 24–29. Defendants argue, on the other hand, that the INA preempts the common law privilege.

"Statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation and alterations omitted). In order to abrogate a common-law principle, the federal statute at issue "must 'speak directly' to the question addressed by the common law." *Id.* (citation omitted). This is so because, under such circumstances, "Congress does not write upon a clean slate." *Id.*

Where state law is involved, furthermore, federalism concerns govern. Thus, when considering whether federal law pre-empts *state* common law, the Court is admonished to "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest purpose of Congress.*'" *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 316 (1981) (emphasis added) (citation omitted). "If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so *unmistakably clear* in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (emphasis added) (alterations, internal quotations, and citation omitted).[3] Absent evidence of such a "clear and manifest purpose," therefore, the

---

[3] The First Circuit, which recently ruled against the Plaintiffs in a similar case, did not reach the question of whether the INA reflects Congress's clear and manifest purpose to pre-empt state common law because the district court did not address this argument in its analysis. *See Ryan v. U.S. Immigration & Customs Enf't*, No. 19-1838, 2020 WL 5201945, at *14 (1st Cir. Sept. 1, 2020). As a result, this Court's ruling is not in tension with the First Circuit's holding in *Ryan*.

presumption against pre-emption cautions against a judicial determination that state law—

including state common law—was superseded by federal action.  *See Wyeth v. Levine*, 555 U.S.

555, 565 (2009).

      The INA does not contain the requisite clear and manifest congressional purpose to

preempt the New York state common law privilege against civil courthouse arrests.  Indeed, the

two civil arrest provisions in the INA—Sections 1226 and 1357—authorize arrests with and

without a warrant respectively but do not speak to arrests in and around courthouses in *any way*.

*See* 8 U.S.C. §§ 1226(a) and 1357(a)(2).  Because the INA provides *no* indication that Congress

intended to abrogate the common law privilege against civil courthouse arrests—let alone an

"unmistakably clear" one—the Court concludes that "the statute incorporates the privilege."  *See*

*State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 391 (S.D.N.Y. 2019).

      Defendants argue, to the contrary, that because the INA speaks "directly to the issue of

immigration arrests" generally, Dkt. No. 64 at 28, it has displaced the state common law

privilege.  However, as discussed above, the Sections governing civil immigration arrests are

silent as to whether such arrests may be made in and around courthouses.  And such silence

"falls far short of an expression of legislative intent to supplant the existing common law in that

area."  *Texas*, 507 U.S. at 535.  Indeed, in *Texas*, the Supreme Court concluded that states remain

subject to common-law prejudgment interest liability in spite of the Debt Collection Act because

that "statute is silent as to the obligation of the states to pay prejudgment interests on such

debts."  *Id.*  Moreover, in order to supplant *state*—as opposed to federal—common law, the

relevant statute need not simply "speak directly" to the issue of immigration arrests, but rather it

must contain the requisite clear and manifest congressional purpose to displace the relevant

common law principle.  As the Court has already concluded, no such clear and manifest purpose to supplant the common law privilege is evident in the INA's arrest provisions.

Defendants further argue that Section 1229(e)(1), which was added to the INA in 2006, expressly addresses immigration enforcement actions against aliens at courthouses, and therefore displaces the common law privilege.  *See* Dkt. No. 64 at 29.  This Section provides that if an enforcement action leading to a removal proceeding takes place at a courthouse and the noncitizen is appearing "in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 1101(a)(15) of this title," the Notice to Appear must include a statement that Section 1367 of the INA has been complied with.  *See* 8 U.S.C. § 1229.  Section 1367, in turn, prohibits the Departments of Justice, Homeland Security, and State from making an adverse determination of admissibility or credibility using information furnished solely by various people who battered or subject the noncitizen or the noncitizen's child to extreme cruelty.  *See id.* § 1367.

The Court concludes that Section 1229, too, falls short of providing the clear and manifest congressional purpose necessary to supplant the common law privilege.  At most, as Defendants themselves admit, this Section amounts to an acknowledgement that courthouse arrests were occurring and an attempt to provide those subject to such arrests with certain protections*, see* Dkt. No. 64 at 29 ("Congress knew that ICE was making courthouse arrests . . . and provided certain requirements that ICE must follow.")—a far cry from the "unmistakably clear" language necessary to abrogate the common law privilege.  Indeed, as Judge Rakoff points out, it would turn this statutory provision—which is intended to *protect* noncitizens subject to

courthouse arrests—on its head to find in it a *clear and manifest* congressional purpose to abrogate the common law privilege against civil courthouse arrests. *See State v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019) ("[I]t would be odd to view a provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective."). For this reason, the Court agrees with Plaintiffs that "Section 1229(e)'s goal of making courthouses safer for noncitizens precludes reading the statute as an 'unmistakably clear' expression of Congress's intent to make courthouses less safe by affirmatively authorizing ICE civil courthouse arrests." Dkt. No. 74 at 27.

Defendants finally argue that plenary federal power over immigration means that "state common law cannot bar the federal government from arresting aliens in public places." *See* Dkt. No. 64 at 28, 30. But this argument proves too much. Defendants are correct that "[b]ecause Congress possesses plenary authority over immigration-related matters, it *may* freely displace or preempt state laws in respect to such matters." *Herrera-Inirio v. INS*, 208 F.3d 299, 307–08 (1st Cir. 2000) (emphasis added). But that Congress possesses such power does not mean that it has exercised it. Indeed, the Court has already concluded that Congress has *not* displaced or preempted the state common law privilege. Moreover, the other cases Defendants cite in support of this argument, *see United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012); *Arizona v. United States*, 567 U.S. 387, 410 (2012), are inapposite because they involved specific attempts by states to regulate immigration. As the history of the common law privilege illustrates, on the other hand, it is not—and has never been—an attempt to regulate immigration. Indeed, it does not prohibit only civil *immigration* arrests in and around courthouses; it prohibits *all* civil arrests

in and around courthouses.  That it has some incidental effect on federal immigration enforcement authority does not render it preempted or displaced.

Because the Court concludes that the privilege against civil courthouse arrests persists in New York state common law and has not been preempted or displaced by the INA, it denies Defendants' motion to dismiss Plaintiffs' common law and APA claims for failure to state a claim.  In light of this conclusion, the Court need not consider whether a similar privilege exists in federal common law.[4]

### 2.  Constitutional Claims

The Court finally turns to Plaintiffs' access to courts claims, which they assert under the First, Fifth, and Sixth Amendments to the United States Constitution.  Defendants argue that Plaintiffs have failed to state a claim under any of these Amendments.  The Court disagrees with respect to Plaintiffs' First and Fifth Amendment claims, but it agrees with respect to Plaintiffs' Sixth Amendment claim and hereby dismisses it.

### a)  First and Fifth Amendment Claims

"It is well established that all persons enjoy a constitutional right of access to the courts, although the source of this right has been variously located in the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments."  *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997).  In order to allege a violation of a right of access to the courts, whether construed as arising under the First or Fifth Amendments, a plaintiff must allege that "a defendant caused 'actual injury,' *i.e.,* took or was responsible for actions that 'hindered [a

---

[4] Though Plaintiffs argue that such a privilege exists in both New York state and federal common law, *see* Dkt. No. 74 at 22–24, they more "strenuously" argue for the existence of a state common law privilege, Dkt. No. 94 at 22:19–20; *see* Dkt. No. 74 at 24–29.

plaintiff's] efforts to pursue a legal claim.'" *Id.* at 247 (cleaned up) (quoting *Lewis v. Casey,* 518 U.S. 343, 351–52 (1996).  As relevant here, the Second Circuit has recognized that "hostile action toward a litigant could be so offensive as to effectively drive the litigant out of a courthouse and thereby become the functional equivalent of a denial of access." *Id.*

Under this standard, Plaintiffs' Complaint adequately alleges a violation of the right of access to the courts.  Indeed, the Complaint alleges that individuals have been arrested by ICE in and around courthouses pursuant to the Directive, and that these arrests have created an "atmosphere of fear" so significant that it deters Plaintiffs and their clients—including Doe— from bringing meritorious suits.  *See* Compl. ¶¶ 3–6, 58, 60, 62, 69, 77–78, 83–84, 87, 96–98. At this juncture, Plaintiffs have thus adequately alleged that the atmosphere of fear the Directive has engendered is the "functional equivalent of a denial of access." *See Monsky*, 127 F.3d at 247.

The Court rejects out of hand Defendants' suggestion that Plaintiffs' First Amendment claim fails because non-citizens unlawfully present in the United States do not have any First Amendment rights.  *See* Dkt. No. 64 at 20–21.  As Defendants themselves concede, there is no authority, binding on this Court, that stands for the proposition "that nonresident aliens do not fall within the ambit of 'the people' for First Amendment protection," *see* Dkt. No. 94 at 24:9– 12, and the Court is not prepared to so conclude as a matter of first impression on the authority offered by Defendants.  Several cases Defendants rely on to support this proposition are distinguishable in that they arise in the context of extraterritorial application of the First Amendment.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Hoffman v. Bailey*, 996 F. Supp. 2d 477, 488 (E.D. La. 2014).  And the Supreme Court case in which they place the most stock *leaves open* the possibility that non-citizens unlawfully present in the

country *do* possess such rights.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265

(1990) (suggesting that "the people" in the First Amendment refers "to a class of persons who

are part of a national community or who have otherwise developed sufficient connection with

this country to be considered part of that community"); *see also Washington*, 2020 WL 1819837,

at *13 ("[T]he *Verdugo-Urquidez* Court did not preclude unlawfully present aliens from

asserting rights secured by the First Amendment.").  But even were Defendants correct, it would

not be fatal to Plaintiffs' right of access to the courts claim, because, as stated above, such a right

also derives from the Fifth Amendment, which unequivocally applies to citizens and non-citizens

alike.  *See Zadvydas*, 533 U.S. at 693 ("[T]he Due Process Clause applies to all 'persons' within

the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent.").  Accordingly, the Court concludes that Plaintiffs have adequately alleged a right of

access to the courts claim, regardless of whether such a claim arises under the First or Fifth

Amendment.

### a)  Sixth Amendment Claim

To the extent Plaintiffs' Sixth Amendment claim mirrors their First and Fifth Amendment

claims, it fails to state a claim under that Amendment as a matter of law.  To begin, Plaintiffs

argue that ICE's courthouse arrest policy "interferes with Plaintiffs' efforts to pursue legal

claims," *see* Dkt. No. 74 at 20; *see also* Compl. ¶¶ 5, 7, 67, 69–71, 78, 81–84, thereby also

framing their Sixth Amendment claim as a right of access to the courts claim, *see* Dkt. No. 74 at

2 (characterizing Sixth Amendment rights as "rights of meaningful access to courts").  As

discussed above, however, such an argument is barred by the Second Circuit's holding that "the

right of access to the courts is grounded not in the Sixth Amendment but in various other

constitutional provisions," including the First and Fifth Amendments.  *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004).

To the extent Plaintiffs' Sixth Amendment claim alleges interference with their ability to be confronted with or offer testimony from noncitizens and to access counsel without fear of arrest, *see* Dkt. No. 74 at 20, these allegations, too, fail to state a claim.  Sixth Amendment rights are "personal to the accused."  *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979).  But with respect to Plaintiffs' confrontation allegations, the Complaint does not allege that the Directive interferes with *Plaintiffs'* ability to be confronted with witnesses against them; rather, its allegations regarding the targeting of witnesses for arrest focus on witnesses' fear to come forward to report criminal activity or cooperate with law enforcement in criminal cases.  *See* Compl. ¶¶ 85–87.

Finally, Plaintiffs' sparse allegations regarding access to counsel fail because they lack proper foundation in the record.  Indeed, this argument is fatally conclusory.  *See* Compl. ¶ 78 ("ICE carries out courthouse arrests at all stages of legal proceedings—at arraignments and other initial appearances, as well as at subsequent appearances.  They take place often outside the presence of counsel.  In many cases, individuals were arrested as they were on their way to meetings with their lawyers.").  *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that to survive a 12(b)(6) motion, a plaintiff must assert "more than labels and conclusions.").

Accordingly, the Court dismisses Plaintiffs' Sixth Amendment claim for failure to state a claim.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion is DENIED as to all but Plaintiffs' Sixth Amendment claim and GRANTED as to Plaintiffs' Sixth Amendment claim.  Within seven days

of the date of this Opinion and Order, the parties shall meet and confer and submit a joint letter

in which they provide a status update and a proposal for next steps in the litigation.

      This resolves Dkt. No. 63.

      SO ORDERED.


Dated: September 28, 2020
       New York, New York

                                    ALISON J. NATHAN
                       United States District Judge